IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                                    )
RAMZI BIN AL-SHIBH,                 )
            Petitioner,             )
                                    )
    v.                              )         Civil Action No. 06-cv-1725 (EGS)
                                    )
GEORGE W. BUSH,                     )
    President of the United States, )
    et al.,                         )
                                    )
            Respondents             )
                                    )
```

## RESPONDENTS' OPPOSITION TO PETITIONER'S MOTION TO ENJOIN MILITARY COMMISSION PROCEEDINGS

### PRELIMINARY STATEMENT

Petitioner in this habeas corpus proceeding has moved to enjoin the litigation of criminal charges in an entirely separate forum, a forum in which he is entitled to raise the very issues on the merits that he seeks to raise here. Petitioner's attempt to raise those issues is squarely on point with the motion to enjoin a military commission proceeding recently rejected in *Hamdan v. Gates*, No. 1:04-cv-1519 (JR), __ F. Supp. 2d __, 2008 WL 2780911 (D.D.C. July 18, 2008) (Memo Order attached as Ex. A). It should be dealt with similarly.

Following the Supreme Court's decision in *Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006)—holding that the President needed, and lacked, congressional authorization to convene a military commission to try persons such as petitioner utilizing procedures other then those in the Uniform Code of Military Justice (UCMJ)—the President "return[ed] to Congress to seek the authority" necessary to try unlawful enemy combatants captured during a time of war. 126 S. Ct. at 2799 (Breyer, J., concurring). Congress had "the power and prerogative" to confer such authority,

*id.* at 2800 (Kennedy, J., concurring in part), and Congress responded swiftly and clearly, enacting the Military Commissions Act of 2006 ("MCA") only months later, with bipartisan support in both Houses. On June 5, 2008, Petitioner was arraigned by a duly constituted military commission—a commission convened pursuant to an express Act of Congress, in which he is guaranteed by law an impartial judge and jury (the members of the commission), 10 U.S.C. § 949f, the presumption of innocence until proven guilty beyond a reasonable doubt, *id.* § 949*l*, the assistance of defense counsel, *id.* § 949c, the right to be present, *id.* § 949d(b), the right to discovery (including a right to exculpatory evidence), *id.* § 949j, the right to take depositions, *ibid.*, the right to call witnesses, *ibid.*, and a full panoply of other substantive and procedural rights that are carefully described in the MCA. Such rights for an alien charged with war crimes are utterly unprecedented and far exceed the protections given to the defendants in *Ex parte Quirin*, 317 U.S. 1 (1942), and *Johnson v. Eisentrager*, 339 U.S. 763 (1950), cited approvingly by the Supreme Court in *Boumediene v. Bush*, 128 S. Ct. 2229, 2259-60, 2271 (2008).

Like Hamdan, petitioner is to face a military commission "designed ... by a Congress that ... acti[ed] according to guidelines laid down by the Supreme Court." *Hamdan v. Gates*, Ex. A at 15. Despite congressional sanction and these unprecedented rights, petitioner, having been charged and arraigned with pre-trial motions underway[1], now asks this Court to take the extraordinary measure of enjoining his military commission trial and all subsequent commission proceedings until this Court can conduct a review of the legality of commission procedures and undertake its own investigation of the Government's basis for detaining petitioner. Petitioner's motion is not without some irony. In the days since the Supreme Court's decision in *Boumediene*, the Guantanamo habeas petitioners as a group have urged the judges in this District to hasten the arrival of their day in court.

---

[1]*See, e.g.*, Exhibit B to Pet's Mem. of Law in Supp. of Mot.

For petitioner Shibh, that day is all but upon him; yet, he would have this Court delay an adjudication of the facts and second-guess preliminary legal determinations made by the commission, which may be reviewed in full by the D.C. Circuit on appeal.  This he may not do, particularly through the "extraordinary and drastic remedy" of a preliminary injunction.  *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008).

Congress has specifically determined that challenges such as petitioner's be heard first by a military commission, with review by the Article III courts to follow *after* adjudication, not before. As the court observed in *Hamdan v. Gates*, "[w]here both Congress and the President have expressly decided when Article III review is to occur, the courts should be wary of disturbing their judgment." *Hamdan v. Gates*, Ex. A at 16.  Thus, the situation here is radically different from the commission considered by the Supreme Court in its 2006 *Hamdan* decision where review lay only with the Executive as of right.  In creating a system of review, Congress precluded this Court from considering claims such as petitioner's, including claims couched as a collateral attack under habeas, that  "relat[e] to the prosecution, trial, or judgment of a military commission."  10 U.S.C. § 950j(b). "His claims of unlawfulness," regarding the military commission procedures "are all claims that should or must be decided in the first instance by the Military Commission, and then raised before the D.C. Circuit, as necessary, on appeal. The Supreme Court's decision in  *Schlesinger v. Councilman*, 420 U.S. 738 (1975) requires federal courts to give 'due respect to the autonomous military judicial system created by Congress.'" *Hamdan v. Gates*, Ex.  A at 14.

Moreover, it would be inappropriate for this Court to exercise jurisdiction.  As the Supreme Court reiterated unanimously in *Munaf*, on the same day it decided *Boumediene*, "the orderly administration of criminal justice may 'require a federal court to forgo the exercise of its habeas corpus power.'"  128 S. Ct. at 2220 (quoting *Francis v. Henderson*, 425 U.S. 536, 539 (1976)).

Given Congress' enactment of the MCA, which unquestionably confers jurisdiction on the military court to try petitioner and sets forth in great detail elaborate procedures for his trial (including an appeal process that includes appeal as of right to the D.C. Circuit), petitioner cannot and does not seriously challenge "the right of the military to try [him] at all." *Schlesinger v. Councilman*, 420 U.S. at 763. As such, just as Judge Robertson concluded in *Hamdan v. Gates*, Ex. A at 14-16, this Court must properly abstain from considering this collateral challenge, and allow petitioner to pursue his claims in the military commission, the Court of Military Commission Review, the D.C. Circuit, and ultimately the Supreme Court on writ of certiorari.

Petitioner argues that his trial by the military commission would result in a violation of various asserted constitutional rights. The Court need not reach these issues if it decides either that it lacks jurisdiction or that abstention is appropriate. It is far from clear that petitioner even has any claim to the constitutional rights asserted. Even assuming that he might, the existence of a colorable constitutional claim would not excuse trial by the military commission in the first instance, particularly as there exists the opportunity for appellate review by an Article III court as of right. Such posited constitutional violations in no way cast doubt on the *jurisdiction* of the commission over petitioner. The orderly administration of justice requires that they be litigated before the commission in the first instance, with appeal to follow; not the other way around. *Accord Councilman*; *Younger v. Harris*, 401 U.S. 37 (1971). Because petitioner has no likelihood of success on the merits, his motion should be denied.

The other preliminary injunction factors also require denial. As the D.C. Circuit held only a few weeks ago, "[t]here is no substantial public interest at stake in this case that distinguishes it from the multitude of criminal cases for which post-judgment review of procedural and jurisdictional decisions has been found effective." *Khadr v. United States*, 529 F.3d 1112, 1118 (D.C. Cir. June

20, 2008). Indeed, the court of appeals squarely held that "the 'substantial public interest' claimed by the petitioner cannot be solely his 'right not to stand trial.'" *Ibid*. Thus, the public interest in the orderly administration of justice decisively favors the Government, not petitioner. Moreover, the balance of harms tips decidedly against the issuance of an injunction in these circumstances. Petitioner's motion is akin to seeking a continuance, when the Government has and continues to commit substantial resources—by arranging for the movement of attorneys, witnesses from around the world, commission members, security, and translation personnel, and overcome daunting scheduling issues to provide petitioner his "day in court." As in *Hamdan v. Gates*, petitioner's "chances of prevailing on the merits of his prayer for injunctive relief are uncertain;" "he has shown no public interest reason for an injunction;" "the disruption that would be caused by a last-minute delay of his trial would be significant;" and "the irreparable injuries he asserts do not outweigh the other preliminary injunction factors." *Hamdan v. Gates*, Ex. A at 17 (internal citation omitted). Accordingly, petitioner's motion should be denied.

## BACKGROUND

On September 11, 2001, Usama Bin Laden and his terrorist network, al Qaeda, operating out of Taliban-controlled Afghanistan, attacked the United States. Nearly three thousand Americans were killed in what was the worst attack on American soil by a foreign aggressor in our nation's history. On September 18, 2001, Congress adopted the Authorization for the Use of Military Force, authorizing the use of "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001." Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001). Within weeks, American forces were deployed in Afghanistan.

///

In September 2002, petitioner Ramzi bin al-Shibh, a coordinator of the 9/11 attacks, was captured in an al-Qaida safe house. He was in possession of explosives and detonators, as well as personal information and effects of Usama Bin Laden's family members and other al-Qaida operatives. *See* Ex. B at 17. Al-Shibh was subsequently transferred to the U.S. Naval Station at Guantanamo Bay, Cuba, for detention. In July 2003, the President designated petitioner as an individual eligible for trial before a military commission. In March 2007, a Combatant Status Review Tribunal (CSRT) determined petitioner to be an "enemy combatant."[2] In April 2007, a Legal Sufficiency Review of Combatant Status Review Tribunal confirmed that determination and reiterated that "the detainee was unanimously found to be part of al Qaida." Ex. B, CSRT Review, p.1.

In 2006, Congress enacted the MCA, establishing a detailed regime governing the establishment and conduct of military commissions. *See* 10 U.S.C. §§ 948a-950p. The MCA provides for the trial by military commission of unlawful enemy combatants, 10 U.S.C. § 948c, defined in part as a person who "has engaged in hostilities or who has purposefully and materially supported hostilities against the United States . . . who is not a lawful enemy combatant." 10 U.S.C. § 948a(1). A military commission is made up of at least five members who are military officers, 10 U.S.C. §§ 948i, 948m, and is presided over by a military judge, 10 U.S.C. § 948j, the same judges who preside over courts-martial. The defendant is appointed military defense counsel and may also retain private civilian counsel. 10 U.S.C. §§ 948k, 949c. The defendant is presumed innocent unless his guilt is established beyond a reasonable doubt. 10 U.S.C. § 949l(c). All military commission proceedings must take place in the presence of the accused unless, after the accused is warned, he

---

[2]The April 2007 Legal Sufficiency Review of Combatant Status Review Tribunal and the unclassified summary of basis for CSRT decision (previously provided to opposing counsel in November 2007) is included here at Exhibit B.

persists in conduct that would justify exclusion to ensure the physical safety of individuals or to prevent disruption of the proceedings. 10 U.S.C. § 949d(b), (e).

The defendant has broad appellate rights. 10 U.S.C. § 950b(b). If convicted, the defendant may appeal to the Court of Military Commission Review, an intermediate military court. 10 U.S.C. § 950f. The defendant may next appeal to the D.C. Circuit,10 U.S.C. § 950g, which has "exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission"; it may review "matters of law" and consider "whether the final decision was consistent with the standards and procedures specified in this chapter" and with "the Constitution and the laws of the United States." 10 U.S.C. § 950g(a)-(c).

In May 2008, petitioner was charged pursuant to a military commission convened under the MCA, with offenses under 10 U.S.C. § 950v(b): Conspiracy, §950v(b) (28), Attacking Civilians, §950v(b)( 2); Attacking Civilian Objects, §950v(b)(3), Intentionally Causing Serious Bodily Injury, §950v(b)(13), Murder in Violation of the Law of War, §950v(b)(15), Destruction of Property in Violation of the Law of War(§950v(b)(16), Hijacking or Hazarding a Vessel or Aircraft, §950v(b)(23), Terrorism, §950v(b)(24), and Providing Material Support for Terrorism, §950v(b)(25).[3]

The conspiracy charge specified that petitioner had entered into an agreement with other members of al Qaeda to commit one or more substantive offenses triable by military commission, and committed several overt acts in support. Those acts, among others, include serving in the "planes operation" at the request of Usama Bin Laden, attempting to enroll in and obtain flight training for a martyrdom operation at the same Florida center attended by Zaid Jarrah (one of the

---

[3]A copy of the charge sheet is posted on the DefenseLink information page at http://www.defenselink.mil/news/Ramzi%20Binalshibh%20Referred%209%20May%202008R.pdf, hereinafter referred to as "Charge Sheet."

9/11 hijackers), reporting his progress to Khalid Shiek Mohammad at the request of Usama Bin

Laden, training in an al-Qaeda camp in Afghanistan, making a video of his "martyrs will," applying

four times for a visa to attend flight school in the United States, sending several wire-transfers of

funds totaling several thousand dollars to fellow 9/11 conspirators attending flight training in the

United States, flying to Germany to brief Usama Bin Laden on flight training progress, notifying

Khalid Shiek Mohammad of the attack date selected by Mohammad Ata, and making a video in late

September 2001 with Usama Bin Laden and others for propaganda release by al Qaeda discussing

the September 11th operations.  Charge Sheet, pp.1, 3-8, 13, 17.  The "attacking civilians" charge

alleges that petitioner intentionally engaged in attacks on civilian populations and personnel on

aircraft and in and around the World Trade Center, the Pentagon and Shanksville, PA. The

"intentionally causing serious bodily injury" charge alleges that petitioner intentionally caused

serious injury to one or more persons, with unlawful force or violence, in violation of the law of war

by intentionally crashing civilian aircraft.  *Id*.  The "murder in violation of the law of war" charge

alleges that petitioner intentionally and unlawfully ki1led 2,973 persons in violation of the law of

war by intentionally causing four civilian aircraft to be crashed.  *Id*., pp. 18-19.  The "destruction of

property in violation of the law of war" charge alleges that petitioner intentionally destroyed property

belonging to another person, without that person's consent (four airplanes, part of the Pentagon, the

World Trade Center and a field near Shanksville, PA.).  *Id*., p. 19.  The "hijacking or hazarding a

vessel or aircraft" charge alleges that petitioner intentionally seized, exercised unauthorized control

over, and endangered the safe navigation of aircraft that were not legitimate military objectives.  *Id*.

The "terrorism" charge alleges that petitioner intentionally killed and inflicted great bodily harm on

one or more protected persons and engaged in an act that evinced a wanton disregard for human life,

in a manner calculated to influence and affect the conduct of the United States Government and

8

civilian population by intimidation or coercion, and to retaliate against United States Government conduct, by intentionally crashing four civilian aircraft. Charge Sheet, pp. 19-20. The "material support" charge alleges two specifications of intentionally providing material support and resources to al Qaeda and intentionally and knowingly providing material support and resources to be used in preparation for or carrying out an act of terrorism as previously described in the overt acts. *Id.*, pp. 20-22.

The factual sufficiency of these charges is a matter to be determined by petitioner's military commission. Petitioner's legal challenges, as well, can be decided there, and, if an appeal is warranted, in the military and Article III appellate courts designated by Congress.

## <u>ARGUMENT</u>

This Court lacks jurisdiction to entertain the challenge to the military commission proceedings raised in petitioner's habeas petition. Section 3 of the MCA includes a review-channeling provision, 10 U.S.C. § 950j(b), that specifically eliminates this Court's jurisdiction over "any claim or cause of action whatsoever . . . relating to the prosecution, trial, or judgment of a military commission under this chapter, including challenges to the lawfulness of procedures of military commissions under this chapter." 10 U.S.C. § 950j(b). Under the MCA, the D.C. Circuit has "exclusive jurisdiction" to review a challenge "relating to" a military commission and only after a final decision of the military commission has been reviewed by the Court of Military Commissions Review. *See* 10 U.S.C. § 950g. As Judge Robertson observed in *Hamdan v. Gates*, the Supreme Court's decision in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), which, by its terms, only applies to claims of detention, where detention is based solely on a non-adversarial CSRT determination that the detainee is an enemy combatant, is not controlling as to the permissibility of this jurisdictional limitation. *See* Ex. A at 13.

Beyond this statutory jurisdictional bar, the comity-based abstention doctrine recognized in *Councilman* would require this Court to stay its hand, to include the detention issue, until the completion of the military commission process. As Judge Robertson held in *Hamdan v. Gates*, the "central rationale" of *Councilman* is "applicable here." Ex. A at 15. Petitioner has been charged by a military commission and is part of ongoing military proceedings. The abstention doctrine bars civilian courts from interfering with ongoing military proceedings, and applies in this case because *Congress* channeled review of challenges like petitioner's to the military commission and the D.C. Circuit. Failure to abstain would deny "due respect to the autonomous military judicial system created by Congress." *New v. Cohen*, 129 F.3d 639, 643, (D.C. Cir. 1997). There will be ample opportunity for an Article III court to review petitioner's legal challenges should he be convicted. This is not a case in which no Article III court may review the constitutional and legal issues petitioner seeks to raise; the only question is *when*, and Congress has resolved that in favor of post-judgment review. *See* Ex. A at 16. Petitioner's "jurisdictional" arguments are not challenges to the military commission's jurisdiction at all—they are challenges to the *merits* of the military commission's determinations and to the charges and procedures in the military commission. Whatever may be said of his challenges, this much is clear: they may be reviewed and resolved by the D.C. Circuit on appeal if petitioner is convicted. This Court may, thus, resolve the case on jurisdictional or abstention grounds.

Should the Court nonetheless reach the merits, petitioner's challenges are unavailing. Petitioner has made no "substantial challenge" to the commission's personal jurisdiction over him. There is ample, unchallenged evidence of his unlawful enemy combatancy.[4] Petitioner's remaining

---

[4]An "unlawful enemy combatant" is defined, *inter alia*, as "a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the

challenges do not address the *personal jurisdiction* of the military commission and, in any event, are meritless. Petitioner's Ex Post Facto Clause and Law of Nations Clause arguments are limited to two of the nine charges against him. And even those two reflect long-standing law of war violations that Congress codified. Nor does the MCA constitute an illegal bill of attainder. His Due Process Clause challenge is both premature and without merit. Likewise his Sixth Amendment Right to Counsel claim is premature. In any event his arguments can be (and are being) addressed by the military commission and are reviewable on appeal.[5] Finally, petitioner's claims under the equal protection component of the Due Process Clause are without substance. It is well established there is nothing improper with the Federal Government treating aliens differently from the citizenry, particularly in an armed conflict with a foreign enemy.

The remaining preliminary injunction factors tip decidedly against the issuance of an injunction. The prosecution of individuals suspected of war crimes is an important aspect in the armed conflict with al Qaeda, and of United States efforts to find a long-term solution to the combatants detained at Guantanamo Bay. Putting the military commission proceedings on hold now would be contrary to these interests and hamper the government's war efforts, not to mention constitute a significant intrusion into areas within the province of the Executive Branch. The difficulties attendant to delaying proceedings here are the kinds of difficulties of holding a trial in this context that the Supreme Court identified in both *Johnson v. Eisentrager*, 339 U.S. 763 (1950), and *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004): Witnesses may have to be brought in from half a world away, witnesses may be subject to imminent international deployment around the world,

---

Taliban, al Qaeda, or associated forces)." 10 U.S.C. § 948a(1).

[5] *See, e.g.,* Exhibit C to Pet's Mem. of Law in Supp. of Mot.; Rule for Military Commissions Rule 706.

witnesses may have sensitive responsibilities, and witnesses will likely have to interrupt crucial national security work to testify about sensitive military matters. If the timing of a trial is to be altered by judicial order, it should be altered by the judge conducting the trial; the potential violation of separation-of-powers would be particularly egregious here because the Legislative Branch has specifically authorized prosecutions by military commission and divested this Court of the power to act in this circumstance. The government has also expended significant resources to make a trial possible under the MCA's speedy trial requirements in R.M.C. 707. While it should go without saying that while the harms to the government are significantly greater and broader in military commission proceedings when compared to those to be encountered in a typical criminal case, the harms described by petitioner remain the same as those the Supreme Court considered and rejected in *Younger v. Harris*, 401 U.S. 37 (1971).

By contrast, the D.C. Circuit recently dismissed for lack of jurisdiction a similarly ill-timed challenge, holding "[t]here is no substantial public interest at stake in this case that distinguishes it from the multitude of criminal cases for which post-judgment review of procedural and jurisdictional decisions has been found effective." *Khadr*, 529 U.S. at 1118. Petitioner's allegations largely boil down an argument that the habeas court must superintend an ongoing prosecution. However, "[t]hat interest does not warrant . . . interruption of this criminal proceeding just because it is a military commission." *Ibid*. Petitioner, like any criminal defendant in a conventional prosecution, may raise his legal objection before the judge appointed to try him but then must wait until after trial to mount an Article III challenge to his conviction, if he is convicted, as Congress has directed. Courts sit to review after the fact. Accordingly, the Court should deny petitioner's request to enjoin his military commission proceedings.

///

**PETITIONER HAS NOT CARRIED HIS BURDEN OF SHOWING THAT HE IS ENTITLED TO THE EXTRAORDINARY RELIEF OF A PRELIMINARY INJUNCTION**

As the Supreme Court reiterated in a recent habeas challenge, "[a] preliminary injunction is an 'extraordinary and drastic remedy,'" that is "never awarded as of right." *Munaf*, 128 S. Ct. at 2219. Rather, the movant must, "by a clear showing, carr[y] the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation and quotation marks omitted). To obtain such extraordinary relief, the movant must establish: (1) that he is substantially likely to succeed on the merits; (2) that in the absence of an injunction, he will suffer irreparable harm for which there is no adequate legal remedy; (3) that the injunction would not substantially harm other parties; and (4) that the injunction would further the public interest. *Davenport v. Int'l Brotherhood of Teamsters, AFL-CIO*, 166 F.3d 356, 361 (D.C. Cir. 1999). Moreover, it is not enough that petitioner's claims present serious questions. *See Munaf*, 128 S. Ct. at 2219. Accordingly, because a preliminary injunction is "an 'extraordinary and drastic remedy,'" absent petitioner establishing that he has "'a likelihood of success on the merits,'" a preliminary injunction cannot issue. *Ibid*.

**I.    PETITIONER HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS**

Petitioner has no likelihood of success for three separate reasons. First, this Court lacks jurisdiction to consider petitioner's claims or issue the injunction sought. Second, even if jurisdiction were proper, this Court would be required to abstain. Finally, petitioner's constitutional claims, which do not go to the commission's *jurisdiction* over petitioner, lack merit. In any event, the Court need not reach any of these constitutional questions if it denies the motion either on jurisdictional grounds or on the basis of abstention.

**A.    This Court Has No Jurisdiction to Consider Petitioner's Claim that Military Commission Proceedings Should be Enjoined.**

**1.** Petitioner has no likelihood of success on the merits because Section 3 of the MCA

includes a channeling provision, 10 U.S.C. § 950j(b), that deprives this Court of jurisdiction to consider the claims raised in petitioner's motion for a preliminary injunction.   Section 950j(b) provides that "no court, justice, or judge shall have jurisdiction to hear or consider any claim or cause of action whatsoever . . . *relating to the prosecution, trial, or judgment of a military commission* under this chapter, including challenges to the lawfulness of procedures of military commissions under this chapter."  10 U.S.C. § 950j(b) (emphasis added).  The provision specifies that it applies "notwithstanding any other provision of law (including section 2241 of title 28 or any other habeas corpus provision)."  *Ibid*.

In enacting section 950j(b), Congress did not deprive the courts of all jurisdiction over such claims.   Instead, section 950j(b) and 950g serve to channel claims such as the ones raised by petitioner into the military commission process itself and subsequent appeals to a particular Article III court, a practice that is a familiar method of making judicial review more efficient and limiting collateral actions.  *See Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984) ("where a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the *exclusive* review of the Court of Appeals");  8 U.S.C. § 1252(a)(5) (eliminating habeas review of removal orders and channeling review to court of appeals); *Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 114 (2d Cir. 2008) (collecting cases); *Puri v. Gonzales*, 464 F.3d 1038, 1042 (9th Cir. 2006) ("We hold that the Suspension Clause is not violated by judicial review by this court of Puri's constitutional challenges to his removal order because the Suspension Clause does not demand an evidentiary hearing before an Article III court in lieu of judicial review of the administrative proceeding."). *Cf. INS v. St. Cyr*, 533 U.S. 289, 313 (2001) (referring to exclusive review provision "as a 'zipper clause'" designed to "consolidate 'judicial review' of immigration proceedings into one action in the

14

court of appeals"). Accordingly, claims that are subject to section 950j(b) must first be considered by the military commission, *see*, *e.g.*, 10 U.S.C. §§ 949d(a), 949*l*(b); next such claims may be reviewed in the Court of Military Commissions Review, 10 U.S.C. §§ 950c, 950f(c); and finally review is available in the D.C. Circuit, with possible *certiorari* review by the Supreme Court. *See* 10 U.S.C. § 950g(c), (d). Indeed, petitioner asks the Court to second-guess determinations that have been made by, or are pending before, the commission itself, precisely what Congress sought to avoid.

Petitioner does not dispute that section 950j(b) sweeps broadly (Mot. at 14-15), but he claims that it preserves claims that raise "challenges to the *jurisdiction* of the military commission." Mot. at 15. He suggests that otherwise, the provision would violate the Suspension Clause. These arguments are mistaken. First, Congress spoke in broad terms in prohibiting "any claim . . . whatsoever" that "relat[es] to the prosecution, trial, or judgment of a military commission." A challenge to the commission's "jurisdiction . . . over . . . the defendant" (Mot. at 15) plainly "relat[es] to" the "trial" before the commission." The relief sought here cannot be treated as a claim unrelated to the military trial. The jurisdictional bar thus clearly applies. In *Hamdan v. Gates*, the court rejected a similar argument, concluding that 950j was "intended to deprive the federal courts of all habeas jurisdiction over [military commissions in] Guantanamo." Ex. A at 10.

If petitioner is found guilty, he has full appellate rights first to the Court of Military Commissions Review and then to the D.C. Circuit. 10 U.S.C. §§ 950f(d), 950g(b). In conducting its review, the court of appeals can evaluate the legal sufficiency of the evidence underlying the military commission's exercise of jurisdiction—it is authorized to consider whether the commission's "final decision was consistent with the standards and procedures" for military commissions (10 U.S.C. § 950g(c)(1)), including the standard that jurisdiction may be exercised only over "an alien unlawful enemy combatant," 10 U.S.C. § 948d(a), as well as the standards governing

15

jurisdictional litigation that are set forth in the Rules for Military Commissions. *See* R.M.C. 905c(1) (prosecution must establish jurisdiction by "a preponderance of the evidence"); R.M.C. 905c(2)(B) (prosecution has burden to prove jurisdiction in response to a motion to dismiss for lack of jurisdiction); *Khadr*, 529 F.3d at 1117 (challenge to personal jurisdiction "is reviewable on appeal from final judgment"); *see also Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (recognizing that a federal court may review state-court judgments for sufficiency of the evidence on direct review). Accordingly, the jurisdictional determination made by the commission is part-and-parcel of petitioner's trial that is subject to direct appellate review by the D.C. Circuit and over which Congress precluded collateral review pursuant to section 950j(b).

**2.** Section 950j(b) raises no substantial Suspension Clause issue in these circumstances for two reasons. First, the constitutional right to habeas corpus is concerned with the core habeas right to be free from unlawful detention. *See Munaf*, 128 S. Ct. at 2221. Second, no Suspension Clause issue is raised because section 950j(b), in conjunction with section 950g, channels judicial review of petitioner's claims into the D.C. Circuit and that review is a wholly adequate substitute for habeas. *Cf. Ruiz-Martinez*, 516 F.3d at 114; *Puri*, 464 F.3d at 1042.

**a.** The Suspension Clause is concerned with the core habeas right to be free from unlawful detention. It is well established that a habeas action has historically been understood as a vehicle for challenging only the fact of detention or its duration. *See Munaf*, 128 S. Ct. at 2221. The *Boumediene* Court recognized this essential function of habeas, which at its core exists to test the legality of detention. 128 S. Ct. at 2240 (remanding to consider "questions regarding the legality of the detention"). As the Court has explained, "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973); *see Boumediene*, 128 S. Ct. at 2277 ("first principles" secured by habeas are "freedom from arbitrary and

16

unlawful restraint"); *id*. at 2247 ("The Clause protects the rights of the detained by affirming the duty and authority of the Judiciary to call the jailer to account."); 3 Blackstone 131 (describing habeas as "the great and efficacious writ, in all manner of illegal confinement").[6]

Indeed, *Munaf*—decided the same day as *Boumediene*—emphasized that "[h]abeas is at its core a remedy for unlawful executive detention. The typical remedy is, of course, release." *Munaf*, 128 S. Ct. at 2221 (citation omitted). Accordingly, the *Munaf* Court held that "habeas is not appropriate" when the goal is not "release." *Ibid*.; *see also id*. at 2228 (Souter, J., concurring) ("habeas is aimed at securing release, not protective detention"); *cf. Aguilar v. United States Immigration and Customs Enforcement*, 510 F.3d 1, 11 (1st Cir. 2007) (distinguishing between permissible habeas challenge to detention and impermissible collateral attack on removal proceedings through habeas). It is this core constitutional function of habeas that was left intact after Congress repealed statutory habeas for Guantanamo detainees. *Boumediene*, 128 S. Ct. at 2278 (Souter, J., concurring) ("Subsequent legislation eliminated the statutory habeas jurisdiction over these claims, so that now there must be constitutionally based jurisdiction or none at all.").

In holding that the Suspension Clause applies to those detained at Guantanamo, the *Boumediene* Court concluded that petitioners "are entitled to the privilege of habeas corpus to challenge the legality of their detention," when they have not had the benefit of an adversarial proceeding to determine their status. 128 S. Ct. at 2262. And in evaluating whether the DTA

///

---

[6]*Cf. Bell* v. *Wolfish*, 441 U.S. 520, 527 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself."); *Doe* v. *Pennsylvania Bd. of Probation & Parole*, 513 F.3d 95, 100 n.3 (3d Cir. 2008) (habeas is limited to "[a]ttacks on the fact or duration of the confinement"); *Pischke* v. *Litscher*, 178 F.3d 497, 499 (7th Cir. 1999) (stating that habeas action is proper "only if the prisoner is seeking to 'get out' of custody in a meaningful sense").

provided an adequate substitute, the Court asked whether the "Court of Appeals has jurisdiction . . . to inquire into the legality of the detention." *Id*. at 2265.

In significant tension with petitioner's claim that he is entitled, as a constitutional matter, to pre-trial review of the commission proceedings, the *Boumediene* Court reaffirmed the well-established requirement that "defendants in courts-martial [must] exhaust their military appeals before proceeding with a federal habeas corpus action." 128 S. Ct. at 2274; *cf. id.* at 2268 (in cases involving state court criminal proceedings, "the prisoner should exhaust adequate alternative remedies before filing for the writ in federal court") (citing *Ex parte Royall*, 117 U.S. 241, 251-52 (1886). In sum, the core purpose of constitutional habeas is to test the legality of detention, not to challenge a trial in advance. Here, however, as the court observed in *Hamdan v. Gates*, "the application of habeas corpus that [petitioner] wishes to advance . . . is different form the one recognized in *Boumediene*." Ex. A at 11. Although Judge Robertson did not decide the jurisdictional question, he noted that whereas "*Boumediene* dealt with a challenge to detention," "the gist of the challenge presented in this motion for a preliminary injunction is to the jurisdiction of the Military Commission, an issue farther removed from the 'historical core' of the Writ than was the case in *Boumediene*." Ex. A at 11-12. So too here.

**b.** There is a second independent reason why section 950j(b) does not suspend the writ: with respect to military prosecutions, the MCA provides the adequate, alternative remedy for considering the claims channeled by section 950j(b) to post-trial review that was lacking in the provisions governing review of enemy combatant determinations by CSRTs. More specifically, petitioner cannot show that habeas is needed to address *any* of the claims raised in his motion for a preliminary injunction. Military commission proceedings are vastly different that the CSRT procedures found wanting by the Supreme Court. First and foremost they are adversarial, which itself is a dispositive

difference.  *See Boumediene*, 128 S. Ct. at 2259-60 (citing approvingly military trial with a "rigorous adversarial process" to test the legality of detention in *Eisentrager*).  Additionally, and for the same basic reasons, because those who are charged by military commission are provided "adequa[te] . . . process through which [their] status determination [is] made," subject to judicial review, that process is not only an adequate substitute for habeas, it satisfies the *Boumediene* Court's three-factor test such that the Suspension Clause does not apply in the first place.  *Boumediene*, 128 S. Ct. at 2259 (distinguishing *Eisentrager*'s conclusion that the Suspension Clause does not apply because, in that case, "there had been a rigorous adversarial process to test the legality of their detention," namely, a "trial by military commission for violations of the laws of war").  Indeed, in *Hamdan v. Gates*, Judge Robertson observed that the military commissions were an adversarial process in which the petitioner would be able to "call and cross-examine witnesses, to challenge the use of hearsay, and to introduce [their] own exculpatory evidence."  Ex. A at 12.  Thus, while not deciding the Suspension Clause issue, the court concluded "[i]t is by no means controlled by the four corners of *Boumediene*."  Ex. A at 13.

Boumediene itself recognized that Congress could limit access to the habeas writ, in circumstances where a "trial has been held."  128 S. Ct. at 2264 (citing *Felker v. Turpin*, 518 U.S. 651, 662-64 (1996)).  Moreover, like other provisions designed to channel and streamline challenges, section 950j(b) does not "eliminate[] traditional habeas corpus relief."  *Id*. at 2265.  *Cf. Ruiz-Martinez*, 516 F.3d at 114; *Mohammed*, 477 F.3d at 526; *Puri*, 464 F.3d at 1042; *Alexandre*, 452 F.3d at 1206.  Instead, by precluding collateral attack, it simply requires that petitioner's legal and constitutional claims be brought in the military commission forum in the first instance, with appeal to the D.C. Circuit to follow.  *See Boumediene*, 128 S. Ct. at 2268 ("the necessary scope of habeas

///

19

review in part depends upon the rigor of any earlier proceedings," an idea that "accords with our test for procedural adequacy in the due process context").

Thus, should the Court decide the jurisdictional issue presented by 950j (rather than simply decide the case on abstention grounds), there is no Suspension Clause violation. Military commission proceedings, in conjunction with review by an Article III court, certainly comprise a sufficient habeas substitute for considering the covered claims. The touchstone for an adequate substitute is to provide "the prisoner . . . a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Id.* at 2266 (quoting *St. Cyr*, 533 U.S. at 302).[7] The most "relevant consideration in determining the [habeas] courts' role is whether there are suitable alternative processes in place to protect against the arbitrary exercise of governmental power." *Id.* at 2275. "What matters is the sum total of procedural protections afforded to the detainee at all stages, direct and collateral." *Id.* at 2269. Here, Congress has afforded more than adequate procedures.

First, petitioner has the tools needed in the military commission proceedings "to rebut the factual basis for the Government's" charges. *Id.* at 2269. Unlike the CSRT process at issue in *Boumediene*, the defendant has "the assistance of counsel." *Ibid.*; *see* 10 U.S.C. § 949c(b). Further, unlike the CSRT process at issue in *Boumediene*, the defendant in military commission proceedings

---

[7]One element of a habeas court's function is to "allow[] prisoners to introduce exculpatory evidence that was either unknown or previously unavailable to the prisoner." *Boumediene*, 128 S. Ct. at 2267; *see id.* at 2270 (habeas court "must have the authority to admit and consider relevant exculpatory evidence that was not introduced during the earlier proceeding"). That role is unnecessary in cases like this one where a defendant is represented by counsel in the initial proceedings, where those proceedings are entirely adversarial, and where the opportunity to introduce exculpatory evidence is manifestly robust. *Id.* at 2272, 2273 ("an opportunity for the detainee to present relevant exculpatory evidence that was not made part of the record in the earlier proceedings" is "constitutionally required *in this context*" where "the underlying detention proceeding lack[s] the necessary adversarial character") (emphasis added); *see also id.* at 2259-60. And it is certainly not implicated here, where trial has yet to occur.

is "aware of the most critical allegations" against him, *i.e.*, the criminal charges and all the evidence submitted to establish them. *Boumediene*, 128 S. Ct. at 2269; *see* 10 U.S.C. § 948q(b) ("the accused shall be informed of the charges against him"); *see also* 10 U.S.C. § 949d(f) (procedures for using classified information at trial). Moreover, unlike the CSRT procedures at issue in *Boumediene*, where there were "in effect no limits on the admission of hearsay," *Boumediene*, 128 S. Ct. at 2269, the defendant in military commission proceedings is given an opportunity to challenge the use of hearsay evidence. *See* 10 U.S.C. § 949a(b)(2)(E). In sum, the proceedings are not "'closed and accusatorial,'" *Boumediene*, 128 S. Ct. at 2270, but "ha[ve] an adversarial structure that [was] lacking" in the CSRT process, *id*. at 2271. *See* 10 U.S.C. § 949d(d).

Second, the review procedures confer upon an Article III court "some authority to assess the sufficiency of the Government's evidence against the detainee." *Boumediene*, 128 S. Ct. at 2270. Specifically, in conducting its legal review, the court of appeals can evaluate the legal sufficiency of the evidence just as a federal court may do in reviewing a state court judgment. *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979). In providing for appellate review by an Article III court as of right, Congress granted protection to the accused that goes above and beyond the procedures in the UCMJ, which provides only for a petition for certiorari to the Supreme Court. *See* 10 U.S.C. §§ 867-867a. This direct appellate review in a "court of record," *i.e.*, an Article III court of general jurisdiction, is a critical factor in determining whether Congress has provided an adequate habeas substitute. *See Boumediene*, 128 S. Ct. at 2268 (placing importance on whether "relief is sought from a sentence that resulted from the judgment of a court of record").

Third, the court of appeals has ample authority to order the defendant released from punitive custody (the only custody implicated by Hamdan's challenge to the commission). The court of appeals is charged with "determin[ing] the validity of a final judgment rendered by a military

21

commission." 10 U.S.C. § 950g. Because it is that judgment of conviction (10 U.S.C. § 949m(a)) which forms the basis of punitive detention, there is no doubt that the court of appeals has the authority to terminate punitive detention. Likewise, if the court of appeals were to determine that the commission lacked jurisdiction, it would necessarily vacate the judgment of conviction which would also work to terminate punitive detention.

Finally, the military commission statute "allow[s] the [defendants] to assert . . . all[] of the legal claims they seek to advance" before an Article III court. *Boumediene*, 128 S. Ct. at 2271. And indeed, petitioner has advanced the claims he raises here in the military commission proceedings. The court of appeals has jurisdiction to consider "matters of law," including whether the conviction is consistent with military commission "standards and procedures"; whether the conviction is consistent with the "laws of the United States"; and whether the conviction is consistent with the "the Constitution." 10 U.S.C. § 950g(b) & (c). Petitioner has raised no claim in his motion that is not fully cognizable on direct review if he is convicted by a military commission. This is radically different from the commission previously before the Supreme Court where review lay only with the Executive as of right. *See Hamdan*, 126 S. Ct. at 2788. The military courts, as well as the court of appeals on direct review, will be able to consider every claim asserted by petitioner in his instant motion: those courts can determine whether the military commission lacked personal jurisdiction over petitioner (Mot. at 21-22 (arguing that petitioner not properly determined to be an unlawful enemy combatant by a correct application of relevant law); *see Khadr*, 529 F.3d at 1118); they can decide whether, if petitioner is ultimately convicted, that conviction violates the Ex Post Facto Clause of the Constitution (Mot. at 23-27), the Law of Nations & Define and Punish Clauses (Mot. at 27-29), the Bill of Attainder Clause (Mot. at 29-32), the Due Process Clause, including its equal

protection and rights under the Geneva Conventions components (Mot. at 32-37),[8] or Right to Counsel (Mot. at 37-40). He therefore has not shown a likelihood of establishing that section 950j(b) violates the Suspension Clause when applied to his claims.

The result under the Suspension Clause is no different with respect to claims that petitioner characterizes as "jurisdictional." Such challenges are fully cognizable in commission proceedings and by the court of appeals thereafter. *Khadr*, 529 F.3d at 1118 ("This Court will have opportunity to review . . . whether the commission properly determined its jurisdiction and acted in conformity with the law"). Indeed, if the rule were different, the Supreme Court's abstention jurisprudence—crystallized in *Schlesinger v. Councilman*, 420 U.S. 738 (1975)—whereby the court will abstain from involvement in most military criminal proceedings until a judgment is final—would work an unconstitutional suspension of the writ. Moreover, the same logic would invalidate *Younger* abstention so long as the challenge to state court criminal proceedings could be couched in the language of "jurisdiction." But the norm in criminal proceedings is that even "jurisdictional" challenges can be reviewed only post-conviction.

*Councilman* was itself a case where petitioner claimed that he had been charged for a crime that was "not within the military court-martial jurisdiction." *Councilman*, 420 U.S. at 740. As the Supreme Court has explained, in another case where military court jurisdiction was challenged, an exhaustion requirement in the context of a military prosecution "is [in] no sense a suspension of the writ of habeas corpus." *Gusik*, 340 U.S. at 132. Instead, it is entirely appropriate for a court to decline to resolve "the collateral attack of military judgments" when there is "an available procedure

---

[8]Petitioner also argues that a conviction would violate Common Article 3 of the Geneva Conventions. Mot. at 35. However, petitioner is precluded from relying on the Conventions "as a source of rights." 10 U.S.C. § 948b(g); MCA § 5. In any event, to the extent petitioner alleges a constitutional entitlement to invoke the Geneva Conventions before the military commission and in court, he may raise that claim in the commission and on review in the D.C. Circuit.

. . . to rectify the alleged error." *Id*. at 131-32.[9]  The rule can be no different when Congress channels review to a particular forum rather than when a court imposes an exhaustion requirement though its equity power—if anything, the rule has more force in such instances.  *Cf. Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004) ("If the statute does mandate exhaustion, a court cannot excuse it.").  Indeed, there is nothing unusual or anomalous about statutory exhaustion requirements in the context of habeas review.  *See* 28 U.S.C. § 2254(b)(1)(A);  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) (the "exhaustion doctrine . . . is now codified at 28 U.S.C. § 2254(b)(1)"); *see also Gusik*, 340 U.S. at 131-32 ("The policy underlying that rule [that a habeas court will not interfere when a state court provides a remedy] is as pertinent to the collateral attack of military judgments as it is to collateral attack of judgments rendered in state courts.").  And none of the handful of cases that considered collateral jurisdictional challenges while military proceedings were ongoing did so in the face of a statute expressly authorizing commission proceedings and requiring review to be channeled through the military proceedings.[10]  Here as in *Hamdan v. Gates*,

---

[9]*See Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 236 (1960) (petitioner first "challenged the jurisdiction of the court-martial over her" in those proceedings and, after exhausting military appeals, "filed this petition for habeas corpus"); *Grisham v. Hagan* 361 U.S. 278, 278 (1960); *Burns v. Wilson*, 346 U.S. 137, 138 (1953) ("petitioners exhausted all remedies available to them under the Articles of War for review of their convictions by the military tribunals"); *Gusik*, 340 U.S. at 129 ("[a]fter conviction by the court-martial petitioner exhausted all his remedies" and "[w]hen he secured no relief from the military authorities he filed this petition in which he challenges the jurisdiction of the court-martial both under the Articles of War and the Constitution"); *id*. at 131 (normally, court would "not have been justified in entertaining the petition unless the remedy afforded by the Article [of War] had first been exhausted"); *Duncan v. Kahanamoku*, 327 U.S. 304, 310-11 (1946) (both petitioners convicted by military tribunals); *Yamashita*, 327 U.S. at 5 (petitioner had been "found guilty of the offense as charged" prior to petitioning for habeas); *Ex parte Reed*, 100 U.S. 13, 20 (1879) (habeas challenging jurisdiction of court-martial sought after petitioner found guilty and sentenced by court-martial).

[10]*See Hamdan v. Rumsfeld*, 126 S. Ct. 2749 (2006); *Reid v. Covert*, 354 U.S. 1, 5 (1957) (one petitioner serving sentence after conviction; second petitioner awaiting retrial after conviction reversed in military appeal)*; United States ex rel. Toth v. Quarles*, 350 U.S. 11, 13 (1955) (habeas granted before trial); *McElroy v. United States ex rel. Guagliardo*, 361 U.S. 281, 282-83 (1960)

the petitioner may raise his claims in the military commission. "A real judge is presiding over the pretrial proceedings in [petitioner's] case and will preside over the trial.... If the Military Commission judge gets it wrong, his error may be corrected by the CMCR. If the CMCR gets it wrong, it may be corrected by the D.C. Circuit. And if the D.C. Circuit gets it wrong, the Supreme Court may grant a writ of certiorari." Ex. A at 17.

A key element cited by courts conducting immediate jurisdictional review through habeas proceedings was their concern that no impartial tribunal was otherwise open petitioners to address petitioners' claims on appeal as of right. *See Hamdan*, 126 S. Ct. at 2770 (noting an important factor in determining whether to abstain was the availability of a "military court system established by Congress—with its substantial procedural protections and provision for appellate review by independent civilian judges [that] 'will vindicate service-men's constitutional rights."); *Burns*, 346 U.S. at 139; *see id.* at 140 (observing that the Supreme Court "ha[s] exerted no supervisory power over the courts which enforce" military law); *Quirin*, 317 U.S. at 46-47 (noting the governing military procedures might "preclude a later opportunity to test the lawfulness of the detention."). Here, these concerns are inapplicable given the statutorily authorized review of claims subject to section 950j(b) in the D.C. Circuit. *See* 10 U.S.C. § 950g.

Thus, none of the cases that have considered habeas challenges to a military tribunal's jurisdiction justify ignoring the statutory abstention principles embodied in section 950j(b). These decisions, including the Supreme Court's decision in *Hamdan*, do not suggest that the Constitution requires a court to disregard a statutory requirement that challenges to military commission proceedings occur in the proceeding, only to be reviewed on appeal. There is, therefore, no basis for

///

_____

(habeas granted after conviction but while military appeals pending).

disregarding Congress' judgment that commissions have sufficient authority to render a "final decision," and that judicial review should await such a decision. *See* 10 U.S.C. § 950g.

In sum, the procedures and review afforded by the MCA explicitly authorized by Congress, is far more robust than that of the CSRTs at issue in *Boumediene*, and raises no Suspension Clause problem if it is exclusive and, with respect to the claims covered by section 950j(b), replaces traditional habeas review. But at a minimum, there can be no Suspension Clause violation by precluding *pre-trial* habeas review of military commission jurisdiction and procedures.[11]

### B.     Even if the Court has Jurisdiction, *Councilmen* Requires that the Court Abstain.

Even if this Court has jurisdiction to grant the injunction sought, abstention is appropriate under the Supreme Court's decision in *Councilman* because this Court must give "due respect to the

---

[11]As we have shown, section 950j(b) applies to preclude a court from collaterally considering claims that can be made as a part of the military commission process. And we have shown that this interpretation does not raise Suspension Clause concerns in this context. But even if section 950j(b) were viewed as raising serious Suspension Clause concerns under that interpretation, another interpretation is "fairly possible" (*St. Cyr.*, 533 U.S. at 299-300) that raises no such concerns: section 950j(b) at the very least requires *exhaustion* of military procedures and appellate review in the D.C. Circuit. *See Gusik*, 340 U.S. at 131-32 ("The policy underlying that rule [that a habeas court will not interfere when a state court provides a remedy] is as pertinent to the collateral attack of military judgments as it is to collateral attack of judgments rendered in state courts. . . . Such a principle of judicial administration is [in] no sense a suspension of the writ of habeas corpus."). The statute specifies that it bars claims "[e]xcept as otherwise provided in this chapter." With that language and its focus on the procedures available in the MCA, the statute could be interpreted to foreclose collateral claims ("including section 2241" claims) *only when* MCA remedies are "otherwise provided." Once those procedures are exhausted, they are no longer provided, and the jurisdiction strip might cease to operate. Such an interpretation, would be plausible enough given past precedent interpreting related provisions in the UCMJ. *See Councilman*, 410 U.S. at 744 n.10 & 749 (Article 76 of the Articles of War, which specifies that "all action taken pursuant to [court martial] proceedings are binding upon all departments, courts, agencies, and officers of the United States" "only defines the point at which military court judgments become final and requires that they be given res judicata effect" but does not preclude them from being "impeached collaterally in suits otherwise within a court's subject-matter jurisdiction"). Moreover, given the judicial duty to preserve as much of a statute as possible, it is preferable to an all-or-nothing construction that would invalidate section 950j(b) in its entirety. *See, e.g.*, *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329 (2006).

autonomous military judicial system created by Congress." *New v. Cohen*, 129 F.3d 639, 643 (D.C. Cir. 1997). Indeed, in light of the substantial procedural safeguards codified by Congress in a comprehensive military court system and Congress' clear intent to foreclose collateral attacks to that system, it would be anomalous not to abstain.[12]

1. In *Hamdan*, the Supreme Court explained that "as a matter of comity, federal courts should normally abstain from intervening in pending court-martial proceedings against members of the Armed Forces." 126 S. Ct. at 2770. As the court concluded in *Hamdan v. Gates*, *Councilman*'s "central rationale is applicable here." Ex. A at 15. Thus, "federal courts should respect the balance that Congress struck between military preparedness and fairness to individual service members when it created 'an integrated system of military courts and review procedures, a critical element of which is the Court of Military Appeals, consisting of civilian judges 'completely removed from all military influence or persuasion.'" *Ibid.* (quoting *Councilman*, 420 U.S. at 758). The problems with the prior military commissions system—that it was "not autonomous, and it was not created by Congress," 344 F. Supp. 2d at 157—have now been solved. Indeed, four members of the Supreme Court's *Hamdan* majority specifically recognized that "Congress . . . has the power and prerogative to" authorize a military commission trial system. 126 S. Ct. at 2800 (Kennedy, J., concurring in part); *see also id.* at 2799 (Breyer, J., concurring) ("Nothing prevents the President from returning to Congress to seek the authority he believes necessary"). And with the President and Congress acting in concert to authorize commission proceedings and channel review through those proceedings, their authority "is at its maximum, for it includes all that [the President] possesses in his own right plus

---

[12]*Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 89-90 (1998), does not prohibit the Court from addressing abstention prior to the jurisdictional arguments presented in Section I.A. Because abstention is a threshold ground of decision, the Court can, if it so chooses, resolve this case on abstention grounds without deciding the jurisdictional issues discussed above. *See, e.g.*, *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999).

all that Congress can delegate." *Youngstown Sheet & Tube, Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). Indeed, all three branches of government are in concert on this score: as Judge Robertson recently observed, petitioner "is to face a military commission . . . designed . . . by a Congress that . . . act[ed] according to guidelines laid down by the Supreme Court." *Hamdan v. Gates,* Ex. A at 15. And "[w]here both Congress and the President have expressly decided when Article III review is to occur, the courts should be wary or disturbing their judgment." Ex. A at 16.

In the MCA, Congress created an autonomous military judicial system to try unlawful enemy combatants, with a right of appeal to an Article III court. The review provided here is even more "removed from all military influence or persuasion" than was the case in *Councilman* and other cases involving court-martial proceedings: whereas those procedures provided for "appellate review by independent civilian judges," *Hamdan*, 126 S. Ct. at 2770, the MCA provides for review by an Article III court (10 U.S.C. § 950g), the most "independent review" forum possible. *Id*. at 2771; *see Boumediene*, 128 S. Ct. at 2268 (requiring the prisoner to "exhaust adequate alternative remedies before filing for the writ in federal court" is "justified because . . . . the prisoner already has had a chance to seek review of his conviction in a federal forum through a direct appeal"); *see also Hamdan v. Gates*, Ex. A at 15 ("[O]ne of the most substantial improvements under the MCA is in the structure for review of convictions.").[13] If anything, Congress' decision to channel review to a *superior* federal court should militate even more strongly in favor of abstention. *See Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984) ("where a statute commits review of agency action to the Court of Appeals, any suit seeking relief

---

[13]The scope of review authorized by the MCA is also modeled on the "plenary review exercised by the Court of Appeals for the Armed Forces." *Hamdan*, 126 S. Ct. at 2771 n. 19. Both courts may "act[] only with respect to matters of law." 10 U.S.C. § 867(c); *see* 10 U.S.C. § 950g(b) (same).

that might affect the Circuit Court's future jurisdiction is subject to the *exclusive* review of the Court of Appeals").

In fact, in providing the requisite congressional authorization, the MCA also fully addressed other structural and procedural flaws identified in *Hamdan*. For example, whereas the prior tribunal convened to try petitioner was not part of the integrated system of military courts with independent review panels that Congress has created, *see Hamdan*, 126 S. Ct. at 2771 (noting that the prior review bodies "lack the structural insulation from military influence that characterizes the Court of Appeals for the Armed Forces, and thus bear insufficient conceptual similarity to state courts to warrant invocation of abstention principles"), now the military commission judges are the same military judges who sit for courts-martial, and a final decision of the military commission may now be appealed as of right to the D.C. Circuit,[14] 10 U.S.C. § 950g(a), with Supreme Court review available by writ of certiorari, *id.* § 950g(d). Similarly, whereas petitioner in *Hamdan* argued that he would be excluded from his own trial, *see Hamdan*, 126 S. Ct. 2788, and denied access to evidence against him in the form of protected information, *id.* at 2787, the MCA grants that same accused the right to "be present at all sessions of the military commission," 10 U.S.C. § 949a(b)(1)(B) and to have access to all the evidence admitted before the trier of fact, *see id.* § 949a(b)(1)(A).[15] Petitioner can make no argument here that he will be excluded from any hearing

---

[14] Previously, under the DTA, D.C. Circuit review was automatic only with respect to a capital case or a case in which the alien was sentenced to a term of imprisonment of 10 years or more. *See* DTA, § 1005(e)(3) (2005).

[15] Of course, consistent with federal court practice, the accused may be excluded where his own conduct requires his exclusion, 10 U.S.C. § 949a(b)(1)(B), or from *in camera* and *ex parte* presentations to the military judge (who is not a trier of fact) related to information that is classified or subject to a national security privilege. *See Holy Land Found. v. Ashcroft*, 333 F.3d 156, 163-64 (D.C. Cir. 2003) (classified information withheld in case under International Emergency Economic Powers Act); *compare* Classified Information Procedures Act ("CIPA"), Pub. L. No. 96-456, 94 Stat. 2025, § 4 (1980), *with* 10 U.S.C. § 949d(f)(2)(C) and MCRE 505(e)(3). Even then an unclassified

at his upcoming public trial.

At bottom, the MCA and the Manual for Military Commissions ("MMC") promulgated thereunder cured what the Supreme Court in *Hamdan* found to be the most fundamental structural flaw in the prior military commission system—it "operate[d] free from many of the procedural rules prescribed by Congress for courts-martial—rules intended to safeguard the accused and ensure the reliability of any conviction." *Hamdan*, 126 S. Ct. at 2772; *see id.* at 2800 (Kennedy, J., concurring in part) ("If Congress, after due consideration, deems it appropriate to change the controlling statutes, in conformance with the Constitution and other laws, it has the power and prerogative to do so."); *see also Hamdan v. Gates*, Ex. A at 4 ("The procedures codified by the MCA also include significant improvements."). Congress has now "stepped up to its responsibility, acting according to guidelines laid down by the Supreme Court." *Hamdan*, 464 F. Supp. 2d at 18. There can be no serious doubt as to the validity of the present military commission system; and thus, abstention is required, not only by statute but also under *Councilman*.

**2.** As the Supreme Court recognized in *Hamdan*, abstention is appropriate unless a petitioner makes a "substantial argument[] denying the right of the military to try them at all" because the "legal challenge 'turn[s] on the status of the person[] as to whom the military asserted its power.'" 126 S. Ct. at 2770 n. 16 (quoting *Councilman*, 420 U.S. at 759). However, the invocation of "jurisdictional" challenges is not talismanic. Rather, courts should decline to abstain only when "there is a substantial question whether a military tribunal has personal jurisdiction over the defendant." *Ibid*. Importantly, a claim that the military tribunal "lack[s] jurisdiction" over the subject matter of the case—the criminal charges at issue—does *not* warrant abstention, as was the case in *Councilman* itself. 420 U.S. at 741.

---

substitution may be required for the classified information. 10 U.S.C. § 949d(f)(2)(A).

All of petitioner's claims, save one, do not concern the military commission's personal jurisdiction over him. Three of petitioner's claims challenge the charges brought against him as violating the Constitution: he argues that the criminal provisions he is alleged to have violated, as applied to him, violate the Ex Post Facto Clause (Mot. at 23-27); he claims that the Congress lacked the power under the Define and Punish (and Law of Nations) Clause to criminalize his offenses (Mot. 27-29); and that the MCA constitutes an unconstitutional bill of attainder. Mot. at 29-32. His remaining claims are that the commission procedures violate the Due Process Clause, including its equal protection component, the Geneva Conventions (Mot. at 32-37), and a Sixth Amendment Right to Counsel. Mot. at 37-40. As Judge Robertson observed in *Hamdan v. Gates*, these kinds of claims can be, and are being, adjudicated before a "real judge" in the military commission and can be fully reviewed, ultimately by the D.C. Circuit on appeal as of right. Ex. A at 17. Petitioner does not claim that any of these challenges address the military commission's "personal jurisdiction" over him—the only sort of claim that warrants abstention. Instead, petitioner urges that the commission lacks "subject-matter jurisdiction" based on his Ex Post Facto Clause, Define and Punish Clause, and bill of attainder claims, which as *Councilman* itself illustrates, is not a basis for declining to abstain. Mot. at 23, 29, 32. In any event, none of those claims bears on the subject-matter jurisdiction of the commission. These are precisely the type of *merits* arguments properly presented to the commission itself, and then the D.C. Circuit on ultimate appeal.

Petitioner's purported challenges to the military commission's subject-matter jurisdiction are no different than those in *Councilman* itself, where the Court required abstention in a case where the defendant "contend[ed] that the court-martial lacked jurisdiction" over the "alleged offenses" because the Constitution did not confer authority on the commission to try such offenses by court-martial. 420 U.S. at 741, 747; *United States v. Hollywood Motor Car. Co., Inc.*, 458 U.S. 263, 269

(1982) (per curiam) ("in the run of cases, the correctness of a trial court's rejection even of a constitutional claim made by the accused in the process of prosecution must await his conviction before its reconsideration by an appellate tribunal") (internal quotations omitted); *United States v. Baucum*, 80 F.3d 539, 540 (D.C. Cir. 1996) (trial court not deprived of jurisdiction even if a statute forming the basis of criminal prosecution is unconstitutional); *Deaver v. Seymour*, 822 F.2d 66 (D.C. Cir. 1987) ("That [defendant's] challenge is a serious one with far-ranging and troubling constitutional implications does not support his argument for accelerated and unorthodox judicial review.").[16]  Accordingly, these claims, even if viewed as substantial and involving "subject-matter jurisdiction," do not relate to the personal jurisdiction of the commission to try petitioner, *i.e.*, they have nothing to do with the "'status of the person[] as to whom the military asserted its power.'" 126 S. Ct. at 2770 n. 16 (quoting *Councilman*, 420 U.S. at 759).

Rather than raising a "substantial question" exists as to whether the military commission has personal jurisdiction over him, which is his burden, Petitioner merely asserts that trial by military commission is limited "to individuals who have been properly determined to be unlawful enemy combatants." Mot. at 21.  This is insufficient.  To be sure, the military commission has not yet itself made a jurisdictional determination of unlawful enemy combatancy; but, that only further establishes that petitioner's claim is more premature that the claim to enjoin the military commission in *Hamdan*.

It is axiomatic that the commission has jurisdiction to determine its own jurisdiction.  *See Apple v. Greer*, 554 F.2d 105, 109 (3d Cir. 1977) (a "claim that there is a lack of jurisdiction can be

---

[16]Constitutional challenges to the propriety of criminal proceedings are routinely reviewed either on direct appeal or in post-conviction proceedings.  *See United States v. Alston-Graves*, 435 F.3d 331 (D.C. Cir. 2006) (due process and ex post facto challenges); *United States v. Johnson*, 40 F.3d 436 (D.C. Cir. 1994) (equal protection challenge).

made to a military tribunal"); *United States v. Khadr*, No.07-001, slip op. at 20 (Ct. Mil. Com. Rev. Sept. 24, 2007) ("unambiguous language of the MCA, in conjunction with a clear and compelling line of federal precedent on the issue of establishing jurisdiction in federal courts, convince us the military judge possessed the independent authority to decide this critical jurisdictional prerequisite"), *available at* http://www.defenselink.mil/news/Copy%20of%20CMCRKHADR.html. *Cf. United States v. Ruiz*, 536 U.S. 622, 628 (2002) ("a federal court always has jurisdiction to determine its own jurisdiction"). It would be wholly inconsistent with the principles of comity set forth in *Councilman* for this Court to preempt not only the military commission trial but essentially the military commission's very determination of its own jurisdiction.

In any event, the CSRT's determination of "enemy combatancy" demonstrates *a fortiori* that petitioner is an unlawful enemy combatant subject to the commission's jurisdiction. The CSRT determined that petitioner is an enemy combatant and that he is a member of al Qaeda, which operates in violation of the laws of war. *See* Ex. B at 11 (para 7, Conclusions of Tribunal). Specifically, the definition of "enemy combatant" employed by the CSRT extends only to individuals who are "part of or supporting" unlawful military organizations, namely, "Taliban or al Qaeda forces, or associated forces." Congress was aware of the CSRT definition when it enacted the MCA and provided that the CSRT determination would render a detainee an "unlawful enemy combatant" under section 948a(1)(ii).

Abstention on these facts is clearly warranted because petitioner has made no showing, much less a showing raising a substantial question, to refute the evidence considered by the CSRT establishing petitioner's unlawful enemy combatancy. *See* Ex. B.[17] *Hamdan* requires such a

---

[17] The Government is providing the unclassified portion of petitioner's CSRT record; however, classified evidence also supports the CSRT determination and further demonstrates petitioner's unlawful enemy combatancy. If the Court wishes to review the classified CSRT record,

33

substantial question to permit a court not to abstain. 126 S. Ct. at 2772 n. 20. Petitioner points to nothing in the record, let alone a evidence raising a substantial question, that challenges the ample evidence that indicates his unlawful enemy combatancy. *See* Ex. B, at, *e.g.*, pp.24-26, 29-30, 47-48, 49-52 (unclassified summary). Instead, petitioner simply asserts that a military commission may only try alien unlawful combatants and he has yet to receive that determination by the commission. Mot. at 21. But the fact that the commission has not yet decided the issue of personal jurisdiction suggests only that petitioner's challenge is not ripe, not that personal jurisdiction is, in any way, lacking. Indeed, that issue is presently before the military commission, and will be resolved *before* there would be a trial. In any event, the prematurity of the question does not relieve petitioner of *his burden* under *Councilman*. Further, the issues petitioner seeks to raise do not relate to the application of the governing legal standard for establishing the commission's personal jurisdiction, 10 U.S.C. § 948a. Petitioner's "summary assertion of these claims does not automatically make his jurisdictional challenge a substantial one." *Hamdan v. Gates*, Ex. A at 16.

The legal arguments petitioner summarily makes with respect to his unlawful combatant status are meritless under the applicable standards of section 948a. *See id.* First, petitioner claims that he is "not a member of the armed forces of any nation at war with the United States." Mot. at 22. But, as section 948a makes plain, a combatant is defined not only as a formal member of the military but also any "person who has engaged in hostilities" or has "purposefully and materially supported hostilities." 10 U.S.C. § 948a(1)(i). Congress' statutory definition reflects the background law-of-war principles discussed in *Hamdan* and, in any event, the statute would control over any previously ratified treaty, *see*, *e.g.*, *Breard v. Greene*, 523 U.S. 371, 376 (1998); *Reid*, 354 U.S. at 18 (plurality opinion). Moreover, in *Hamdan*, the Supreme Court held that the present conflict

we will make it available subject to appropriate security arrangements.

between the United States and al Qaeda—a non-state entity—qualifies as an "armed conflict" for purposes of Common Article 3 of the Geneva Conventions. Petitioner also argues that he cannot be found to be an enemy combatant based simply on "[a]ffiliation with or membership in a terrorist organization." Mot. at 22. But the CSRT found much more than simple affiliation.[18] For example, among the unclassified evidence before it, the CSRT received evidence that petitioner acted as a broker between various al Qaeda operatives, sent funding at the behest of, and for the benefit of, al Qaeda operatives, and that he "thought the money was being provided 'within the framework' of the 9/11 operation." Ex. B at 48. Both the *9/11 Commission Report* and the unclassified summary of evidence (drawn from, *inter alia* transcripts and evidence in *United States v. Zacarias Moussaoui*), *see* Ex. B at 49-51, demonstrate petitioner was an unlawful enemy combatant. Petitioner offers nothing to the contrary. Thus, petitioner has not presented a substantial likelihood of success on the claim that the commission lacks personal jurisdiction.

Finally, abstention is appropriate because petitioner does not and cannot allege that "Congress had no constitutional power to subject [him] to the jurisdiction" of a military tribunal *Councilman*, 420 U.S. at 759. Instead, he points only to the fact the CSRT only determined him to be an "enemy combatant." Mot. at 36, n.25. He does not, and cannot, contend that al Qaeda constitutes a lawful armed force. In any event, even lawful combatants may be tried by the military (in a court-martial). 10 U.S.C. § 948d(b). Thus, this is not a case where "[t]he  issue presented concerned not only the military court's jurisdiction, but *also* whether under Art. I, Congress could allow the military to interfere with the liberty of civilians even for the limited purpose of forcing them to answer to the military justice system." *Councilman*, 420 U.S. at 759 (emphasis added); *see Quirin*, 317 U.S. at 41 (recognizing the established "practice of trying, before military tribunals

---

[18]*See, e.g.*, Ex. B, pp.8, 10, 15 and 17.

without a jury, offenses committed by enemy belligerents against the law of war"). Moreover,

petitioner is being detained as an enemy combatant. *See Khadr*, 529 F.3d at 1118 (reasoning that

"[t]here is no substantial public interest at stake in this case [where Khadr challenged a military

commission's personal jurisdiction and sought interlocutory review of that determination] that

distinguishes it from the multitude of criminal cases for which post-judgment review of procedural

and jurisdictional decisions has been found effective"). Given section 950j(b) it would be

particularly anomalous not to at least require petitioner to exhaust his claims in the process

contemplated by Congress. The *Boumediene* Court also contemplated that in the normal course,

habeas review would only be appropriate after an exhaustion of other remedies. 128 S. Ct. at 2275-

76. Indeed, such exhaustion of remedies before habeas relief may be pursued is the norm. *See* 28

U.S.C. § 2254(b)(1).

The determination that a petitioner is an unlawful enemy combatant is a routine claim that

is intimately tied to the facts that give rise to his prosecution and precisely the sort of issue that falls

comfortably within the commission's expertise and should be resolved by the commission in the first

instance, even though it pertains to the issue of the court's personal jurisdiction. *See Councilman*,

420 U.S. at 759 (observing that another reason the court declined to abstain was because the court

"'did not believe that the expertise of military courts extended to the consideration of constitutional

claims of the type presented'") (quoting *Noyd*, 395 U.S. at 696 n.8); *id*. at 760 (exhaustion necessary

when resolution of claims depends on the "precise set of facts in which the offense has occurred");

*Khadr*, 529 F.3d at 1117 (challenge to personal jurisdiction "is reviewable on appeal from final

judgment"); *United States ex rel. Guagliardo v. McElroy*, 259 F.2d 927, 929 (D.C. Cir. 1958)

(exhaustion required when claim pertains to "alleged errors in the court-martial proceedings"), *aff'd*,

361 U.S. 281 (1960); *see also Apple*, 554 F.2d at 109 (a "claim that there is a lack of jurisdiction can

be made to a military tribunal"); *see also Hamdan v. Gates*, Ex. A at 17.

In sum, petitioner provides no reason—let alone evidence of a substantial question of personal jurisdiction needed to avoid abstention—to displace the military court in conducting its assigned role or to preempt the appellate review to which petitioner is entitled under the MCA. Abstention is clearly warranted and the petitioner's motion must therefore be denied.

**C.    Petitioner Is Not Likely to Succeed Because His Constitutional Challenges to the Military Commission Process Have No Merit**

If the Court concludes either that it lacks jurisdiction over petitioner's challenge at this juncture, or that abstention is required out of respect for the autonomous and comprehensive military justice system established by Congress, that is the end of the matter and the court need go no further. Should the court reach the merits, for the reasons set forth in Section I.B.2., it should find a substantial likelihood that the military commission has personal jurisdiction, which itself should be dispositive.   In any event, as set forth below, petitioner has little likelihood of success on his constitutional claims and thus the motion should be denied.

**1.   Petitioner Can Claim No Benefit From the Constitutional Provisions He Cites.**

As an initial matter, the constitutional provisions cited by petitioner do not apply to him, since he is an enemy combatant who has not established any voluntary connection but instead is at war with the United States.   In *Boumediene*, the Court addressed a narrow question under the Suspension Clause.   The Court signaled no intention of extending the individual-rights protections of the Constitution to alien enemy combatants tried by military commission.   To the contrary, the Court emphasized that "[i]t bears repeating that our opinion does not address the content of the law that governs petitioners' detention." *Boumediene*, 128 S. Ct. at 2240; *see also id*. at 2277.

Thus, *Boumediene* did not upset the well-established holding that the Fifth Amendment and other individual rights secured by the Constitution do not apply to alien enemy combatants lacking

any voluntary connection to the United States. The Supreme Court has recognized that the writ of habeas corpus historically has had an "extraordinary territorial ambit." *See Rasul v. Bush*, 542 U.S. 466, 482 n.12 (2004). By contrast, the Court has made clear that the individual rights provisions of the Constitution run only to aliens with a substantial connection to our country and not to alien enemy combatants detained abroad. *See United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990); *Eisentrager*, 339 U.S. at 783.

Indeed, even when an alien is found within United States territory, the degree to which constitutional protections apply depends on whether the alien has developed substantial voluntary contacts with the United States. *Verdugo-Urquidez*, 494 U.S. at 271. Nothing in *Boumediene* casts doubt on these well-established holdings that the Constitution does not apply in toto to nonresident aliens. *Boumediene* certainly does not extend the Constitution's individual-rights protections, contrary to *Eisentrager*, *Verdugo-Urquidez* and other cases, to alien unlawful enemy combatants before congressionally-constituted military commissions. To paraphrase the *Boumediene* Court itself, "if the [petitioner's] reading of [*Boumediene*] were correct, the opinion would have marked not only a change in, but a complete repudiation of" long-standing precedent. *Id.* at 2258.

Because the Supreme Court did not disturb those holdings in *Boumediene*, they remain binding precedent. *See Agostini v. Felton*, 521 U.S. 203, 237-38 (1997) ("[i]f a precedent of this Court has direct application in a case, yet appears to rest on reason rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions"). Contrary to *Agostini*, however, petitioner would read *Boumediene* as, *sub silentio*, overruling the Court's existing precedents and providing a multi-factored test for the analysis of other constitutional rights. It is clear, however, that the test enunciated by the Court to determine whether the Suspension Clause applied to the *Boumediene-*

petitioners was specifically geared to measuring whether the Suspension Clause—and not any other constitutional provision—applies to those petitioners. *See Boumediene*, 128 S. Ct. at 2237. That three-part test addressed only the specific issue before it, and does not govern the question of whether other portions of the Constitution apply extraterritorially to aliens, much less overrule prior precedents rejecting such extraterritorial application. Even so, under that functional analysis endorsed in *Boumediene* for purposes of the Suspension Clause, it is clear that enemy aliens abroad who have not established any voluntary connection with the United States do not come within the protection of the various constitutional provisions cited by petitioner. The Government has broad latitude when it operates in the international sphere, where the need to protect the national security and conduct foreign relations is paramount. *See Haig v. Agee*, 453 U.S. 280, 292, 307-08 (1981); *see also Palestine Information Office v. Schultz*, 853 F.2d 932, 937 (D.C. Cir. 1988).

With respect to the Due Process Clause and its equal protection component, it is well established that they do not apply to someone in petitioner's position who has established no voluntary contacts with the United States. *Verdugo*, 494 U.S. at 271. This petitioner's contacts with the United States, which consist solely of unlawfully waging war against the nation and being detained in a U.S. military base, "is not of the sort to indicate any substantial connection with our country." *Id.*; *see Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (reaffirming *Verdugo* and *Eisentrager*); *Eisentrager*, 339 U.S. at 783 (finding "no authority whatever for holding that the Fifth Amendment confers rights upon all persons, whatever their nationality, wherever they are located and whatever their offenses"); *Hamdan*, 464 F. Supp. 2d at 18-19 n.15. As the *Eisentrager* Court explained, "[i]f [the Fifth] Amendment invests enemy aliens in unlawful hostile action against us with immunity from military trial, it puts them in a more protected position than our own soldiers" because "American citizens conscripted into the military service are thereby stripped of their Fifth

Amendment rights and as members of the military establishment are subject to its discipline, including military trials for offenses against aliens or Americans." 339 U.S. at 783. Similar reasoning also should preclude petitioner from seeking the benefit of the Ex Post Facto Clause, the Define and Punish Clause, the Bill of Attainder Clause, and the Sixth Amendment. Accordingly, petitioner has not established that the various constitutional provisions he cites apply to him.

Drawing a distinction between aliens abroad, on the one hand, and those who make up part of our political community, on the other hand, is a basic feature of sovereignty. *See Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982); *Foley v. Connelie*, 435 U.S. 291, 295-96 (1978); *cf. Mathews v. Diaz*, 426 U.S. 67, 80, 85 (1976) (recognizing that it is "a routine and normally legitimate part" of the business of the Federal Government to classify on the basis of alien status and to "take into account the character of the relationship between the alien and this country"). In this context, application of these various constitutional principles to aliens who have established no voluntary contact with the United States would interfere with the role of the political branches to implement our foreign policy and successfully prosecute a foreign war.

For the reasons explained, the various constitutional provisions invoked by petitioner afford no protection to alien unlawful enemy combatants captured and held outside the United States, who have no significant voluntary connection to the United States. In any event, as we now demonstrate, even if these constitutional provisions were applicable here, petitioner cannot show a likelihood of success on the merits.

>   **2.    The MCA Does Not Violate the Ex Post Facto Clause because the Offenses for which Petitioner is Charged are Well-Established Violations of the Law of War**

Petitioner's argument that the MCA violates the Ex Post Facto Clause because it makes clear that conspiracy and material support for terrorism are violations of the law of war ignores the fact that petitioner has *also* been charged with attacking civilians, attacking civilian objects, intentionally

causing serious bodily injury, murder in violation of the law of war, destruction of property in violation of the law of war, hijacking, and terrorism. Thus, even if petitioner were correct that the two offenses he singled out could not be applied to him (which he is not), and assuming arguendo that this issue went to the military commission's jurisdiction over him (which it does not), there can be no serious doubt that these other charges are historic violations of the laws of war over for which he may be properly tried by a commission. Thus, the Ex Post Facto Clause argument is unavailing. In any event, petitioner is simply wrong as to the two charges he has addressed in his motion.

These offenses and others, codified through the MCA in 2006, have deep historic roots as violations of the laws of war. These and like offenses have been addressed not only by military commissions but by other war crimes tribunals. Indeed, Congress specifically found that the MCA "codif[ied] offenses that have traditionally been triable by military commissions. [The MCA] does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission." 10 U.S.C. § 950p(a); *see Quirin*, 317 U.S. at 30 ("Congress had the choice of crystallizing in permanent form and in minute detail every offense against the law of war, or of adopting the system of common law applied by military tribunals"). Notwithstanding this clear congressional interpretation of the law of war, petitioner asserts (Mot. at 23) that the offenses with which he is charged violate the Constitution's prohibition against ex post facto laws.

Petitioner's assertion is without merit, and certainly does not present the substantial likelihood of success that would justify enjoining the Military Commission scheduled to try him. The MCA does exactly what Congress said it was doing—it codifies longstanding violations of the law of war for these commissions rather than creating new offenses. The MCA's codification of such proscribed conduct does not violate the Ex Post Facto Clause, *see Landgraf v. USI Film Prods.*, 511 U.S. 244, 269-70 (1994), and thus petitioner has not met his burden of demonstrating a

41

substantial likelihood of success on the merits.

Before addressing the merits of petitioner's assertion that conspiracy and material support were not violations of the law of war prior to the MCA, it is necessary to address the effect of 10 U.S.C. § 950p.  The Constitution expressly grants to *Congress* the authority to "define and punish . . . Offenses against the Law of Nations."  U.S. Const. art. I, § 8, cl. 10.  *See also Hamdan*, 126 S. Ct. at 2809 (2006) (Kennedy, J., concurring in part) ("Congress, not the Court, is the branch in the better position to undertake the 'sensitive task of establishing a principle not inconsistent with the national interest or international justice'") (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964)).  This Court thus owes substantial deference to the legislative branch's judgment about what offenses have constituted long-standing violations of the laws of war.

### a.    The offense of conspiracy was a violation of the law of war even prior to the MCA's enactment.

Throughout the history of the United States, individual enemy combatants have been tried before military commissions for conspiring to commit war crimes.  Both the Nazi saboteurs in *Ex parte Quirin*, 317 U.S. 1, 23 (1942), and the saboteur in *Colepaugh v. Looney*, 235 F.2d 429, 431-33 (10th Cir. 1956), were charged with conspiracy.  Conspiracy was recognized as an offense against the laws of war, and triable by military commission, in the authoritative treatise of Colonel William Winthrop, "the Blackstone of Military Law."  *Reid v. Covert*, 354 U.S. 1, 19 (1957).  In that late-nineteenth-century work, Winthrop listed examples of conspiracies against the law of war triable by military commission.  *See* WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 839 & n.5 (2d ed. 1920) (originally published 1895).[19]  The plurality opinion in *Hamdan*, relied on by petitioner, is

---

[19]Petitioner's overly restrictive view of conspiracy as a violation of the law of war is contradicted by recent international practice.  The International Military Tribunal established to try major Nazi war criminals after World War II did try, and convict, some defendants of conspiring to wage aggressive war, *see Hamdan*, 126 S. Ct. at 2784 (plurality opinion), and, as the *Hamdan*

neither binding nor persuasive authority to the contrary.[20]

Given this history, there was ample precedent from which Congress might reasonably conclude that conspiracy was a recognized violation of the law of war. In such circumstance, it is for *Congress* to "define" what the law of war requires, *Hamdan*, 126 S. Ct. at 2809 (Kennedy, J., concurring in part), and that determination is entitled to substantial deference.

> **b.    Providing material support to terrorists is an application of long-standing rules of the law of war to the present conflict.**

Petitioner also asserts that the charge of material support to terrorism is a new offense, created by the MCA, and not a recognized violation of the law of war. This claim is meritless. Terrorists are either guerillas, other irregular forces, or persons who intentionally target civilians. The laws of war have long covered each of these categories.

Irregular forces were, under the laws of war, subject to summary punishment. Lieber Code ¶ 82, *Instructions for the Government of Armies of the United States in the Field*, Gen. Order No. 100 (1863); *see* FRANCIS LIEBER, GUERILLA PARTIES CONSIDERED WITH REFERENCE TO THE LAWS AND USAGES OF WAR 7 (1862) ("[A] guerilla party means an irregular band of armed men, carrying

---

plurality acknowledged, conspiracy to commit genocide has been recognized as a war crime, *id*. In fact, the Tribunal also convicted several organizations on a group liability theory that was virtually indistinguishable from that of conspiracy. *See* 1 TRIAL OF THE MAJOR WAR CRIMINALS BEFORE THE INTERNATIONAL MILITARY TRIBUNAL 256 (1947) ("A criminal organization is analogous to a criminal conspiracy in that the essence of both is cooperation for criminal purposes."); 3 TRIALS OF WAR CRIMINALS BEFORE THE NUERNBERG MILITARY TRIBUNALS UNDER CONTROL COUNCIL LAW NO. 10 ("THE JUSTICE CASE") 1029 (1951) (applying same principle in subsequent war crimes trial).

[20]Petitioner misspeaks when he says the "Supreme Court has already held that conspiracy is not an offence against the law of war that is triable by commission." Mot. 25. Justice Kennedy specifically declined to join the *Hamdan* plurality on that point, concluding that deference to Congress was appropriate. *See* 126 S. Ct. at 2809 (Kennedy, J., concurring in part) ("Congress, not the Court, is the branch in the better position to undertake the sensitive task" of determining whether conspiracy is a war crime.). Three other justices concluded that conspiracy was a war crime, *see id*. at 2834 (Thomas, J., dissenting), and Chief Justice Roberts (who had participated in the case in the court of appeals), did not participate.

on an irregular war, not being able, according to their character . . . to carry on what the law terms a *regular* war"). As Winthrop explained, "[i]rregular armed bodies or persons not forming part of the organized forces of a belligerent . . . are not in general recognized as legitimate troops or entitled, when taken, to be treated as prisoners of war, but may upon capture be summarily punished even with death." Winthrop, *supra*, at 783; *see also id.* at 784, 839-40. Under any reasonable interpretation of the law of war, terrorism committed in furtherance of armed conflict is a war crime.[21] The other characteristic of terrorism—the intentional targeting of civilians—is a violation of the most fundamental law of war. *See* Lieber Code, ¶ 44.

Just as terrorism is a specific application of the well-established law of war prohibitions against guerilla activity or targeting civilians under the law of war, the provision of material support to such groups is also a specific definition of offenses of long-standing vintage. The provision to guerillas of the type of material support charged in petitioner's case—that of personnel, *i.e.*, oneself —has long been tried by military commission as a violation of the law of war. *See, e.g., Military Commissions*, 11 Op. Att'y Gen. 297, 312 (1865) ("[T]o unite with . . . guerillas, or other unauthorized marauders is a high offence against the laws of war; the offence is complete when the band is organized or joined."); U.S. War Dep't, General Court Martial Order (GCMO) No. 51, at 1 (1866) (charging defendant by military commission with "being a guerilla"); GCMO No. 93, at 9 (1864) (charging defendant by military commission with joining "a band of insurgents and armed rebels"). Providing other types of support to irregular armed forces is an equally long-standing violation; in essence, material support to terrorism is simply a more precise definition of

---

[21] It is difficult to imagine a crime more offensive to the law of war than what occurred on September 11, 2001, when al Qaeda operatives hijacked commercial aircraft and used them to kill almost 3,000 people. Indeed, the United Nations has repeatedly denounced al Qaeda's actions in particular as war crimes. *See, e.g.*, S.C. Res. 1189 (Aug. 13, 1998); S.C. Res. 1267 (Oct. 15, 1999); S.C. Res. 1333 (Dec. 19, 2000); S.C. Res. 1390 (Jan. 16, 2002); S.C. Res. 1455 (Jan. 17, 2003).

the established principle that providing aid, comfort or support to the enemy in time of armed conflict is a violation of the law of war. *See* Winthrop, *supra*, at 840 (noting offenses triable by military commission only, including "furnishing [enemies] with money, arms, provisions, medicines, &c." and "acting as a guide to [the enemy's] troops").

In short, the provision of material support to terrorists, like conspiracy, was not created by the MCA. To the contrary, the provisions of offenses in the MCA are merely "declarative of existing law;" they do not "establish new crimes that did not exist before [the MCA's] enactment and thus, "they do not preclude trial for crimes that occurred before the date of the enactment of this chapter." 10 U.S.C. § 950p(a)-(b). The MCA therefore does not violate the Ex Post Facto Clause.

## 2.   Congress Validly Exercised its Constitutional Authority to Define and Punish Offenses Against the Laws of Nations in Enacting the MCA.

Petitioner asserts that the MCA exceeds Congress' authority under the Law of Nations Clause to "define and punish . . . Offenses against the Law of Nations," U.S. Const. Art. I, § 8, cl. 10, because conspiracy and providing material support for terrorism are, in his view, not recognized as such. Again, a challenge to only two of the nine charges cannot deprive the commission of jurisdiction over petitioner. And as described above, petitioner's assertion as to those two particular charges fails; they constitute well-established violations of the law of war. In any event, Congress—acting pursuant to its express power to define and punish such offenses—could permissibly reach that conclusion.

At the outset, it is telling that petitioner cites *no* case in which a court held that a statute violated Congress' authority under the Law of Nations Clause.[22] That is because *there are no such*

---

[22] The case that petitioner cites, *United States v. Furlong*, 18 U.S. (5 Wheat.) 184 (1820), is not to the contrary. *Furlong*'s description of the outer boundaries of the Law of Nations Clause was not necessary to the decision reached in that case, which was grounded in the intent of Congress. *Id.* at 198.

*cases*; in order for petitioner to succeed on the merits of his claim here, this Court would have to be the first in the history of the United States to hold that Congress unconstitutionally defined and punished an offense against the law of nations. Far from demonstrating a substantial possibility of success on the merits, the absolute lack of precedent for petitioner's challenge makes it almost certain that his claim will fail.

The uniqueness of the Law of Nations Clause bears emphasis. Petitioner attempts to link his theory of the Law of Nations Clause to, for example, the Commerce Clause, arguing that "Just as the Commerce Clause limits Congress' power to define criminal offenses, so too does the Define and Punish Clause." Pet. Mot. at 27. But the power to "define" the law of nations is textually one of the most sweeping powers granted to Congress by Article I, § 8 of the Constitution, and it stands in sharp contrast to other provisions, such as the Commerce Clause, which does not in any respect grant Congress the power to "define" interstate commerce. Congress therefore has significant discretion to decide what offenses constitute violations against the law of nations. *See United States v. Smith*, 18 U.S. (5 Wheat.) 153, 159 (1820) ("Offenses . . . against the law of nations, cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognized by the common consent of nations."); JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION § 565, at 407 (R.D. Rotunda & J.E. Nowak eds., 1987); *see also* Curtis A. Bradley*, Universal Jurisdiction and U.S. Law*, 2001 U. Chi. Legal F. 323, 335 (2001) (noting that even in circumstances where it is unclear whether conduct violates international law, courts should defer to Congress in making the determination).

Petitioner selectively quotes from *United States v. Arjona*, 120 U.S. 479, 488 (1887), for the proposition that "[w]hether an offense as defined is an offense against the law of nations depends on the thing done, not on any declaration to that effect by Congress." Mot. at 25. But at issue in

*Arjona* was whether a statute promulgated under the Law of Nations Clause required an express statement from Congress to that effect. And in rejecting that requirement, the Court stated, in the same paragraph as the quoted language: "Upon its face, therefore, [the statute] defines an offense against the law of nations as clearly *as if congress had in express terms so declared*." *Arjona*, 120 U.S. at 488 (emphasis added). *Arjona* therefore supports the proposition that it is for Congress to determine the parameters of the law of nations, which it clearly and expressly did in the MCA. Given the constitutional authority to "define" violations of the law of nations, and the respect that this Court accordingly owes those determinations, substantial deference is due Congress' definition of such offenses. *See Hamdan*, 126 S. Ct. at 2809 (Kennedy, J., concurring in part) ("Congress, not the Court, is the branch in the better position to undertake the sensitive task of establishing a principle not inconsistent with the national interest or international justice.") (internal quotation marks and citation omitted). Here, for the same reasons the enactments do not violate the Ex Post Facto Clause, they are an eminently reasonable exercise of Congress' authority under the Law of Nations Clause.

**3.     The MCA Is Not an Unconstitutional Bill of Attainder**

A bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841 (1984). But here, there has been no legislative determination of guilt. Congress merely enacted a comprehensive military judicial system to *adjudicate* guilt with regard to a certain class of offenses and offenders—it did not itself purport to adjudicate any such questions. If that were sufficient to violate the Bill of Attainder Clause, then the entire UCMJ would be a bill of attainder because it sets up special rules for a discrete class of people. The Bill of Attainder Clause acts as "safeguard against legislative exercise of the judicial

function or more simply - trial by legislature." *United States v. Brown*, 381 U.S. 437, 442 (1965). It has rarely been invoked to condemn legislation; to the contrary, the Supreme Court has held that only "the clearest proof" suffices "to establish the unconstitutionality of a statute on such a ground." *Communist Party of United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 83 (1961). The MCA neither singles out petitioner nor of its own force imposes punishment and thus cannot be a Bill of Attainder. *See Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003) ("Both 'specificity' and 'punishment' must be shown before a law is condemned as a bill of attainder."). The Government must prove petitioner's guilt to an impartial tribunal beyond a reasonable doubt.

a.    **The MCA Does Not Target Specific Individuals.**

According to petitioner, the MCA violates the specificity element of the Bill of Attainder clause insofar as it applies to all non-citizens presently designated or designated in the future by the government as "unlawful enemy combatants." Mot. at 21, 23, 30, 33. Petitioner thus concedes that the MCA does not unlawfully "single out" petitioner *alone* for punishment—the historical hallmark of a bill of attainder. *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 471 n.34 (1977); *Selective Serv. Sys.*, 468 U.S. at 847. But just as the MCA does not meet the specificity requirements for a bill of attainder because it does not apply "either to named individuals" it also does not apply to "easily ascertainable members of a group." *United States v. Lovett*, 328 U.S. 303, 315-16 (1946).

The bill of attainder prohibition could not bear on the MCA because it applies to an open-ended class of individuals—aliens *otherwise determined* by someone other than Congress to be unlawful enemy combatants. *See Korte v. Office of Personnel Management*, 797 F.2d 967, 972 (Fed. Cir. 1986) (rejecting bill of attainder challenge where alleged finding of "guilt" was not imposed on plaintiff by federal statute, but by agency-level adjudicative body whose decision was subject to judicial review). Moreover, petitioner's bill of attainder argument is essentially an attempt

to recast his equal protection argument—both arguments essentially contend that the MCA unlawfully discriminates against non-citizen enemy combatants by limiting the scope of judicial review. The Supreme Court, however, has held that the Bill of Attainder Clause "surely was not intended to serve as a variant of the equal protection doctrine, invalidating every Act of Congress or the States that legislatively burdens some persons or groups but not all other plausible individuals." *Nixon*, 433 U.S. at 470.

Finally, the broad reading of the Bill of Attainder Clause petitioner advances would extend the prohibition far beyond its intended scope. To accept petitioner's argument would "cripple the very process of legislating" because "every person or group made subject to legislation which he or it finds burdensome" would complain that "he or it is being subjected to unwarranted punishment." *Nixon*, 433 U.S. at 470. Such reasoning would impermissibly transform any law into a bill of attainder, including the UCMJ, merely because it regulates conduct on the part of designated individuals or classes of individuals. *See Wilson v. Yaklich*, 148 F.3d 596, 605-06 (6th Cir. 1998); *Marozsan v. United States*, 90 F.3d 1284,1287 (7th Cir. 1996); *Nagac v. Derwinski*, 933 F.2d 990, 990-91 (9th Cir. 1991). For this reason, petitioner notably does not identify a single case in which a statute regulating the jurisdiction of the federal courts with respect to certain classes of litigants has been struck down on bill of attainder grounds.

### b. The MCA Does Not Inflict Legislative Punishment.

Assuming *arguendo* that the MCA impermissibly singled out a group as petitioner assert, his claim would still fail because "the proscription on bills of attainder reaches only statutes that inflict punishment" by their own force. *Selective Serv. Sys.*, 468 U.S. at 851. Although the MCA identifies punishable offenses and the penalties for such offenses, in that its no different from an ordinary criminal law. To be a bill of attainder the law must *itself* impose the punishment. The MCA does

nothing of the sort: it sets up a system for adjudication, but does not itself do the adjudicating or punishing.

According to petitioner, the MCA "punishes them by subjecting them to trial before unfair military commissions." Mot. at 30. But under that theory, trying him or any member of the U.S. armed forces, before a military tribunal, rather than the Article III courts, would constitute "punishment." In any event, whatever the burden of trial, it is certainly not "punishment." It is well-established that to "decid[e] whether a statute inflicts forbidden punishment," a court must make "three necessary inquiries: (i) whether the challenged statute falls within the historical meaning of legislative punishment; (ii) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes;' and (iii) whether the legislative record 'evinces a congressional intent to punish.'"[23] *Selective Serv. Sys.*, 468 U.S. at 852 (quoting *Nixon*, 433 U.S. at 475-76). The MCA easily passes this test.

First, historically, legislative punishment has generally been limited to death, imprisonment, banishment, the punitive confiscation of property, and legislative bars to participation by individuals or groups in specific employments or professions. *Selective Serv. Sys.*, 468 U.S. at 852; *Nixon*, 433 U.S. at 474. By contrast, the MCA simply specifies the forum in which permissible claims by unlawful enemy combatants must be brought, sets forth trial procedures, and clarifies the scope of review.[24] Second, the MCA plainly "can be said to further nonpunitive legislative purposes."

_____

[23] Thus, in "determining whether a statute inflicts punishment within the proscription against bills of attainder," the severity of the sanction imposed "is not determinative of its character as punishment." *Selective Serv. Sys.*, 468 U.S. at 851. Neither is the fact that the statute "regulates conduct on the part of designated individuals or classes of individuals," or compels "an individual or defined group . . . to bear burdens which the individual or group dislikes." *Nixon*, 433 U.S. at 470-71.

[24] Petitioner's reliance on *Pierce v. Carskadon*, 83 U.S. (16 Wall.) 234 (1872), *see* Mot. at 31 n.18, is inapposite. *Pierce* involved a statute that deprived non-residents of all access to West

*Selective Serv. Sys.*, 468 U.S. at 852. The MCA's purpose is to create a military judicial system, an obviously valid purpose. Moreover, there can be no serious question that the MCA is a rational means of furthering nonpunitive purposes. *See Foretich*, 351 F.3d at 1221. Moreover, as the D.C. Circuit has observed, "the inclusion of protective measures designed to safeguard the rights of the burdened individual or class weighs against a finding that a statute is a bill of attainder." *Foretich*, 351 F.3d at 1222 (D.C. Cir. 2003). As we have explained, the MCA is filled with numerous protections for enemy aliens to be tried in military commissions.

Finally, the legislative record is clear in showing that congressional intent was not to punish anyone, but to clarify the procedures for the fair and efficient trial of unlawful enemy combatants, with judicial review. Thus, far from punishing petitioner, Congress exercised its legitimate constitutional authority over the scope of federal court jurisdiction, *see* U.S. Const. Art III, § 1, to provide a comprehensive legislative solution to the unique situation presented by trying alien combatants during wartime. Although petitioner contends that Congress' intent was punitive, the isolated statements from the floor debates cited by petitioner simply reflect legitimate distinctions between the judicial process afforded to United States citizens and alien enemy combatants. Mot. 31-32 & nn.18 & 20. In any event, such "isolated statements are not sufficient to show a punitive intent." *Navegar, Inc. v. United States*, 192 F.3d 1050, 1067 (D.C. Cir. 1999); *see also BellSouth Corp. v. F.C.C.*, 144 F.3d 58, 67 (D.C. Cir. 1998). In sum, the MCA is no bill of attainder.

**4.      Petitioner's Equal Protection Claim is Meritless Because the MCA's Application To Only Alien Unlawful Enemy Combatants is a Rational Distinction When the United States is at War with Foreign Enemies.**

---

Virginia state courts to protect property rights, unless they provided a loyalty oath that they had not supported the Confederacy. Conversely, the MCA involves no similar circumstance and, in fact, expressly *creates* procedures for judicial review of any punishment that a military commission might impose.

Petitioner argues that the military commission scheduled to try him for violating the law of war violates his right to equal protection under the Fifth Amendment. This assertion is based on the remarkable premise that the MCA, which subjects only alien unlawful enemy combatants to trial by military commission, violates equal protection through "unequal access to the Great Writ, leaving American citizens with pretrial habeas challenges but not green-card holders or foreigners." Mot. 33-34, n.23. Distilled to its essence, petitioner's equal-protection argument is that any distinction that the United States Congress makes between United States citizens and the rest of the world is inherently suspect. The Constitution does not require such an absurd result.

To begin with, the Supreme Court has made clear that *federal* policies regarding aliens are entitled to a great degree of deference, even in times of peace. *See, e.g.*, *Nyquist v. Mauclet*, 432 U.S. 1, 7 n.8 (1977) ("Congress, as an aspect of its broad power over immigration and naturalization, enjoys rights to distinguish among aliens that are not shared by the States."); *Mathews v. Diaz*, 426 U.S. 67, 80 (1976) ("The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious'"). The Court has further observed:

> [A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference. . . . Any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution.

*Diaz*, 426 U.S. at 81 & n.17 (internal quotation marks and citations omitted). Moreover, in *Verdugo-Urquidez*, the Supreme Court squarely rejected the claim, substantively identical to that advanced by this petitioner, that "treat[ing] aliens differently from citizens with respect to the Fourth Amendment somehow violates the equal protection component of the Fifth Amendment," because "the result of accepting [this] claim would have significant and deleterious consequences for the

United States in conducting activities beyond its boundaries." *Verdugo-Urquidez*, 494 U.S. at 273.

The cases cited by petitioner do not hold otherwise. To the contrary, those cases simply stand for the unremarkable proposition that discrimination in administering *state* welfare programs, based on the classification of *resident* aliens, voluntarily residing in the United States, will be strictly scrutinized. *See Graham v. Richardson*, 403 U.S. 365 (1971); *Plyler v. Doe*, 457 U.S. 202 (1982) (same); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886) (same). The Supreme Court has itself rejected the extension of these precedents to the claim advanced by this petitioner. *See Verdugo-Urquidez*, 494 U.S. at 271 ("These cases, however, establish only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); *see also Le Clerc v. Webb*, 419 F.3d 409, 415 (5th Cir. 2005) ("The Supreme Court has reviewed with strict scrutiny only state laws affecting permanent resident aliens."). This is so simply because resident aliens, "like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society." *In re Griffiths*, 413 U.S. 717, 722 (1973). These same considerations do not apply, as petitioner would have this Court believe, to the entirety of the rest of the world, and they certainly do not apply to nonresident aliens who wage unlawful war against the United States.

The United States can draw, and historically has drawn, distinctions between alien enemies and citizens who join and assist our enemies. As members of our political community, citizens who assist foreign powers are not identically situated to aliens lacking any duty of allegiance to the United States. The Constitution itself draws this distinction by defining the offense of treason, which applies only to citizens and others with a duty of allegiance to the United States. *See* U.S. Const. Art. III, § 3; *see also* 18 U.S.C. § 2381. In both the current and in our past armed conflicts, the United States has distinguished between citizen and enemy combatants, including in the use of

53

federal courts or military commission trials. Justice Scalia described these historical distinctions in the course of dissenting in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004):

> In more recent times, too, citizens have been charged and tried in Article III courts for acts of war against the United States, even when noncitizen co-conspirators were not. For example, two American citizens alleged to have participated during World War I in a spying conspiracy on behalf of Germany were tried in federal court. *See United States v. Fricke*, 259 F. 673 (S.D.N.Y. 1919); *United States v. Robinson*, 259 F. 685 (S.D.N.Y. 1919). A German member of the same conspiracy was subjected to military process. *See United States ex rel. Wessels v. McDonald*, 265 F. 754 (E.D.N.Y. 1920). During World War II, the famous German saboteurs of *Ex parte Quirin*, 317 U.S. 1 (1942), received military process, but the citizens who associated with them (with the exception of one citizen-saboteur . . . ) were punished under the criminal process. *See Haupt v. United States*, 330 U.S. 631 (1947); L. Fisher, Nazi Saboteurs on Trial 80-84 (2003); *see also Cramer v. United States*, 325 U.S. 1 (1945).

*Hamdi*, 542 U.S. at 560. Although a majority of the Court in *Hamdi* held that citizen enemy combatants could be subject to military detention, no member of the Court disputed that citizens historically had been treated differently from alien enemy combatants or that such historical treatment was fully consistent with the Equal Protection Clause of the Constitution. Congress appropriately relied on such historical precedents in passing the Military Commissions Act.

Given the deference that courts owe the political branches in this area, distinctions based on alienage by the federal government are subject only to the most deferential rational-basis review. Such laws will be upheld as long as the classification is rationally related to a legitimate government interest. *See United States v. Ferreira*; 275 F.3d 1020 (11th Cir. 2001) (applying rational basis review of 18 U.S.C. § 1203, which criminalizes conduct by aliens when the same conduct committed by U.S. citizen would not be criminal); *United States v. Montenegro*, 231 F.3d 389 (7th Cir. 2000) (same); *United States v. Lue*, 134 F.3d 79 (2d Cir. 1998) (same). Indeed, the need for deferential review in the present context is even greater. Distinctions between citizens and aliens drawn by the political branches are especially appropriate when the United States is in a state of war with foreign

enemies. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 586-87 ("Under our law, the alien in several respects stands on an equal footing with citizens, but in others has never been conceded legal parity with the citizen. . . . So long as the alien elects to continue the ambiguity of his allegiance his domicile here is held by a precarious tenure.").

By any measure, the MCA's application to aliens is rational. Congress enacted the MCA in response to the most serious aggression ever against the United States on its soil by aliens affiliated with a foreign-based terrorist organization. In time of war, the government must use the forces at its disposal, including military forces and intelligence assets, to prevent the enemy from harming American lives and interests. In doing so, the government may make distinctions between citizens and aliens in matters of detention and punishment: a violent act committed against the United States by a citizen may be an act of war, but it is always a criminal offense; a violent act committed by an enemies is an act of war, whether lawful or unlawful, even if it does not constitute a domestic criminal offense. *See Harisiades*, 342 U.S. at 587 ("War, of course, is the most usual occasion for extensive resort to the power" to treat aliens differently). Moreover, citizens have a greater panoply of both constitutional and statutory rights that they may invoke than do aliens abroad. Thus, inherently, they are differently situated. Nothing in the Constitution requires that aliens and citizens be held to the same standard with respect to acts of war against the United States. *See id.* at 586-87.

**5.    Petitioner's Due Process challenge is both premature and without merit.**

**a.** Petitioner argues that the military commission process violates the Due Process Clause in several respects. None of these claims have merit. As an initial matter, review of these Due Process challenges will not be ripe until the conclusion of the military commission process because they will depend on actions that may or may not be taken during the commission, including actions with respect to actual evidence used at trial and the prospect of possible acquittal. Whether

petitioner has been deprived of due process during his commission proceeding resulting in a deprivation of his liberty interest is a question that can only be determined following the completion of commission proceedings and imposition of the sentence, if any. *See Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990) (a due process violation is "not complete unless and until the State fails to provide due process").

Petitioner, in effect, is attempting to challenge the military commission rules and procedures in the abstract. However, he has made no attempt whatsoever to meet the heavy burden in such a challenge to establish that "no set of circumstances exists under which the [rules challenged] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Indeed, he cannot meet that burden. A facial challenge to any statutory scheme is the "most difficult challenge to mount successfully," *id.*, because there are most certainly a large number of circumstances in which due process would not be violated. The same is even more true here, when petitioner seeks to challenge judicial processes, in the abstract, absent any consideration into whether or what evidence that the Government actually may seek to introduce in the upcoming trial.

**b.** More specifically, petitioner claims that the rules allowing the admission of hearsay and evidence allegedly obtained through coercion violate the Due Process Clause. Mot. at 36. This claim lacks merit. Instead, while the MCA provides for the consideration of reliable hearsay evidence, it includes substantial protections for defendants: anytime the government wishes to use hearsay evidence, it must notify the defendant "sufficiently in advance to provide the adverse party with a fair opportunity to meet the evidence" and must explain "the particulars of the evidence (including information on the general circumstances under which the evidence was obtained)." 10 U.S.C. 949a(b)(2)(E)(i); *see id*. § 949a(b)(2)(E)(ii) (if party demonstrates evidence is "unreliable or lacking in probative value," it will not be admitted). In light of the ongoing nature of the war, many

witnesses may well not be available to testify in person, and some allowance for hearsay is essential. Despite petitioner's theoretical challenge to the admissibility of hearsay evidence, there is nothing inherently improper about admitting hearsay in the circumstances allowed by the MCA. Most nations and international courts allow hearsay, as do our courts in many circumstances. *See, e.g.,* Fed. R. Evid. 803 (listing 23 exceptions to the rule against hearsay when declarant is available); Fed. R. Evid. 804 (listing five exceptions to the rule against hearsay when declarant is unavailable); Fed. R. Evid. 807 (creating residual exception to hearsay rule for statements with circumstantial evidence of trustworthiness). Moreover, petitioner is allowed to challenge the use of hearsay at trial, MCRE 803, and on judicial review to the D.C. Circuit. To the extent petitioner suggests that under "no set of circumstances" would it be constitutional to consider hearsay, his claim is little short of absurd.

As for petitioner's objection to the potential admissibility of "coerced" statements, the MCA strikes a reasonable balance between the various competing interests, including the accused's rights to a full and fair trial, the commission's need to consider all reliable and probative evidence, and the integrity of the commission proceedings. The MCA permits the admission of statements upon the military judge's finding that the statements were not obtained by torture or in violation of the DTA's prohibition on "cruel, inhuman, or degrading treatment," 10 U.S.C. § 948r(d)(3), and that the totality of the circumstances renders the statements reliable and that the interest of justice further support their admission, *id*. § 948r(c)-(d). It is impossible to conclude, in the abstract, that any statement admitted under this standard would necessarily violate due process, and petitioner's facial claim is therefore meritless.

In any event, any potential prejudice to the accused from application of the rule permitting hearsay or coerced statements is highly speculative. To begin with, the accused is free to show that the evidence proffered for admission is unreliable, obtained under impermissible standards, or that

57

admission would be contrary to the interest of justice.  If he is unsuccessful, he may argue to the trier

of fact that the weight of the evidence should be affected in light of those rules.  *See* 10 U.S.C.

§ 948r; MCRE 803(c).  Most importantly, petitioner may raise his due process concerns after the

trial, when there will be an actual ruling and record for a court to review.  The speculation that some

allegedly coerced statement might be improperly admitted against petitioner during the commission

proceeding—which could readily be corrected by the D.C. Circuit on appeal—is insufficient to

mount a successful facial challenge to these rules.

Petitioner further claims that the Due Process Clause is violated because "the MCA offends

Common Article 3" of the Geneva Conventions.  Mot. at 36.  This claim is meritless—nothing in

the Due Process Clause prevents Congress from replacing treaty standards with statutory ones.  *See*

*Breard v. Greene*, 523 U.S. 371, 376 (1998); *Reid*, 354 U.S. at 18 (plurality opinion).  In any event,

the MCA procedures are plainly consistent with Common Article 3, which mandates only those trial

procedures "recognized as indispensable by civilized peoples."  *See also Hamdan*, 126 S. Ct. at 2797

(plurality opinion).  Common Article 3 ensures only the "barest of those trial protections that have

been recognized by customary international law."  *Id.*[25]

## 6.    The MCA and Military Commissions Do Not Violate Petitioner's Sixth Amendment Right to Counsel, If Any.

As with his due process claim, this issue is clearly premature.  Petitioner has been provided

with counsel.  Whether or not his counsel is able to be effective under the circumstances (Mot. at 38;

---

[25]To the extent petitioner separately invokes the Convention as a source of rights, his claim is statutorily barred.  10 U.S.C. § 948b(g); MCA § 5.  Further, Congress concluded that the MCA implements Common Article 3, 10 U.S.C. § 948b(f), a conclusion that is not subject to judicial challenge.  Neither does this enactment improperly intrude into the judicial function.  In *Hamdan* the justices actually *invited* Congress to act in addressing military commission trials so as define the standards under Common Article 3.  *Hamdan*, 126 S. Ct. at 2799 (Breyer, J., concurring); *see also id.* at 2800 (Kennedy, J., concurring in part).

Ex. A to Mot.) is not something that a habeas court can or should address *ex ante*. A habeas court cannot do so because the effectiveness of counsel will obviously depend on how the trial unfolds. And it should not do so because any violation will be fully remediable after trial. *See Khadr*, 529 F.3d at 1117-1118. The very concept of ineffective assistance of counsel in habeas cases contemplates that a habeas petitioner has been actually prejudiced through a conviction because counsel's representation fell below an objective standard. *See United States v. Hughes*, 514 F.3d 15, 18 (D.C. Cir. 2008) (quoting *Strickland v. Washington,* 466 U.S. 668, 687-88, 694 (1984), which requires "(1) showing 'counsel's representation fell below an objective standard of reasonableness' and (2) demonstrating 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different'"). There can be no actionable claim to ineffective assistance of counsel where the Court cannot measure counsel's performance because it has not yet occurred. And the Court cannot evaluate prejudice through conviction when a conviction has not yet been rendered. Indeed, an ineffective assistance of counsel claim is often "premature" on even direct review. *See United States v. Whitefeather*, 275 F.3d 741, 743 (8th Cir. 2002). In any event, it is clear that petitioner's claims concerning effective assistance of counsel must, if they are to be preserved, be addressed to the body subjecting him to trial and not in an ancillary habeas proceeding before trial has occurred. *See generally United States v. Kazni*, 576 F.2d 238, 242 (9th Cir. 1978).

Indeed, the statutory scheme created by Congress specifically demands that such claims be presented to the military commission. Congress thus excluded the type of "over the shoulder" micro-managing petitioner now invites this Court to engage in—to have this Court superintend his military trial. These are precisely the types of issues "that should or must be decided in the first instance by the Military Commission, and then raised before the D.C. Circuit, as necessary, on appeal. The

Supreme Court's decision in *Schlesinger v. Councilman*, 420 U.S. 738 (1975) requires federal courts to give 'due respect to the autonomous military judicial system created by Congress.'" *Hamdan v. Gates*, Ex. A at 4. Thus, if petitioner's allegations ripen into constitutional violations (assuming he may assert such claims), they are best reviewed by the commission itself in the first instance, and ultimately the D.C. Circuit on appeal as of right, at which point any *prejudice* from his asserted violations may be assessed. *See Khadr*, 529 F.3d at 1118 ("This Court will have the opportunity to . . . determine whether the commission . . . acted in conformity with the law.").

As for whether petitioner is unconstitutionally prejudiced in his ability to present his defense, either in terms of counsel access, or in terms of his alleged medical conditions, neither may those issues be addressed by a habeas court *ex ante*. He certainly has not made a showing of incompetent representation by his lawyers, and the Military Commission Rules set forth mechanisms for addressing such issues.[26]  If any detailed military counsel has doubts about his or her competency in these proceedings, the appropriate mechanism is to raise the issue of qualifications and competency to the military judge of the commission. Indeed, they would have an obligation to do so. R.M.C 502. Tellingly, they have not. To the extent petitioner complains that his counsel have not represented a defendant in a death penalty case before, that is not a ground for relief even under the Uniform Code of Military Justice. *See, e.g., United States v. Loving*, 41 M.J. 213, 300 (CMA 1994); *United States v. Curtis*, 44 M.J. 106, 126 (CMA 1996).

Petitioner's counsel have questioned his own mental competency. But the military judge *has ordered* "an inquiry into the mental capacity of Ramzi Bin Al Shibh be conducted in accordance with

---

[26] *See, e.g.*, R.M.C. 502(d) (concerning qualifications of counsel); R.M.C. 901(d) (advisement by military judge of rights to counsel; announcement of legal qualifications by military judge and counsel; inquiry of counsel qualifications by military judge; obligation of military judge to "take appropriate measures to protect each accused's right to counsel").

Rule for Military Commission 706," and this court need not, and should not, prevent that inquiry from proceeding.[27] While the procedures under the Rules for Military Commissions set forth by Congress may not be exactly the same as the Rules for Courts-Martial, they are constitutionally adequate.  In any event, any inadequacy due to petitioner's alleged medical conditions cannot be addressed without first knowing whether the petitioner was prejudiced—which cannot be decided *ex ante*.  Put differently, even assuming the applicability of the Sixth Amendment, no constitutional issue is ripe at this time.

## III.    THE BALANCING OF HARMS TIPS DECIDEDLY AGAINST THE ISSUANCE OF AN INJUNCTION

The injunction requested by petitioner also should be denied because granting it would result in substantial injury to respondents and be contrary to the public interest.  Issuing an injunction would substantially defeat the public interest to try unlawful combatants such as petitioner by a military commission, duly authorized by Congress.  Undoubtedly, the ability to try alien enemy combatants suspected of war crimes in a timely fashion is an important part of the United States' war effort, and the public has a strong interest in seeing such individuals brought to justice as soon as possible.  *See Quirin*, 317 U.S. at 28-29 ("[a]n important incident to the conduct of war is the adoption of measures by the military command not only to repel and defeat the enemy, but to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war").  For this Court to enjoin the ongoing military commission proceedings now (when Congress has authorized the commission and declared that this court has no power to do so) would harm those significant interests.  Enjoining military commission proceedings would also exacerbate the burdens on the Government from conducting these kinds of

---

[27]Ex. C to Pet's Mot.

trials, including the deployment of remote witnesses, many with sensitive responsibilities in an ongoing war, to document the circumstances of capture or the evidence collected regarding a petitioner.  Moreover, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers).  That is particularly so here where an injunction would prevent a wartime prosecution from proceeding pursuant to an act of Congress.  Thus the "presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of applicants in balancing hardships."  *See Walters v. Nat'l Assn. of Radiation Survivors*, 468 U.S. 1323, 1323 (1984) (Rehnquist, J., in chambers).

On the other hand, petitioner has not shown that he will suffer irreparable harm that is "both certain and great," *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), if this Court does not enjoin his military commission proceedings.  As the D.C. Circuit explained in the context of a military commission trial of another Guantanamo detainee, "[t]here is no substantial public interest at stake in this case that distinguishes it from the multitude of criminal cases for which post-judgment review of procedural and jurisdictional decisions has been found effective."  *Khadr*, 529 F.3d at 1118. Indeed, as the D.C. Circuit's opinion in *Khadr* necessarily concluded, any harm to petitioner from being subjected to trial does not warrant the interlocutory intervention of an Article III court.  The harms described by petitioner remain the same as those the Supreme Court considered and rejected in *Younger v. Harris*, 401 U.S. 37 (1971).

Petitioner cites an immigration case, *Rafeedie v. INS*, 880 F.2d 506 (D.C. Cir. 1989) for the proposition that he will suffer harm by revealing his defense strategy (Mot. at 5), but this is no different than the risk present in any domestic or military criminal trial that is reversed on appeal

(and petitioner does not acknowledge that this concern works in both directions—the Government, too, will have revealed its prosecution strategy to petitioner).  Thus, the reasoning in *Rafeedie,* which addressed the unique situation where requiring the petitioner to proceed would have required him to reveal his trial strategy without the Government having to do the same, is inapplicable here.  As the Supreme Court has noted in the context of criminal trial of U.S. citizens, "[b]earing the discomfiture and cost of a prosecution for crime even by an innocent person is one of the painful obligations of citizenship."  *Hollywood Motor Car. Co.*, 458 U.S. at  268 n.2 (quoting *Cobbledick v. United States*, 309 U.S. 323, 325 (1940)).  Although petitioner is not a citizen, if convicted, he will nonetheless be able to obtain automatic review by the court of appeals.

The public interest also militates strongly against granting the injunction.  Indeed, the D.C. Circuit held just weeks ago that there is "no substantial public interest" to"warrant our interruption of this criminal proceeding just because it is a military commission" in order to "ensur[e] that all [the] proceedings are just."  *Khadr*, 529 F.3d at 1118.  These were the same kinds of military commission proceedings at issue in this case.  By contrast, there is a significant public interest in avoiding unnecessary delay.  In the days since the Supreme Court's decision in *Boumediene*, the Guantanamo habeas petitioners have urged the judges of this District to hasten the arrival of their day in court.  For petitioner, that day has arrived; yet, he would have this Court *delay* an adjudication of the facts.  However, "encouragement of delay is fatal to the vindication of the criminal law." *United States v. MacDonald*, 435 U.S. 850, 854 (1978).  Rather, the "public has a strong interest in the prompt, effective and efficient administration of justice." *United States v. Poston*, 902 F.2d 90, 96 (D.C. Cir. 1990).

///

///

In sum, petitioner will not be harmed by allowing his criminal proceedings to move forward, but the harm to the United States and the public interest would be significant. Accordingly, a preliminary injunction is not warranted.

## **CONCLUSION**

For the foregoing reasons, this Court should deny petitioner's extraordinary request to enjoin his military commission proceedings.

Dated: July 28, 2008                    Respectfully submitted,

                                        GREGORY G. KATSAS
                                        Assistant Attorney General

                                        JOHN C. O'QUINN
                                        Deputy Assistant Attorney General

                                        _/s/ Scott M. Marconda_
                                        JOSEPH H. HUNT (D.C. Bar No. 431134)
                                        VINCENT M. GARVEY (D.C. Bar No. 127191)
                                        JUDRY L. SUBAR (D.C. Bar No. 347518)
                                        TERRY M. HENRY
                                        ANDREW I. WARDEN (IN Bar No. 23840-49)
                                        SCOTT M. MARCONDA (CA Bar No. 144225)
                                        Attorneys
                                        United States Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Avenue N.W.
                                        Washington, DC 20530
                                        Tel: (202) 305-0169—Fax: (202) 616-8470
                                        Attorneys for Respondents

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAMZI BIN AL-SHIBH, ) | |
| ) | |
| Petitioner ) | |
| v. ) | Civil Action No. 06-cv-1725 (EGS) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, ) | |
| et al., ) | |
| ) | |
| Respondents ) | |
| ) | |

Upon petitioner's Motion for Preliminary Injunction, it is hereby ordered as follows:

1. Petitioner's motion is hereby denied.


Date: _____

_____
UNITED STATES DISTRICT JUDGE

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SALIM AHMED HAMDAN,            :
                              :
        Plaintiff,            :
                              :
    v.                        : Civil Action No. 04-1519 (JR)
                              :
ROBERT GATES,                 :
                              :
        Defendant.            :

## MEMORANDUM ORDER

Salim Ahmed Hamdan seeks a preliminary injunction that would stop his trial by military commission pending federal court review of the Military Commission's determination that he is an unlawful enemy combatant and of his claims that the trial will violate the Constitution and the Geneva Conventions.

## I. Background

A. Procedural History

Hamdan is a Yemeni national.  He was captured by militia forces in Afghanistan in November 2001 and turned over to the United States military.  Since June 2002, he has been held at the Defense Department's detention facility at Guantanamo Bay. One year into his detention at Guantanamo, in July 2003, the President declared him eligible for trial by military commission on unspecified charges.  In April 2004, Hamdan filed a petition for mandamus or habeas corpus in the United States District Court

for the Western District of Washington.  On July 13, 2004, two
years and eight months into his detention, Hamdan was formally
charged with single count of conspiracy "to commit . . . offenses
triable by military commission."  In August 2004, his habeas
petition was transferred to the District of Columbia and randomly
assigned to me.

Around the same time, in July 2004, in compliance with
the Supreme Court's decision in Hamdi v. Rumsfeld, 542 U.S. 507
(2004), the Deputy Secretary of Defense established Combatant
Status Review Tribunals (CSRTs) to determine whether detainees at
Guantanamo are "enemy combatants."  Hamdan was classified as a
enemy combatant by a CSRT on October 2, 2004, and designated for
trial before a military commission.

On November 8, 2004, I granted Hamdan's habeas
petition.  Hamdan v. Rumsfeld, 344 F. Supp. 2d 152 (D.D.C.
2004).[1]  The Supreme Court generally sustained my decision,[2]
holding that Hamdan could not be lawfully tried by a military
tribunal convened only by executive order and that the structure
and procedures of the military commission then in place violated
both the Uniform Code of Military Justice and the Geneva

[1] Contrary to the government's insistence that habeas is
solely concerned with release, Opp. Memo. at 16-17, this grant of
a petition for habeas corpus did not involve Hamdan's release.

[2] The Court ignored my conclusion that Hamdan should be put
before a tribunal that would determine whether he was a prisoner
of war.

Conventions.  Hamdan v. Rumsfeld, 126 S. Ct. 2749, 2759 (2006).
Four justices, in a plurality opinion, also concluded that the
only offense Hamdan was then charged with – conspiracy – was not
a violation of the law of war and thus not triable by military
commission.  Id. at 2780.

      Four justices (not the same four) noted in Hamdan that
"[n]othing prevents the President from returning to Congress to
seek the authority he believes necessary" in order lawfully to
try enemy combatants before a military tribunal.  Id. at 2799.
The President accepted that invitation and, in October 2006,
Congress enacted the Military Commissions Act, Pub. L. No.
109-366, 120 Stat. 2600.  In Section 3(a)(1) of that Act,
codified at 10 U.S.C. § 948d(a), Congress gave military
commissions jurisdiction to try "alien unlawful enemy
combatant[s]."

      Under the Act, a military commission is made up of at
least five officers, 10 U.S.C. §§ 948i, 948m, and is presided
over by a military judge, 10 U.S.C. § 948j.  Many of the
procedures for an MCA commission parallel those that had been
established by the President's order.  Before and after passage
of the MCA, the applicable rules have required that the defendant
be represented by appointed military counsel and have the ability
to retain private counsel (as Hamdan has), that he be informed of
the charges against him, that he be presumed innocent until

- 3 -

proven guilty beyond a reasonable doubt, that he receive (with
important qualifications) the evidence that the prosecution
intends to produce at trial and any known exculpatory evidence,
that he not be required to testify at trial, and that he be
allowed to present evidence and cross-examine witnesses.  32
C.F.R. §§ 9.3 - 9.6; 10 U.S.C. §§ 948k, 949a, 949c, & 949l.

 The procedures codified by the MCA also include
significant improvements.  Previously, the accused could be
excluded from the proceedings, and evidence admitted against him
without his knowledge.  32 C.F.R. §§ 9.6(b)(3), (d)(5).  The MCA
repairs that problem by requiring the presence of the defendant
unless, after being warned, he persists in conduct that justifies
his exclusion in order to protect the safety of others or to
avoid disrupting the proceedings.  10 U.S.C. §§ 949d(b), (e).
While the MCA adopts fairly permissive standards allowing for the
use of hearsay and requires the party opposing admission to prove
unreliability, whenever the government intends to use hearsay, it
must notify the defendant "sufficiently in advance to provide the
adverse party with a fair opportunity to meet the evidence" and
must explain "the particulars of the evidence (including
information on the general circumstances under which the evidence
was obtained)."  10 U.S.C. § 949a(b)(2)(E)(ii).

 The curtailment of confrontation rights through the
broad allowance of hearsay is one of a number of ways in which

- 4 -

MCA commissions depart from standards that would be applied in
either U.S. criminal trials or courts-martial.  Another
departure, and a startling one, is that under 10 U.S.C.
§ 948r(c), evidence obtained by "coercion" may be used against
the defendant so long as the military judge decides that its
admission is in the interest of justice and that it has
"sufficient" probative value.  Compare Chambers v. Florida, 309
U.S. 227 (1940) (reversing conviction and excluding evidence
obtained through five days of coercive interrogation).

        That said, one of the most substantial improvements
under the MCA is in the structure for review of convictions.
Before the MCA, the President himself, or the Secretary of
Defense acting at his direction, was vested with final reviewing
authority.  There was no provision for independent review outside
the military's chain of command.  Under the MCA, defendants
convicted by military commission are afforded three levels of
appellate review.  A defendant may first appeal his conviction to
a Court of Military Commission Review (CMCR), comprised of at
least three military judges or civilians with "comparable
qualifications" appointed by the Secretary of Defense.  10 U.S.C.
§ 950f.  After exhausting (or waiving) proceedings before the
CMCR, the defendant has an appeal of right to the D.C. Circuit,
which has "exclusive jurisdiction to determine the validity of a
final judgment rendered by a military commission."  10 U.S.C.

§ 950g.  The Court of Appeals has jurisdiction to review all
"matters of law" in order to consider "whether the final decision
was consistent with the standards and procedures specified" in
the MCA and with "the Constitution and laws of the United
States."  10 U.S.C. §§ 950g(a)-(c).  Finally, 10 U.S.C. § 950g(d)
provides that the Supreme Court may review the final judgment of
the Court of Appeals on a writ of *certiorari*, in accordance with
28 U.S.C. § 1257.

        Except for its provision "channeling" appellate review
of final judgments to the D.C. Circuit, the MCA was clearly
designed to keep enemy combatants away from the federal courts:
section 7 of the MCA unambiguously stripped Article III courts of
their jurisdiction to consider habeas petitions filed by enemy
combatants.  It was in compliance with Section 7 that I dismissed
Hamdan's petition for habeas corpus on December 13, 2006:
Congress had stripped federal courts of their statutory habeas
jurisdiction, and I thought that precedent required that I refuse
a "constitutional" writ of habeas corpus to an alien detained at
Guantanamo Bay.  Hamdan v. Rumsfeld, 464 F. Supp. 2d 9 (D.D.C.
2006).  That belief turned out to be incorrect.  The Supreme
Court, in Boumediene v. Bush, 128 S. Ct. 2229 (2008), decided
last month that Section 7 was unconstitutional.  The Court held
that the Suspension Clause, Art. I, § 9, cl. 2 of the
Constitution, "has full effect at Guantanamo Bay," and that the

Boumediene petitioners "are entitled to the privilege of habeas corpus to challenge the legality of their detention."  Id. at 2262.

While these developments were moving forward in Congress and the courts, Hamdan's military commission moved forward, as well, although not without difficulty.  On April 5, 2007, the Convening Authority authorized two new charges against Hamdan, both of which had recently been "codified" under the MCA. Charge I was, and is, for conspiracy in violation of 10 U.S.C. § 950v(b)(28); Charge II is for providing material support for terrorism in violation of 10 U.S.C. § 950v(b)(25).  On June 4, 2007, the military judge presiding over Hamdan's Commission dismissed those charges, for lack of jurisdiction, because Hamdan had been classified by CSRT only as an "enemy combatant" and not as an "unlawful enemy combatant."  The government moved for reconsideration and for the military judge to hear evidence and decide for himself whether Hamdan was lawfully triable under the MCA.  The motion was granted and, as a result of hearings held on December 5 and 6, 2007, the military judge issued an opinion finding Hamdan to be an unlawful enemy combatant.  In that same opinion, issued on December 19, 2007, the judge also rejected a number of constitutional arguments – Hamdan's ex post facto, bill of attainder and equal protection challenges – relying on the D.C. Circuit's now-vacated opinion in Boumediene v. Bush, 476

- 7 -

F.3d 981 (D.C. Cir. 2007), which had held that detainees at
Guantanamo have no cognizable constitutional rights.  Id. at 992.

Hamdan's trial by military commission is scheduled to
begin on July 21, 2008.

B. Hamdan's Motion for Preliminary Injunctive Relief

Hamdan argues that the Commission lacks personal
jurisdiction over him and lacks subject matter jurisdiction over
the crimes for which he has been charged.

As to personal jurisdiction, Hamdan begins with the
unassailable fact that the MCA limits trial by military
commission to those who have been determined to be unlawful enemy
combatants.  Although he was so classified by the Commission in
December 2007, Hamdan argues that the Commission may not proceed
against him based on a status determination that has not been
reviewed by a federal court.  Under Hamdan's reading of
Boumediene, detainees' now-recognized constitutional right to
challenge the legality of their detention in habeas means that
trial by military commission cannot proceed before there has been
a full habeas hearing in federal court to test a finding of
unlawful enemy combatancy, whether made by a CSRT or by a
military commission.

As to subject matter jurisdiction, Hamdan argues that
the Commission lacks power to proceed because the charges filed

against him violate the Constitution's *ex post facto*, define and punish, and bill of attainder clauses.  He also asserts that the MCA violates the equal protection component of Fifth Amendment due process by subjecting only aliens to trial by military commission, and that the Commission's potential allowance of certain kinds of hearsay evidence and evidence obtained through coercion will violate his Geneva Convention and due process rights.

The government argues that as a result of a provision in Section 3(a)(1) of the Military Commissions Act, codified at 10 U.S.C. § 950j(b), this Court lacks jurisdiction to decide Hamdan's claims and that, even if jurisdiction does exist, "the comity-based abstention doctrine recognized in [Schlesinger v. Councilman, 420 U.S. 738 (1975)] . . . require[s] this Court to stay its hand until the completion of the military commission process."  Opp. Memo. at 9.  Aside from any claims based on the Geneva Conventions, the government stresses that each claim that Hamdan has raised is "fully cognizable on direct review [by the D.C. Circuit] if he is convicted by military commission."[3]  Id. at 22.

---

[3] The MCA purports to bar defendants from asserting defenses or invoking rights based on the Geneva Conventions. See 10 U.S.C. § 948b(g). Should Hamdan be convicted, nothing in the MCA bars him from asserting on appeal, as he does in this motion, that § 948b(g) violates the Supremacy Clause and the separation of powers. See United States v. Klein, 80 U.S. 128 (1872).

- 9 -

## II. Analysis

A. It is not necessary to decide Hamdan's claim that Section 3(a)(1) of the MCA is an unconstitutional suspension of habeas corpus.

> Except as otherwise provided in this chapter and notwithstanding any other provision of law (including section 2241 of title 28 or any other habeas corpus provision), no court, justice, or judge shall have jurisdiction to hear or consider any claim or cause of action whatsoever, including any action pending on or filed after the date of the enactment of the Military Commissions Act of 2006, relating to the prosecution, trial, or judgment of a military commission under this chapter, including challenges to the lawfulness of procedures of military commissions under this chapter.

10 U.S.C. § 950j(b). Hamdan insists that this provision does not bar challenges to the Commission's jurisdiction, even though on its face it is plainly a jurisdiction-stripping provision.[4] Instead, he argues, it "merely codifies, in the context of the MCA, the prudential rule that civilian courts lack supervisory jurisdiction over military tribunals." Pet.'s Memo. at 14. Hamdan's strained reading of § 950j(b) cannot be squared with the language that withdraws jurisdiction over "any claim or cause of action whatsoever . . . relating to prosecution, trial or judgment of a military commission," and it ignores the context of the provision within the MCA, which was intended to deprive the federal courts of all habeas jurisdiction over Guantanamo.

---

[4] The government euphemistically calls this section a "review channeling provision."

Hamdan next argues that, if and to the extent that § 950j(b) does strip this Court of jurisdiction, either to challenge the MCA tribunal's jurisdiction or to deal with his other constitutional claims about the Commission, it "violate[s] the Suspension Clause by precluding access to the Great Writ without providing an adequate, alternative remedy."  Pet.'s Memo. at 15.

That argument presents important constitutional questions that I need not, and therefore will not, attempt to answer.  "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."  Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 105 (1944).  The Supreme Court did not abstain from the Suspension Clause issue in Boumediene, but the Supreme Court is the Supreme Court.  Moreover, the context in which the issue is presented here is quite different.

First, the application of habeas corpus that Hamdan wishes to advance here is different from the one recognized in Boumediene.  Boumediene dealt with a challenge to detention. Hamdan insists in his reply brief that he also challenges his detention, but the gist of the challenge presented in this motion for preliminary injunction is to the jurisdiction of the Military Commission, an issue farther removed from the "historical core"

- 11 -

of the Writ than was the case in Boumediene.  See INS v. St. Cyr, 533 U.S. 289, 301 (2001)("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of executive detention, and it is in that context that its protections have been strongest.") (emphasis added).

Second, unlike the petitioners in Boumediene, Hamdan has had a CSRT and a two-day jurisdictional hearing before the Commission, at which he was represented by counsel, and will now have a fully adversarial trial that will provide a further test of the premise of his detention.  As Justice Kennedy observed in Boumediene, "habeas corpus review may be more circumscribed if the underlying detention proceedings are more thorough than they were here."  128 S. Ct. at 2270.  The Boumediene petitioners' right to immediate habeas hearings was tied to the fact that "there has been no trial by a military commission for violations of the laws of war" nor had there been "a rigorous adversarial process to test the legality of their detention."  Id. at 2259-60.

Unlike the detainees in Boumediene, Hamdan has been informed of the charges against him and guaranteed the assistance of counsel.  He has been afforded discovery.  He will be able to call and cross-examine witnesses, to challenge the use of hearsay, and to introduce his own exculpatory evidence.  He is entitled to the presumption of innocence.  And, most importantly,

- 12 -

if Hamdan is convicted, he will be able to raise each of his legal arguments before the D.C. Circuit, and, potentially, the Supreme Court.

The question of whether section § 950j(b) violates the Suspension Clause is both novel and complex. It is by no means controlled by the four corners of <u>Boumediene</u>. What must be considered is "whether there are suitable alternative processes in place to protect against the arbitrary exercise of government power." <u>Id.</u> at 2275. "What matters is the sum total of procedural protections afforded to the detainee at all stages, direct and collateral." <u>Id.</u> at 2269.

As an example of the complexity of the question presented by Hamdan's Suspension Clause challenge, and the inadvisability of attempting to decide it now, consider that a traditional function of a habeas court is to "allow[] prisoners to introduce exculpatory evidence that was either unknown or previously unavailable to the prisoner" at the time that the Executive made the decision to detain. <u>Id.</u> at 2267. Because the MCA provides that the D.C. Circuit's jurisdiction on direct review is limited to "matters of law," it appears that the Court of Appeals would be barred from considering a claim of innocence based on previously unavailable evidence. Whether the constitution entitles Hamdan to raise such a claim collaterally, in habeas, is an entirely speculative question at this point,

- 13 -

first, because such claims may not actually arise, and, second, because the question cannot be answered without accessing how much procedure Hamdan did, in fact, actually receive.  Compare Boumediene, 128 S. Ct. at 2272 ("an opportunity for the detainee to present relevant exculpatory evidence that was not made part of the record in the earlier proceedings" is "constitutionally required in this context" where "the underlying detention proceeding lack[s] the necessary adversarial character") with In re Yamashita, 327 U.S. 1, 8 (1946) ("[O]n application for habeas corpus we are not concerned with the guilt or innocence of the petitioners.  We consider here only the lawful power of the commission to try the petitioner for the offense charged.").

## B. Abstention is appropriate – or required – as to the merits of Hamdan's claims.

Hamdan's focus now is not on post-trial habeas, of course. What he seeks is pre-trial relief to avoid being subjected to a trial that, in his submission, will be unlawful. His claims of unlawfulness, however, are all claims that should or must be decided in the first instance by the Military Commission, and then raised before the D.C. Circuit, as necessary, on appeal.  The Supreme Court's decision in Councilman requires federal courts to give "due respect to the autonomous military judicial system created by Congress."  New v. Cohen, 129 F.3d 639, 643 (D.C. Cir. 1997).  Councilman involved court-

martial proceedings against a U.S. service member, to be sure, and not a military commission, but its central rationale is applicable here.  Councilman requires the courts to respect the balance that Congress has struck in creating a military justice system, "a critical element of which is the Court of Military Appeals consisting of civilian judges completely removed from all military influence or persuasion."  420 U.S. at 758. Considerations of comity were inapplicable when Hamdan's petition was first before me in 2004 because, as I said then, "whatever can be said about the Military Commission established under the President's Military Order, it is not autonomous, and it was not created by Congress."  Hamdan, 344 F. Supp. 2d at 157.  With the enactment of the MCA, that is no longer the case: "Hamdan is to face a military commission . . . designed . . . by a Congress that . . . act[ed] according to guidelines laid down by the Supreme Court."  Hamdan, 464 F. Supp. 2d at 18.  Additionally, because the MCA gives Hamdan an appeal of right to an Article III court, direct review will be even more "removed from all military influence or persuasion" than in Councilman.

     The long-standing exception to Councilman abstention is that defendants may raise, pre-trial, "substantial arguments that a military tribunal lacks personal jurisdiction over them," Hamdan, 126 S. Ct. at 2772 n.20, but I find no "substantial argument" about jurisdiction in this case.  Hamdan urges that the

- 15 -

military judge "made a finding of unlawful enemy combatancy in December 2007 based on a misapplication of <u>relevant law</u>," by failing to address the merits of his constitutional arguments, by misapplying the Geneva Conventions, and by denying him the ability to call certain exculpatory witnesses. <u>Pet.'s Memo.</u> at 24. But Hamdan's summary assertion of these claims does not automatically make his jurisdictional challenge a substantial one. Hamdan does not explain how the applicable jurisdictional standards contained in 10 U.S.C. § 948a(1) were violated by the military judge's application of law to the facts adduced at the December 2007 jurisdictional hearing. The absence of a full-scale habeas hearing as to Hamdan's classification as an unlawful enemy combatant does not, by itself, raise a substantial question about the Commission's jurisdiction to proceed. Moreover, under the D.C. Circuit's recent decision in <u>Khadr v. United States</u>, No. 07-1405, 2008 U.S. App. LEXIS 13285 (June 20, 2008), all of Hamdan's jurisdictional arguments can be addressed, if necessary, following final judgment in accordance with § 950g. Where both Congress and the President have expressly decided when Article III review is to occur, the courts should be wary of disturbing their judgment.

**Conclusion**

I find that Hamdan's chances of prevailing on the
merits of his prayer for injunctive relief are uncertain; that he
has shown no public interest reason for an injunction, see Khadr,
2008 U.S. App. LEXIS at *15; that the disruption that would be
caused by a last-minute delay of his trial would be significant;
and that the irreparable injuries he asserts do not outweigh the
other preliminary injunction factors.

The eyes of the world are on Guantanamo Bay.  Justice
must be done there, and must be seen to be done there, fairly and
impartially.  But Article III judges do not have a monopoly on
justice, or on constitutional learning.  A real judge is
presiding over the pretrial proceedings in Hamdan's case and will
preside over the trial.  He will have difficult decisions to
make, as judges do in nearly all trials.  The questions of
whether Hamdan is being tried *ex post facto* for new offenses,
whether and for what purposes coerced testimony will be received
in evidence, and whether and for what purpose hearsay evidence
will be received, are of particular sensitivity.  If the Military
Commission judge gets it wrong, his error may be corrected by the
CMCR.  If the CMCR gets it wrong, it may be corrected by the D.C.
Circuit.  And if the D.C. Circuit gets it wrong, the Supreme
Court may grant a writ of *certiorari*.

- 17 -

The motion for preliminary injunction, [Dkt. # 92], is

**denied.**


                              JAMES ROBERTSON
                         United States District Judge

# EXHIBIT B

UNCLASSIFIED

6 Apr 07

MEMORANDUM

From:  Legal Advisor
To:    Director, Combatant Status Review Tribunal

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL
       FOR DETAINEE ISN # 10013

Ref:   (a) Deputy Secretary of Defense Order of 7 July 2004
       (b) Deputy Secretary of Defense Implementation Directive of 14 July 2006

Encl:  (1) Appointing Order for Tribunal #38 of 22 February 2007
       (2) FBI memo of 7 December 2006
       (3) OARDEC memo of 29 March 2007

1. Legal sufficiency review has been completed on the subject Combatant Status Review
Tribunal in accordance with references (a) and (b). After reviewing the record of the Tribunal, I
find that:

    a. The detainee was properly notified of the Tribunal process and voluntarily elected not
    to participate in the Tribunal.

    b. The Tribunal was properly convened and constituted by enclosure (1).

    c. The Tribunal substantially complied with all provisions of references (a) and (b).

        1. The definition of "enemy combatant" described in the summary of unclassified
    evidence (exhibit R-1) contains an error. The summary states that enemy combatants are
    "part of or supporting the Taliban or al Qaida forces. . . ." The word "the" should not
    appear before "Taliban," however. Since the detainee was unanimously found to be part
    of al Qaida, this minor error had no effect on the detainee.

        2. Note that some information in exhibits R-7 and R-8 was redacted. Exhibit R-6
    is a memo from the FBI requesting the redaction of certain information in exhibits R-7
    and R-8. The memo contains a certification for the redacted material suitable for use in
    an Administrative Review Board, but distinct from the CSRT criteria required by
    paragraph E(3)(a) of enclosure (1) of reference (b). I alerted CSRT administrative
    personnel at Guantanamo Bay Naval Station about the issue so they could request the FBI
    to examine exhibits R-7 and R-8 and issue proper certifications if appropriate. In
    response, the FBI provided enclosure (2), a memo dated 7 December 2006, which
    certifies that the redacted information would not support a determination that the detainee
    is not an enemy combatant.

UNCLASSIFIED
Exhibit B 1

UNCLASSIFIED

Subj:  LEGAL SUFFICIENCY REVIEW OF COMBATANT STATUS REVIEW TRIBUNAL FOR DETAINEE ISN # 10013

3. In addition to the information redacted from exhibits R-7 and R-8, portions of exhibits R-2 and R-10 are redacted. OARDEC issued enclosure (3) to certify that the redacted information material would not support a determination that the detainee is not an enemy combatant.

4. The internee serial number written on the Detainee Election Form is incorrect. The Personal Representative erroneously over-truncated the ISN to "13" instead of the proper shortened ISN version of "10013."

d. The detainee made no requests for witnesses or other evidence.

e. The Tribunal's decision that detainee # 10013 is properly classified as an enemy combatant was unanimous.

f. The detainee's Personal Representative was given the opportunity to review the record of proceedings and he commented on a typographic error in the transcript.

2. The proceedings and decision of the Tribunal are legally sufficient and no corrective action is required.

3. I recommend that the decision of the Tribunal be approved and the case be considered final.

CDR, JAGC, USN



# Department of Defense
## Director, Combatant Status Review Tribunals
### 1010 Defense Pentagon, Washington, D.C. 20301-1010

22 February 2007

From: Director, Combatant Status Review Tribunals

Subj: APPOINTMENT OF COMBATANT STATUS REVIEW TRIBUNAL #38

Ref: (a) Convening Authority Appointment Letter of 19 December 2006

By the authority given to me in reference (a), a Combatant Status Review Tribunal established by "Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba" dated 14 July 2006 is hereby convened. It shall hear such cases as shall be brought before it without further action of referral or otherwise.

The following commissioned officers shall serve as members of the Tribunal:

**MEMBERS:**

███████████████ Captain, U.S. Navy; President (JAG)

███████████████ Lieutenant Colonel, U.S. Marine Corps; Member

███████████████ Lieutenant Colonel, U.S. Air Force; Member

FRANK SWEIGART

Exhibit B 3

# Memorandum



To        :    Department of Defense                    Date: 12/07/2006
               Office of Administrative Review
               for Detained Enemy Combatants

From    :    FBI GTMO
               Counterterrorism Division
               Asst. Gen. Counsel ▇▇▇▇▇▇▇▇▇

Subject:    REQUEST FOR REDACTION OF
               NATIONAL SECURITY INFORMATION
               ISN 10013
               UNCLASSIFIED SUMMARY

Pursuant to the Secretary of the Defense Order of 14 July 2006, Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba, the FBI requests redaction of the information herein marked.[1]  The FBI makes this request on the basis that said information relates to the national security of the United States.[2]  Inappropriate dissemination of said information could damage the national security of the United States and compromise ongoing FBI investigations.

CERTIFICATION THAT REDACTED INFORMATION DOES NOT SUPPORT A DETERMINATION THAT THE DETAINEE IS NOT AN ENEMY COMBATANT.

The FBI certifies the aforementioned redaction contains no information that would support a determination that the detainee is not an enemy combatant.

The following document(s) relative to the referenced ISN has/have been redacted by the FBI and provided to the OARDEC:

FBI, (U) Investigative Summary, 10/20/2006
FD302, 09/14/2001

---

[1] Redactions are blackened out on the OARDEC provided FBI document.
[2] See Executive Order 12958, as amended by E.O. 13292.

Encl. 2

Memorandum from ████████████
Re:  REQUEST FOR REDACTION, 11/07/2006


        If you need additional assistance, please contact
Assistant General Counsel ████████████████████████

~~FOUO~~



Department of Defense
Office for the Administrative Review of
the Detention of Enemy Combatants (OARDEC)
at U.S. Naval Base Guantanamo Bay, Cuba
1010 Defense Pentagon, Washington, D.C. 20301-1010

29 March 2007

ISN 10013

This certifies that redactions made by OARDEC to documents contained
in the Recorder's exhibit list did not contain any information that
would support a determination that the detainee is not an enemy
combatant, namely that the redactions do not contain information
rebutting an allegation contained in the record that the detainee is
an enemy combatant. Redactions done in "blue" were done so only to
differentiate from FBI redactions, or in the rare case where the
original text was "blue."

The following document(s) relative to the referenced ISN has/have been
redacted by OARDEC:

(U) FBIS Open Source Center, EUP20020908000141, dated 09/08/2002
(U) Open Source 9/11 Commission Report, dated 07/22/2004
(U) DIA IIR 6 105 0055 05, dated 05/09/2005

OARDEC COORDINATION CELL
Washington, DC

~~FOUO~~

Page 1 of 1

Encl. 3



# DEPARTMENT OF DEFENSE
## OFFICE FOR THE ADMINISTRATIVE REVIEW OF
### THE DETENTION OF ENEMY COMBATANTS (OARDEC)
#### AT U.S. NAVAL BASE GUANTANAMO BAY, CUBA
##### 1010 DEFENSE PENTAGON, WASHINGTON, D. C. 20301-1010

3460
GTMO-DET/Ser 872
19 Mar 07

FIRST ENDORSEMENT of President of CSRT Panel #(38), Report of 09 Mar 07.

From:   Officer-in-Charge, OARDEC FORWARD
To:     Designated Civilian Official
Via:    Director, OARDEC     6/28/07

Subj:   RECORD OF PROCEEDINGS FOR THE COMBATANT STATUS REVIEW TRIBUNAL
        FOR ISN 10013.

1. Readdressed and forwarded.

2. I can be reached at DSN ████████.

GARY J. HABEN

## Unclassified Summary of Basis for Tribunal Decision

### (Enclosure (1) to Combatant Status Review Tribunal Decision Report)

TRIBUNAL PANEL: 38
ISN #: 10013

### 1. Introduction

As the Combatant Status Review Tribunal (CSRT) Decision Report indicates, the
Tribunal has determined that this Detainee shall be classified as an enemy combatant. In
reaching its conclusions, the Tribunal considered both classified and unclassified
information. The following is an account of the unclassified evidence considered by the
Tribunal and other pertinent information. Classified evidence considered by the Tribunal
is discussed in Enclosure (2) to the CSRT Decision Report.

### 2. Synopsis of Proceedings

The Tribunal hearing was conducted on 9 March 2007. The Recorder presented Exhibits
R-1 through R-5 during the unclassified portion of the Tribunal. The primary exhibit, the
Unclassified Summary of Evidence (Exhibit R-1), indicates that the Detainee had
extensive, repeated contacts and associations with the September 11, 2001 hijackers
("9/11 Hijackers") and attack planners in 1999 through 2001 in Germany and elsewhere;
that the Detainee was scheduled to receive pilot training; that the Detainee handled the
administrative details for the 9/11 Hijackers and acted as al Qaida's Europe liaison; that
the Detainee attempted to obtain visas to the United States in 2000 to attend flight
training but that the applications were rejected by the U.S. State Department; that the
Detainee provided financial support to the 9/11 Hijackers in the months leading up to the
9/11 attacks including support of Ziad Jarrah's enrollment in flight training and
moneygrams totaling over $25,000 to 9/11 Hijacker Marwan Al-Shehhi and al Qaida
operative Zacharias Moussaoui; that the Detainee was identified in a video tape of
potential suicide operatives; that the Detainee was interviewed by Al-Jazeera television in
Karachi, Pakistan in June 2002 together with Khalid Sheikh Mohammed ("KSM") during
which he stated that he finalized the operational details of the 9/11 attacks with Mohamed
Atta in Madrid in July 2001; that the Detainee was captured in a safe house containing
explosives, detonation devices, passports for Usama bin Laden's family members,
identification cards for Ahmad Ibrahim Al-Haznawi, a 9/11 Hijacker, and contact
information for several known al Qaida operatives, documents detailing the Detainee's
plan to leave for Pakistan with forged identification and other documents; that training
manuals, security information and combat related subjects found in a separate al Qaida
safe house were identical to those captured along with the Detainee; and that a letter

UNCLASS // ~~FOUO~~

found on an al Qaida courier detailed a senior al Qaida operative's instructions to the Detainee to identify operatives to send to the United States or the United Kingdom.

The Recorder called no witnesses.

The Detainee elected not to participate in, or attend, the hearing. The Personal Representative provided the Tribunal with Exhibit D-a, Detainee Election Form, indicating the Personal Representative had four scheduled meetings with the Detainee during which he was uncooperative and largely unresponsive. The Detainee stated at the first meeting that he would not participate in the Tribunal process and would not meet again with the Personal Representative or the Arabic language translator. Thereafter, the Detainee chose not to leave his cell on three subsequent occasions to meet with the Personal Representative to receive the Unclassified Summary of the Evidence (Exhibit R-1). The Personal Representative did not provide any information that would lead the Tribunal to conclude that the Detainee was not physically or mentally capable of attending the hearing. At the hearing the Tribunal President determined that the Detainee's absence was voluntary and that the hearing would be conducted in his absence.

## 3. Evidence Considered by the Tribunal

The Tribunal considered the following evidence in reaching its conclusions:

    a. Exhibits: D-a and R-1 through R-15. Two exhibits (R-16 and R-17) were provided to the Tribunal by the Recorder. However, after carefully reviewing these two exhibits, the Tribunal determined they were not probative of determining whether the Detainee should be classified as an enemy combatant. Accordingly, they were not considered during the Tribunal's deliberation process. However, R-16 and R-17 have been included in Enclosure 4, Copies of Documentary Evidence Presented, to the final Combatant Status Tribunal Review Decision Report for completion of the record. Inasmuch as these exhibits were not considered by the Tribunal in its deliberation, the Convening Authority or Designated Civilian Official may remove Exhibits R-16 and R-17 from the Combatant Status Review Tribunal Decision Report.

    b. Testimony of the following persons: None.

## 4. Rulings by the Tribunal on Detainee Requests for Evidence or Witnesses

The Detainee requested no witnesses. The Detainee requested no additional evidence be produced. Therefore, no rulings were necessary.

ISN # 10013
Enclosure (1)
Page 2 of 4

UNCLASS // ~~FOUO~~

### 5. Discussion of Unclassified Evidence

The Tribunal considered the following unclassified evidence in making its determinations:

a. The Recorder offered Exhibits R-1 through R-5 into evidence during the unclassified portion of the proceeding. Exhibit R-1, the Unclassified Summary of Evidence, while helpful in that it provides a detailed outline of what the Tribunal can expect to see, is not by itself persuasive in that it provides conclusory statements with limited supporting unclassified evidence. Exhibits R-3 and R-4 are open source documents containing transcripts of stories from the *Sunday London Times* in September 2002 describing al Qaida's first written justification for the 9/11 attacks and celebrating the destruction on September 11, 2001 as "that glorious Tuesday". These documents are instructive and corroborate certain elements of Exhibit R-1, however are not afforded great weight by the Tribunal in reaching its determination. Exhibit R-5 is an excerpt from the National Commission on Terrorist Attacks Upon the United States Report ("the 9/11 Commission Report") containing the finding that while 9/11 Hijacker Jarrah was in Germany, Detainee and Zacharias Moussaoui contacted him to arrange for the transfer of funds. Exhibit R-5 also establishes that the Detainee received two wire transfers from al Qaida operative Hawsawi in the United Arab Emirates totaling $15,000 and, within days, relayed almost all of the this money to Moussaoui in two installments. The Tribunal accorded significant weight to this exhibit as it contains the result of the 9/11 Commission's investigation into the events relating to the attacks and the Detainee's role in supporting the financial activities of terrorists. In itself, Exhibit R-5 supports a finding, by a preponderance of the credible evidence, that the Detainee meets the criteria to be classified as an enemy combatant against the United States. However, the Tribunal decided to examine classified exhibits for further support for the Unclassified Summary of Evidence.

b. Inasmuch as the Detainee elected not to participate in the hearing, the only unclassified evidence for the Tribunal to consider is summarized above. A verbatim transcript of the Tribunal hearing conducted on 9 March 2007 is attached as Enclosure (3) to this report.

The Tribunal also relied on certain classified evidence in reaching its decision. A discussion of the classified evidence is found in Enclosure (2) to the Combatant Status Review Tribunal Decision Report.

### 6. Consultations with the CSRT Legal Advisor

No issues arose during the course of this hearing that required consultation with the CSRT legal advisor.

UNCLASS // ~~FOUO~~

## 7. Conclusions of the Tribunal

Upon careful review of all the evidence presented in this matter, the Tribunal makes the following conclusions:

    a. The Detainee was mentally and physically capable of participating in the proceeding. No medical or mental health evaluations were deemed necessary.

    b. The Detainee understood the Tribunal proceedings. The Detainee chose not to participate in the Tribunal process, as indicated in Exhibit D-a.

    c. The Detainee shall be classified as an enemy combatant as defined in the Deputy Secretary of Defense Order of 7 July 2004 and the Deputy Secretary of Defense Memorandum regarding Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba dated 14 July 2006, in that the Detainee is a member of al Qaida and has committed belligerent acts against the United States and its interests.

## 8. Dissenting Tribunal Member's Report

None. The Tribunal reached a unanimous decision.

## 9. Compliance with the Detainee Treatment Act of 2005

The CSRT has complied with the Detainee Treatment Act of 2005. In making a determination of status or disposition of the Detainee, the CSRT has assessed, to the extent practicable, whether any statement derived from, or relating to, the Detainee was obtained as a result of coercion; and the probative value, if any, of any such statement.

Respectfully submitted,



, CAPT JAGC USN

Tribunal President

UNCLASSIFIED//~~FOUO~~

## Verbatim Transcript of Combatant Status Review Tribunal Hearing for ISN 10013

### OPENING

| | |
|---|---|
| PRESIDENT: | Remain seated and come to order.  Please proceed, Recorder. |
| RECORDER: | This Tribunal is being conducted at 1009 local 9 March 2007 on board U.S. Naval Base Guantanamo Bay, Cuba. The following personnel are present: |

Captain █████████ United States Navy, President

Lieutenant Colonel █████████ United States Marine Corps, Member

Lieutenant Colonel █████████ United States Air Force, Member

Major █████████ United States Air Force, Personal Representative

Gunnery Sergeant █████████ United States Marine Corps, Reporter

Lieutenant █████████ United States Navy, Recorder

Captain █████ s the Judge Advocate member of the Tribunal.

| | |
|---|---|
| RECORDER: | All Rise. |
| PRESIDENT: | The Recorder will be sworn.  Do you, Lieutenant █████████ solemnly swear or affirm that you will faithfully perform the duties as Recorder assigned in this Tribunal so help you God? |
| RECORDER: | I do. |
| PRESIDENT: | The Reporter will now be sworn.  The Recorder will administer the oath. |
| RECORDER: | Do you, Gunnery Sergeant █████████ swear or affirm that you will faithfully discharge your duties as Reporter assigned in this Tribunal so help you God? |
| REPORTER: | I do. |
| PRESIDENT: | Please be seated. |

ISN # 10013
Enclosure (3)
Page 1 of 8

UNCLASSIFIED//~~FOUO~~

Exhibit B 12

UNCLASSIFIED//~~FOUO~~

| | |
|---|---|
| PRESIDENT: | This Tribunal is convened by order of the Director Combatant Status Review Tribunals under the provision of his order of 22 February 2007. This Tribunal will determine whether Ramzi aka Ramzi Bin Al Shib Bin meets the criteria to be designated as an enemy combatant against the United States or its coalition partners or otherwise meets the criteria to be designated as an enemy combatant. |
| PRESIDENT: | The members of this Tribunal shall now be sworn. All rise. |
| RECORDER: | Do you swear affirm that you will faithfully perform your duties as a member of this Tribunal; that you will impartially examine and inquire into the matter now before you according to your conscience, and the laws and regulations provided; that you will make such findings of fact and conclusions as are supported by the evidence presented; that in determining those facts, you will use your professional knowledge, best judgment, and common sense; and that you will make such findings as are appropriate according to the best of your understanding of the rules, regulations, and laws governing this proceeding, and guided by your concept of justice so help you God? |
| TRIBUNAL: | I do. |
| PRESIDENT: | The Personal Representative will now be sworn. |
| RECORDER: | Do you swear or affirm that you will faithfully perform the duties of Personal Representative in this Tribunal so help you God? |
| PERSONAL REPRESENTATIVE: | I do. |
| PRESIDENT: | Please be seated. |

## PRESENTATION OF UNCLASSIFIED INFORMATION

| | |
|---|---|
| PRESIDENT: | Personal Representative, please provide the Tribunal with the Detainee Election Form. |
| PERSONAL REPRESENTATIVE: | I am handing the Tribunal the Detainee Election Form, which was previously marked as Exhibit D-a. |
| PRESIDENT: | Personal Representative, you are advising the Tribunal by Exhibit D-a that the Detainee elected not to participate in this Tribunal proceeding. Is that still the situation? |

ISN # 10013
Enclosure (3)
Page 2 of 8

UNCLASSIFIED//~~FOUO~~

Exhibit B 13

UNCLASSIFIED//~~FOUO~~

| | |
|---|---|
| PERSONAL REPRESENTATIVE: | Yes, sir. |
| PRESIDENT: | Please explain the efforts that you have taken to meet with the Detainee and advise him of his rights to be present. |
| PERSONAL REPRESENTATIVE: | Sir, the Detainee is uncooperative and unresponsive. At the first scheduled meeting to present the CRST notification to the Detainee on 9 February 2007, the Detainee stated he would not participate in the Tribunal process and would not meet again with PR#4 and the Arabic translator. |

At the second scheduled meeting to present the Unclassified Summary on 13 February 2007, the Detainee chose to not leave his cell to meet with PR#4 and the Arabic translator.

At the third scheduled meeting to present the Unclassified Summary on 16 February 2007, the Detainee chose to not leave his cell to meet with PR#4 and the Arabic translator.

Finally, at the fourth scheduled meeting to present the unclassified exhibits on 5 March 2007, the Detainee chose to not leave his cell to meet with PR#4 and the Arabic translator.

| | |
|---|---|
| PRESIDENT: | Anything else to add? |
| PERSONAL REPRESENTATIVE: | No, sir. |
| PRESIDENT: | It would appear that the Detainee has voluntarily absented himself from these proceedings. We will proceed in his absence. |

## RECORDER PRESENTS UNCLASSIFIED

| | |
|---|---|
| PRESIDENT: | Recorder, please provide the Tribunal with the unclassified evidence. |
| RECORDER: | I am handing the Tribunal what has previously been marked as Exhibit R-1, the unclassified summary of the evidence that relates to this Detainee's status as an enemy combatant. A translated copy of this exhibit was provided to the Personal Representative in advance of this hearing for presentation to the Detainee. In addition, I am handing to the Tribunal the following unclassified exhibits, marked as Exhibit R-2 through R-5. Copies of these Exhibits have previously been provided to the Personal Representative. |

ISN # 10013
Enclosure (3)
Page 3 of 8

UNCLASSIFIED//~~FOUO~~

| | |
|---|---|
| PRESIDENT: | The Tribunal has received unclassified exhibits R-1 thru R-5. |
| PRESIDENT: | Recorder please read the unclassified summary of evidence for the record. |
| RECORDER: | The following facts support the determination that the Detainee is an enemy combatant: |

On the morning of 11 September 2001, four airliners traveling over the United States were hijacked. The flights hijacked were: American Airlines Flight 11, United Airlines Flight 175, American Airlines Flight 77, and United Airlines Flight 93. At approximately 8:46 a.m., American Airlines Flight 11 crashed into the North Tower of the World Trade Center, resulting in the collapse of the tower at approximately 10:25 a.m. At approximately 9:03 a.m., United Airlines Flight 175 crashed into the South Tower of the World Trade Center, resulting in the collapse of the tower at approximately 9:55 a.m. At approximately 9:37 a.m., American Airlines Flight 77 crashed into the southwest side of the Pentagon in Arlington, Virginia. At approximately 10:03 a.m. United Airlines Flight 93 crashed in Stoney Creek Township, Pennsylvania. These crashes and subsequent damage to the World Trade Center and the Pentagon resulted in the deaths of 2972 persons in New York, Virginia, and Pennsylvania.

According to court transcripts and evidence from *United States v. Zacarias Moussaoui*, the Detainee was closely associated with three of the hijackers responsible for the "9/11" attacks, Mohammed Atta (Atta), Marwan Al-Shehhi (Al-Shehhi) and Ziad Jarrah while they lived in Hamburg, Germany during the late 1990's and early 2000. The Detainee, Atta and Al-Shehhi are known to have lived at or frequented one particular address during the same time period, 54 Marienstrasse 21073, Hamburg, Germany.

Airline and immigration records indicate that from November 1999 through February 2000, the Detainee, Mohammed Atta, Marwan Al-Shehhi and Ziad Jarrah all traveled from Germany to Pakistan.

Sayf al-Adl is a senior al Qaida military commander with a long-term relationship with Usama bin Laden. Sayf al-Adl's role in the organization has been as a trainer, military leader, and key member of Usama bin Laden's security detail.

The diary of Sayf al-Adl was recovered during a raid in Saudi Arabia in 2004. The diary details the Detainee's involvement in the 11 September 2001 terrorist plot and subsequent attack. The Detainee is listed as a "highly professional jihadist" along with "9/11 hijackers", Mohammed Atta and Ziad Jarrah. The diary states that the three were briefed on an operation involving aircraft by Abu Hafs, a senior al Qaida planner. The Detainee, Mohammed Atta, and Ziad Jarrah subsequently met with Usama bin Laden about the plan. Following the meeting, al Qaida began arrangements for the Detainee, Mohammed Atta and Ziad Jarrah to receive pilot training. The Detainee handled administrative details for the "9/11 hijackers" while they were in the United States and the Detainee served as an al Qaida Europe based liaison.

The Detainee was identified in a video tape of potential suicide operatives.

ISN # 10013
Enclosure (3)
Page 4 of 8

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED//~~FOUO~~

The Detainee attempted to obtain a United States visa on four occasions from May 2000 to November 2000 for the purpose of attending flight school in the United States. Each application was rejected by United States Department of State.

The Detainee attempted to enroll in the Florida Flight Training School, where 9/11 hijacker Ziad Jarrah was a student. The Detainee put down a 2,350 United States dollars deposit for flight training.

Ziad Jarrah repeatedly attempted to assist the Detainee's travel to the United States and enrollment in the Florida flight training center.

The Detainee also attempted to enroll at the Florida-based aviation language school.

The Detainee, while in Germany, wired 9/11 hijacker Marwan Al-Shehhi, who was in the United States 2708.33 United States dollars on 13 June 2000 via moneygram.

The Detainee, while in Germany, wired 9/11 hijacker Marwan Al-Shehhi, who was in the United States 1803.19 United States dollars on 21 June 2000 via moneygram.

The Detainee, while in Germany, wired 9/11 hijacker Marwan Al-Shehhi. who was in the United States) 1760.61 United States dollars on 26 July 2000 via Western Union.

The Detainee, while in Germany, wired 9/11 hijacker Marwan Al-Shehhi who was in the United States) 4,118.13 United States dollars on 25 September 2000 via Western Union.

In June 2002, the Detainee was personally interviewed by Yosri Fouda, an investigative journalist for Al-Jazeera television. The interview took place over the course of 48 hours in Karachi, Pakistan. Also present at the meeting was Khalid Sheikh Mohammed, a senior al Qaida planner. Fouda conducted the interview in person with both the Detainee and KSM. The Detainee and KSM detailed how the 9/11 attacks were planned and executed during the course of the interview. KSM identified the Detainee as the coordinator of the 9/11 attacks. The Detainee displayed items he claimed were "souvenirs" of the 9/11 attacks. The items included: an air navigation map of the American eastern seaboard, flight simulator CD-Roms and Boeing manuals and a flight instruction book the Detainee claimed had 9/11 hijacker Mohamed Atta's handwritten notes. The Detainee stated Mohamed Atta left them in the Hamburg, Germany, apartment he shared with the Detainee. The Detainee stated that he later met with Atta in July, 2001 in Madrid, Spain, to finalize the operational details of the 9/11 plot. The Detainee stated he received a phone call on 29 August 2001 from Atta that gave the date for the 9/11 attacks. After learning this, the Detainee ordered active al Qaida cells in Europe and elsewhere to evacuate and then he fled to Pakistan.

An unsigned letter found at the Detainee's point of capture, and addressed to the Detainee, asks follow on questions related to the Detainee's Al-Jazeera interview detailing the 9/11 attacks.

ISN # 10013
Enclosure (3)
Page 5 of 8

UNCLASSIFIED//~~FOUO~~

Exhibit B 16

UNCLASSIFIED//~~FOUO~~

An article from the London Sunday Times published on 8 September 2002 listed excerpts from a 112 page document entitled "The Reality of the New Crusaders' War." The Detainee passed the document to Al-Jazeera reporter Yosri Fouda with a request for the document to be translated into English and entered into the Library of Congress. According to the London Sunday Times the document is al Qaida's written attempt to justify the 9/11 attacks through Islamic teaching.

The London Sunday Times article published on 8 September 2002 listed excerpts from "The Reality of the New Crusaders' War" which contained statements from Taliban leader Mullah Mohamed Omar and Usama bin Laden which encourages jihad in service of the ousted Taliban regime.

The Detainee was captured in a safe house. Items also recovered at the safe house at the time of the Detainee's capture were high explosives, sheet explosives, a large quantity of improvised detonation devices, passports for Usama bin Laden's family members, a handwritten note to a senior al Qaida operative, identification cards for a senior al Qaida operative, identification cards for Ahmad Ibrahim Al-Haznawi, a 9/11 hijacker, and contact information for several known al Qaida operatives.

Documents captured in a raid of a separate al Qaida safe house were identical to documents captured along with the Detainee. The documents included training manuals, security information and combat related subjects.

Letters and personal effects of a senior al Qaida operative were discovered in the safe house where the Detainee was arrested.

Letters found at the Detainee's point of capture detailed a plan to egress Pakistan with forged identification. This plan was in conjunction with a senior al Qaida operative.

A letter captured on an al Qaida courier detailed a senior al Qaida operative's instructions to the Detainee to identify operatives to send to the United States or United Kingdom.

The Detainee wired approximately 15,000 United States dollars to Zacharias Moussaoui while Moussaoui was enrolled in pilot training.

| | |
|---|---|
| RECORDER: | Sir, this concludes the summary of unclassified evidence. |
| PRESIDENT: | Thank you. |
| PRESIDENT: | Personal Representative, does the Detainee have any evidence to present to this Tribunal? |
| PERSONAL REPRESENTATIVE: | No, sir. |
| PRESIDENT: | Does the Recorder have any further unclassified evidence? |

ISN # 10013
Enclosure (3)
Page 6 of 8

UNCLASSIFIED//~~FOUO~~

Exhibit B 17

UNCLASSIFIED//~~FOUO~~

| | |
|---|---|
| RECORDER: | Mr. President, I have no further unclassified evidence for the Tribunal but I respectfully request a closed Tribunal session at an appropriate time to present classified evidence relevant to this Detainee's status as an enemy combatant. |
| PRESIDENT: | Recorder, your request for a closed session is granted and will be taken in due course. |
| PRESIDENT: | We will now pause briefly to permit the Tribunal members time to read the unclassified evidence. [The Tribunal President and Members reviewed exhibits R-1 thru R-5]. |
| PRESIDENT: | We will now allow for the calling of witnesses. All witnesses called before this Tribunal may be questioned by the Detainee if present, the Personal Representative, Recorder, and Tribunal members. |
| PRESIDENT: | Does the Recorder have any witnesses to present? |
| RECORDER: | No, sir. |
| PRESIDENT: | On the Detainee election form provided to the Tribunal earlier, I note the Detainee has not request any witnesses to be present. |
| PRESIDENT: | Any member of the Tribunal have any questions for the Personal Representative or the Recorder at this time? |
| MEMBERS: | No, sir. |

### CLOSING UNCLASSIFIED SESSION

| | |
|---|---|
| PRESIDENT: | All unclassified evidence having been provided to the Tribunal, this concludes the open tribunal session. |
| PRESIDENT: | Ramzi Bin Al-Shib, shall be notified of the Tribunal decision upon completion of the review of these proceedings by the Combatant Status Review Tribunal Convening Authority in Washington, D.C. |
| PRESIDENT: | If the Tribunal determines that the Detainee should not be classified as an enemy combatant, he will be released to his home country as soon as arrangements can be made. |
| PRESIDENT: | If the Tribunal determines his classification as an enemy combatant he may be eligible for an Administrative Review Board hearing at a future date. |

ISN # 10013
Enclosure (3)
Page 7 of 8

UNCLASSIFIED//~~FOUO~~

Exhibit B 18

UNCLASSIFIED//~~FOUO~~

PRESIDENT:    The Administrative Review Board will make an assessment of whether there is continued reason to believe that the Detainee poses a threat to the United States or its coalition partners in the ongoing armed conflict against terrorist organizations such as al Qaida and its affiliates and supporters or whether there are other factors bearing upon the need for continued detention.

PRESIDENT:    The Detainee will have the opportunity to be heard and to present relevant information to the Administrative Review Board. The Detainee can present information from his family and friends that might help him at the Board.

PRESIDENT:    A military officer will be assigned at a later date to assist him in the Administrative Review Board process.

### ADJOURN OPEN SESSION

PRESIDENT:    The open session of this Tribunal hearing is adjourned.

RECORDER:    The time is 1042 local. The date is March 9, 2007.

RECORDER:    All Rise.

[The Tribunal President and Members withdrew from the hearing room]

### AUTHENTICATION

I certify the material contained in this transcript is a true and accurate summary of the testimony given during the Combatant Status Review Tribunal of ISN# 10013.



CAPT, JAGC, USN

Tribunal President

UNCLASSIFIED//~~FOUO~~

UNCLASSIFIED

*Unclassified*



## Open Source Center

Document ID: <u>EUP20020908000141[0]</u>
Entry Date: 09/08/2002
Version Number: 01

**Region: Near East/South Asia, West Europe, The Americas**

**Sub-Region: South Asia, West Europe, North America**

**Country: Afghanistan, Pakistan, United Kingdom, United States**

**Topic: INTERNATIONAL POLITICAL, LEADER, TERRORISM.911USA**

**Source-Date: 09/08/2002**

**Al-Jazeera Journalist Interviews Bin Ladin Aides, Believes Bin Ladin Likely Dead**

*EUP20020908000141[0]* London The Sunday Times (Internet Version-WWW) in English 08 Sep 02

**Reference:**

1. <u>Two Top Bin Ladin Aides Reveal Planning Details of September 11 Attacks</u> EUP20020908000118 London The Sunday Times (Internet Version-WWW) English 08 Sep 02

[Report by Yosri Fouda*, investigative journalist for Al-Jazeera television, on interview with Bin Ladin aides Khalid Sheikh Mohammed and Ramzi Binalshibh, in Pakistan in June 2002: "War on Terror: the Masterminds"; first paragraph is newspaper's introduction.]

[FBIS Transcribed Text]
    The two men who planned and directed the September 11 attacks are alive and at large. In a world exclusive, Yosri Fouda of Al-Jazeera television spent two days with them hearing in chilling detail how they carried out the 'Holy Tuesday' operation.

#13
1812
R-2

## UNCLASSIFIED

It began with the sound of my telephone. "I know some people who might be able to provide you with something top secret," said the caller, who asked for my personal fax number and hung up.

Top Secret - the name of my monthly investigative programme on television. He pronounced the Arabic the same way I do, "Sirri Lilghaya", and I felt reassured. He must surely be a viewer, I thought.

A few days later my fax machine started buzzing with a three-page message. It was an outline of a programme to mark the first anniversary of the September 11 attacks. It proposed ideas, locations and personalities. I had the impression that its author understood the media very well. I learnt later, however, that it came from the al-Qa'ida co-ordinator of September 11.

My caller phoned again. He told me to go to Islamabad, the Pakistani capital. After two nights there I got my next instruction: "Take the night flight to Karachi."

In that teeming city I was directed to an obscure $30-a-night hotel undergoing renovation. Another two nights and a man knocked at my door. He introduced himself as my mystery caller. Tall, dark and middle-aged, he switched between different Arabic dialects to cover his origins.

As we talked he gave me my first piece of news: Usama Bin Ladin, the al-Qa'ida leader, was not dead as many commentators had speculated.

"Sheikh Abu-Abdallah (Bin Ladin), God protect him, is an avid viewer of your channel," he said.

"How does the sheikh watch us now?" I asked, fishing for his hiding place.

"Do not worry, brother Yosri. Sheikh Usama, God protect him, is alive and well. Whatever he misses he gets on tape."

After the visit to my hotel room I followed new instructions. Out of the hotel's back door, hail a taxi - "avoid hotel taxis" - go to another address and wait there by the stairs on the second floor.

After I had waited five minutes by the stairs, a heavily bearded man with more of a Pakistani than Arab face came up them and said in English: "Salamulaikom, I have just given my mother-in-law a lift home. We can go now."

He drove me to a busy square and parked for a mango juice. "Do we have time for this?" I asked as politely as I could.

"It is not that we do not have the time," he answered, just as politely. "These are the instructions, brother."

## UNCLASSIFIED

Exhibit B 21

#1 js
2 of 12
R-2

# UNCLASSIFIED

Whose instructions? Who was I going to meet? Long Beard was not forthcoming. I waited in the hot, sticky car while he made three visits to a telephone box. Then he gave me new orders. I had to take a rickshaw to a place that even now I cannot reveal.

It was all becoming a bit silly. The rickshaw man took me on a noisy, bumpy ride through dark alleys - hitting a dead end at one point.

I began to get the idea why Karachi had been chosen for my rendezvous. It is a city of 12m people with no shortage of anti-American sentiments and a lot of "safe" neighbourhoods inhabited not only by people who would sympathise with Usama (they usually call him by his first name) but also by diehards who have been to Kashmir, Afghanistan, Chechnya and other "Islamic flash points".

I was dropped off by the rickshaw only to be picked up almost immediately by a waiting car. "Lahore?" the driver shouted. That was my cue. Lahore it was, except that it was actually not.

Hassan, as he introduced himself, was an intelligent young Arab with a Palestinian dialect. "I have a present for you," he said as he drove at 90 mph out of Karachi. It was a CD-Rom of a programme I had made on Camp X-Ray, the American detention centre for fighters rounded up in Afghanistan and Pakistan.

Hassan said proudly: "It is now everywhere in Pakistan, thanks to our brothers who dubbed it into English."

About five miles outside Karachi, Hassan stopped by a car that looked at first as if it was broken down. Yet another man appeared and they blindfolded me: two balls of thick cotton were taped to my eyes and then covered by sunglasses. We were in business.

Now it was the new man's turn to drive me. Unlike Hassan he was virtually silent. I could sense we were moving back from rural to urban until I was fairly sure we were back somewhere in Karachi. There was something familiar about the smell and sound.

The car stopped and we got out. "Can you help me carry this box inside?" the silent man suddenly asked.

I felt the end of a box thrust into my hands. It was empty. I was puzzled, then I thought: my God, how smart! He was guiding me - I could walk into the building blindfolded without anybody noticing. These were highly trained people, professionals.

I counted four floors on our way upstairs before I heard a doorbell ringing. The door opened and I was pulled inside. Two hands began to take my blindfold off.

#13
3 of 12
P-2

## UNCLASSIFIED

"It is okay now, you can open your eyes," an authoritative but friendly voice said.

I did so and instantly recognised, less than 2ft away, Khalid Sheikh Mohammed, one of the most important figures in the al-Qa'ida leadership. Even before September 11, the FBI had a $5m price on his head. He is an uncle of Ramzi Yousef, the Pakistani who is now serving life in an American prison for organising the first attack on the World Trade Center in 1993.

Khalid led me into a virtually empty flat. I counted five rooms on both sides before he invited me into one of them. There another shock awaited me. █████ ████████████████████████████████████ was sitting on the floor surrounded by three laptops and five mobile phones. Khalid and Ramzi both now have a $25m bounty on their heads.

Ramzi was a flat mate of the key September 11 hijackers when they lived in Marienstrasse, Hamburg, and has been sought around the world.

"Recognised us yet?" Khalid joked as Ramzi shook my hand warmly. "You will when your door is knocked at by intelligence dogs," Ramzi said.

In the Arab manner I began addressing them by their first names, and that is how I shall refer to them now. It is how they are known among their own people.

Khalid outlined the conditions for my interview. "You will not talk about our means of communication, nor will you mention our real codenames," he said. "When - not if - they ask you what we now look like, you will say we look exactly the same as those photos they will show you."

I was asked to place my right hand on a copy of the Holy Quran and solemnly swear to this.

Khalid struck me as shrewd and blunt. Annoyed to find that I had brought my mobile phone, he snatched it, switched it off, removed the Sim card and battery, and buried everything in the furthermost room.

We paused for prayers, led by Ramzi. He used the brief form that a Muslim is allowed to perform when making a journey.

"So you are travelling?" I asked.

"Yes. You did not expect us to show you where we live, did you?"

"Can I have a look at your British passport?" Khalid interjected. Surprised and a little concerned, I handed it over. "Nice one that," he said, leafing through it swiftly until he reached my Pakistani visa. He noted the serial number and

## UNCLASSIFIED

Exhibit B 23

#13
4 of 12
R-2

## UNCLASSIFIED

handed it back.

"No filming today," Khalid declared, "and you do not have to worry about a camera or a cameraman for tomorrow. We will provide for everything."

Ramzi added: "You will be going straight from here to your flight whenever we are done."

Then, with little fanfare, Khalid got down to business by making an announcement that hit me like a heavyweight punch.

"I am the head of the al-Qa'ida military committee," he said, "and Ramzi is the co-ordinator of the Holy Tuesday operation."

I had wondered for so long whom I would be meeting. Bin Ladin, maybe, or his deputy, the inscrutable Egyptian, Ayman al-Zawahiri?

Now it was clear. Khalid and Ramzi were the two master planners of 9/11 - relaxed, calm and willing to speak. For the first time the men behind the twin towers operation had decided to break their silence.

They swiftly began to explain the planning and execution of "Holy Tuesday" - or the Manhattan and Washington Raids, as they also call them, using an old Arabic word, ghazwah, which refers to a raid against enemies of the Prophet.

"About two and a half years prior to the holy raids on Washington and New York," said Khalid, "the military committee held a meeting during which we decided to start planning for a martyrdom operation inside America."

He continued: "As we were discussing targets, we first thought of striking at a couple of nuclear facilities but decided against it for fear it would go out of control."

I was dumbfounded. Nuclear targets? Could he be more specific?

"You do not need to know more than that at this stage, and anyway it was eventually decided to leave out nuclear targets - for now."

"What do you mean 'for now'?"

"For now means 'for now'," Khalid said, silencing me.

He continued: "The attacks were designed to cause as many deaths as possible and havoc and to be a big slap for America on American soil."

Who would carry this out?

## UNCLASSIFIED

#13

5-8-12

P-2

# UNCLASSIFIED

"We were never short of potential martyrs. Indeed, we have a department called the Department of Martyrs."

Was it still active?

"Yes it is, and it always will be as long as we are in jihad against the infidels and the Zionists."

He told me: "We have scores of volunteers. Our problem at the time was to select suitable people who were familiar with the West."

Now it was Ramzi's turn to interrupt the story with a surprise. He had gone to the next room, returning with a dirty grey suitcase. He caught my eye as he unzipped it.

"Yes, it is my Hamburg souvenirs," he smiled, handing me a cup of tea, "and you are the first outsider to have a look at this."

He carefully began to unload his "souvenirs", one by one. Soon, strewn on the floor in front of me, were the bulk of the planning materials used by Mohammed Atta and the other hijack pilots as they plotted their attacks.

A glossy Boeing brochure and manuals, a thick "how-to-fly" textbook, an air navigation map of the American eastern seaboard, how-to-speak English books, floppy disks, flight simulator CD-Roms: it had all been in the Hamburg apartment that Ramzi shared with Atta, where in the earliest days the cell had gathered to work out its strategy.

"Wait, wait," I said as Ramzi lined up more souvenirs. Next to a series of sophisticated illustrations of "how to perform sudden manoeuvres", I had spotted a page with paragraphs underlined and carefully handwritten notes.

"It is brother Abu Abdul-Rahman's handwriting," said Ramzi, referring to Atta by his al-Qa'ida codename.

It did not look much like the rather prettier handwriting in a chilling document attributed to Atta released by the FBI.

That document, found in Atta's luggage left behind at Boston Logan airport, gave spiritual guidance to the hijackers as they approached the climax of their mission.

"Force yourself to forget that thing which is called world," it said, "the time for amusement is gone and the time of truth is upon us . . . . If God grants any one of you a slaughter, you should perform it as an offering on behalf of your father and

#13
6 of 12
R-2

UNCLASSIFIED

mother, for they are owed by you. Do not disagree among yourselves, but listen and obey."

Ramzi explained the discrepancy: Atta was not the author of these "instructions and prayers". They had been written by Abdul Aziz al-Omari, Atta's companion during the last hours of his life.

Ramzi had himself been eager to take part in the attacks. He had applied three times for a visa to enter America for flight training, but he had been turned down on security grounds. He insisted, and I believed him, that he was desperately sad not to have taken part in the operation.

He revealed that his souvenir suitcase and its contents were mostly material brought for him by Atta from America to study and learn from when he was still expected to be one of the "martyrs".

He had learnt the annual flight schedules for American airlines in great detail and still had at his fingertips the minutiae of the esoteric symbols for flight variations. He explained that this knowledge had been used to plan the aircraft seizures.

Over the next 48 hours I remained in the flat with these two key figures, hearing in detail how 9/11 had been put together. They were both proud of what they had organised, Ramzi speaking calmly and with authority while Khalid made incisive interventions.

There were clear limits on what they would say and doubtless there are still many details of the planning that remain known only to these two men and possibly one or two others. But I was able to fit what they said into the gaps that existed in past attempts at explaining the plot. I built up an account that I believe is unprecedented and authentic.

Often Ramzi would quietly sit on the floor fiddling with his laptops - the kind of interviewee who needs a nudge or two to talk. When he did speak it was with a sonorous voice that exuded authority.

Khalid was more active. His hands never stopped moving as he wandered erratically around us. He was the doer while Ramzi was the thinker, a fine division of roles.

It was Khalid, as chairman of the al-Qa'ida military committee, who had come up with the proposal that the "martyrdom operation" in America should target prominent buildings. Superficially his plan was similar to an earlier one to send 12 airliners simultaneously into American landmarks.

Intelligence agencies know about this previous "Bojinka plot", as they call it, because it went disastrously wrong. Khalid had worked on it in 1994-95 with his

UNCLASSIFIED

#13
7-612
R-2

UNCLASSIFIED

nephew, Ramzi Yousef, who was on the run after the first World Trade Center bombing. Hiding in Manila, Yousef had worked on bomb designs and initial logistics. Fleeing when bomb chemicals in his apartment caught fire, he left behind a laptop containing full details and was arrested within months in Pakistan.

Khalid, who arrived in Manila just as the apartment caught fire, managed to escape. He was not heard of again until his name was given to FBI interrogators by Abu Zubaydah, a senior Bin Ladin deputy who was arrested after a gunfight in Pakistan in March this year.

Now Khalid was explaining to me how he not only resurrected the Bojinka plot but refined it into a devastatingly effective act of war.

There has been much conjecture over the past year about when Atta and the other key figures were first recruited. Khalid's story confirmed that, working and studying in Hamburg as a town planner since 1992, Atta was an al-Qa'ida sleeper. During 1999 he and other sleepers were earmarked by the military committee as pilots for the death flights.

In the autumn of that year they got together to start detailed planning. They met in the dust and dirt of Kandahar in southern Afghanistan, the effective capital of the Taliban. Their gathering place was a building often used by volunteers from Saudi Arabia. It was even known as Al-Ghumad House, after the Saudi al-Ghamdi clan - four of whose young members would be foot soldiers in the hijackings.

"There was a shura (council) consisting of the four pilots, as well as Khalid al-Mihdar and Atta's deputy, Nawaf al-Hazemi," said Ramzi, naming other key figures.

It had never been revealed before that al-Hazemi was Atta's second-in-command. He was with Hani Hanjour on American Airlines flight AA77, which crashed into the Pentagon.

Khalid revealed: "After the shura we sent at least four reconnaissance units to America in pairs or singles over the space of five to six months."

Also shortly after the shura, Atta left for Germany - where, to avoid questioning over the Pakistani visas that his passport contained, he reported it stolen.

Two of the other young men at the shura - Marwan al-Shehhi, who was to pilot United Airlines flight 175 into the south tower of the World Trade Center, and Ziad Jarrah, who flew UA Flight 93, which crashed in Pennsylvania - reported their passports stolen, too.

The next stage was to learn the rudiments of flying. In the summer of 2000

UNCLASSIFIED

#13
8-612
R-2

UNCLASSIFIED

Atta entered the United States and began flying lessons in Venice, Florida, along with al-Shehhi. Jarrah was nearby in another training school. Hanjour, already a trained pilot, was undergoing further training in Arizona.

Ramzi said a decision was taken not to put them all in the same flight schools. Contact was kept to a minimum.

I know from other sources that Jarrah, a Lebanese with a more hedonistic past than the others, was consistently kept apart from them in Germany and America.

By the spring of 2001, the mainly Saudi "muscle" for the operation were training in Afghanistan. "They knew it was a martyrdom operation but they did not know the details," said Khalid.

In July, Atta flew from America to Madrid, where he met Ramzi and other al-Qa'ida operatives to finalise details. At this meeting it was agreed that - although there was a rule of "one for all and all for one" - Atta would have full control over the choice of targets and the timing of the attacks.

An elaborate code was agreed so that Atta could keep in touch with his al-Qa'ida commanders by e-mail and internet chat rooms.

Atta was given the codename Abu Abdul Rahman al-Masri (the Egyptian). Some of the other codenames resonate with Islamic heroism. Ziad Jarrah was Abu Tareq - a reference to the Arab conqueror of Andalusia. Al-Shehhi became Abul Qaqaa, who ripped through the Persians for Islam.

Ramzi spoke to me very emotionally of "brother Abu Abdul Rahman" for his "genius" and with great admiration of "brother Abul Qaqaa" who, long before he learnt of the operation, "used to have beautiful visions that he flies in the sky with huge green birds and crashes into things".

What things? "Just things."

What struck me, however, as they reeled off the codenames, was that neither Khalid, whose committee took the decisions, nor Ramzi, who co-ordinated the "raids", could remember the real identities of their "martyrs".

Khalid produced another revelation: the targets had also been given codenames. The Pentagon was the Faculty of Fine Arts, while the twin towers - reflecting Atta's hatred of high-rise buildings - were the Faculty of Town Planning.

Ramzi revealed that the target of the fourth plane, which crashed in Pennsylvania, was Capitol Hill, the heart of American democracy. Its codename? The Faculty of Law.

UNCLASSIFIED

#13
9612
R-2

UNCLASSIFIED

During July and August, e-mails from Atta to Ramzi talked with apparent innocence of whether or not candidates had been admitted to one faculty or another. Atta was indicating whether the attacks were ready or not ready.

Ramzi dug into his computer files and showed me a message on screen. "This one was three weeks before September 11," he said, rather sadly and full of emotion.

It was the last cyber-discussion between Atta and Ramzi. Conducted in German, it had taken place in an Internet chat room. Atta had pretended he was a young man in America talking to Jenny, his girlfriend in Germany.

"The first semester starts in three weeks," Ramzi translated from the German. "Nothing has changed. Everything is fine. There are good signs and encouraging ideas. Two high schools and two universities. Everything is going according to plan. This summer will surely be hot. I would like to talk to you about a few details. Nineteen certificates for private study and four exams. Regards to the professor. Goodbye."

In its coded language, it encapsulated the full story of the attacks. Two high schools and two universities - the twin towers, the Pentagon and Capitol Hill. Nineteen certificates for 19 hijackers and four exams for four targets.

What it did not say was the date for the attacks. That crucial detail was to come in the most intriguing way.

At 3am on Wednesday August 29, a week after the chat room discussion, the phone rang in the second-floor flat at 54 Marienstrasse in Hamburg. Ramzi Binalshibh grabbed the phone. He heard a familiar voice with an Egyptian dialect at the other end. "I have a joke and a little puzzle," said the caller. "A mate of mine bothered me with this puzzle and I was hoping you would help me solve it. Two sticks, a dash and a cake with a stick down - what is it?" Still slightly befuddled, Ramzi could not grasp the riddle. Suddenly, however, his mind jumped into gear. He got the message. "Sounds like a sweet puzzle. Let your mate know he has nothing to worry about," he reassured his caller.

Sitting in front of me on the floor of the Karachi safe house, Ramzi turned his head away with a proud smile and then said in his serious tone: "That caller was none other than brother Abu Abdul-Rahman (Atta).

"He was unbelievable! Un-believable! God bless his soul and put paradise under his feet, for he is, inshallah, among the Shuhadaa (martyrs)."

But what was the puzzle all about? Sticks and cakes with tails - I was completely lost.

UNCLASSIFIED

#13
10 of 12
P-2

UNCLASSIFIED

With a rare flash of mischief, Ramzi explained: "Two sticks is the number 11, a dash is a dash, and a cake with a stick down is the number nine. And that was the zero hour - September 11."

The Americans may call it 9/11 but in Britain and in Arabic it is 11/9 - and the numerals look much the same in English and Arabic.

One of the last people to hear about the date was Bin Ladin himself, according to my original mystery caller, who spoke to me again after the interviews in Karachi.

First Ramzi had ordered active cells around Europe, America and elsewhere to be evacuated. He packed his souvenir suitcase and wiped the Marienstrasse apartment clean. He made sure that his flat mate, a half-German, half-Moroccan called Said Bahaji, had arrived ahead of him in Karachi. Finally, he left for Pakistan.

Only then could Bin Ladin - through a messenger sent by Ramzi on September 6 - learn that his 2-year-long plan to humble the United States would bear fruit in just five days' time.

Throughout the two days and one night of my interview, I was not allowed to leave the apartment. Khalid and Ramzi stayed with me all the time. At the end I left as I had arrived. I was blindfolded, bundled into the back of a car and driven straight to Qaid-i-Azam airport to catch my plane back to London.

As I flew out, I reflected on this extraordinary meeting and on the fate of Bin Ladin.

Before I met Khalid and Ramzi I had thought the chances of his being still alive were 50-50.

Now, despite the fact that my mystery caller said he was alive and well and watching television - and, as he told me after the interviews were over, had handpicked me to meet Khalid and Ramzi - I have changed my mind.

Khalid made a "slip of the tongue" referring to Bin Ladin in the past tense. But I also began to see cracks opening up in the organisation.

Most tellingly, my videotapes of the interviews with Khalid and Ramzi - which they said they would keep for two weeks to blank out their faces - were never returned.

Why was this? After all, they had asked for the interviews to take place, they controlled them and they wanted them to be broadcast.

UNCLASSIFIED

#13
11-612
R-2

UNCLASSIFIED

I am driven to the interpretation that something is wrong within the upper reaches of al-Qa'ida - some sort of disruption. I now believe it is more likely that Bin Ladin is dead.

Who would replace him? It was Ramzi Binalshibh who made an enduring impression on me. His philosophy, even his vocabulary, is very much like Bin Ladin's. He also has the sheikh's serene charm, zest and religious knowledge.

At just 30 years of age, he eclipses his master with field experience in co-ordinating an unprecedented operation on western soil.

I can see him one day leading the organisation. This is our future Bin Ladin.

© Yosri Fouda 2002

* Yosri Fouda is the investigative journalist for Al-Jazeera television, which will broadcast his documentary, Top Secret: The Road to September 11, with English subtitles on Thursday at 6.30pm GMT.


[Description of Source: London The Sunday Times (Internet Version-WWW) in English -- conservative newspaper covered for worldwide reports]

THIS REPORT MAY CONTAIN COPYRIGHTED MATERIAL. COPYING AND DISSEMINATION IS PROHIBITED WITHOUT PERMISSION OF THE COPYRIGHT OWNERS.

---

*Unclassified*

UNCLASSIFIED

#13
12-61?
R-2-

UNCLASSIFIED

*Unclassified*



# Open Source Center

Document ID: <u>EUP20020908000147[100]</u>
Entry Date: 09/08/2002
Version Number: 02

**Region: Near East/South Asia, West Europe, The Americas**

**Sub-Region: South Asia, West Europe, North America**

**Country: Afghanistan, United Kingdom, United States**

**Topic: INTERNATIONAL POLITICAL, TERRORISM.911USA, URGENT**

**Source-Date: 09/08/2002**

**Al-Qa'ida Issues 'First Written Justification' for 11 Sep Attacks**

*EUP20020908000147 London The Sunday Times (Internet Version-WWW) in English 8 Sep 02*

## Reference:

1. <u>Al-Jazeera Journalist Interviews Bin Ladin Aides, Believes Bin Ladin Likely Dead</u> EUP20020908000141 London The Sunday Times (Internet Version-WWW) English 08 Sep 02
2. <u>Two Top Bin Ladin Aides Reveal Planning Details of September 11 Attacks</u> EUP20020908000118 London The Sunday Times (Internet Version-WWW) English 08 Sep 02

[Corrected version: correcting name of source in source line, reformatting reference field: report by Nick Fielding: "Al-Qa'ida Puts Its Case for 'Glorious' 9/11"]

[FBIS Transcribed Text]
  Al-Qa'ida has produced its first written justification for the September 11 attacks on America, celebrating the destruction they caused and calling for a

UNCLASSIFIED
Exhibit B 32

# 13
1-63
R-3

UNCLASSIFIED

thousand similar operations.

The 112-page document, entitled The Reality of the New Crusaders War, is signed in the name of Saladin, Defeater of the Crusaders, but was written by Ramzi Binalshibh, the co-ordinator for the attacks.

It was handed to the Al-Jazeera reporter Yosri Fouda with a request on the cover that it be translated from Arabic into English and lodged with the Library of Congress in Washington DC.

The opening page includes pictures of the World Trade Center as it collapsed on a day described by the author as "that glorious Tuesday".

While not directly admitting responsibility for the attacks, the document seeks to justify them under Islamic teaching, claiming that as a "country of war" America was a viable target and that "such a country may be harmed by the Muslims in every method (sic)".

It reads: "In case that the events which took place in America were the doing of Muslims, then it is legal because those operations were against an enemy state.

"It is permissible for Muslims to kill infidels under a principle of reciprocity, because if those infidels are targeting Muslim women, children and the elderly, then the Muslims can do the same."

Binalshibh strongly suggests that the hijackings were plotted because America was believed to be planning a military attack on Afghanistan.

He writes: "If news of such a plan had reached the Islamic Emirate (Afghanistan) and it had reacted and executed those operations, then all we can say is, 'Well done.'"

He describes as "advantages" the huge economic losses suffered by the United States in the wake of September 11.

He says: "America's losses have reached a trillion, it lost nearly 2,000 experts in economy, its stock exchange has fallen tremendously, the dollar has lost a lot of its value, airline companies have either gone bankrupt or released thousands of employees, as well as many other financial losses."

Hoping that the attacks will be "the beginning of the end of America", the document states that "the fall of 6,333 (sic) casualties, and double that figure injured, does not blow out the fire in the hearts of Muslims against America. We therefore need a thousand operations like these".

UNCLASSIFIED

#13
2-63
R-3

UNCLASSIFIED

[Description of Source: London The Times (Internet Version-WWW) in English -- influential center-right daily]

*THIS REPORT MAY CONTAIN COPYRIGHTED MATERIAL. COPYING AND DISSEMINATION IS PROHIBITED WITHOUT PERMISSION OF THE COPYRIGHT OWNERS.*

---

*Unclassified*

UNCLASSIFIED

#13
3-23
R-3

UNCLASSIFIED



| Document 2 of 2 found | | |
|---|---|---|
| **Bottom of Form** | **Hit List** | ⇨ |

Press arrows to move to previous and next documents; press *Hit List* button to return to hit list

[Go To First Hit]

*Unclassified*

 Open Source Center

Document ID: EUP20020908000169
Entry Date: 09/08/2002
Version Number: 03

**Region: Near East/South Asia, West Europe, The Americas**

**Sub-Region: South Asia, West Europe, North America**

**Country: Afghanistan, Pakistan, United Kingdom, United States**

**Topic: INTERNATIONAL POLITICAL, LEADER, TERRORISM.911WEB**

**Source-Date: 09/08/2002**

**Translated Extracts From Al-Qa'ida Documents Justify 11 Sep Attacks**

*EUP20020908000169 London The Sunday Times (Internet Version-WWW) in English 8 Sep 02*

**Reference:**

1. Al-Qa'ida Issues 'First Written Justification' for 11 Sep Attacks EUP20020908000147[0] London The Sunday Times (Internet Version-WWW) English 8 Sep 02
2. Al-Jazeera Journalist Interviews Bin Ladin Aides, Believes Bin Ladin Likely Dead EUP20020908000141 London The Sunday Times (Internet Version-WWW) English 08 Sep 02

#13
1 of 10
R-4

UNCLASSIFIED

[Corrected version: changing name of source in source line: translated excerpts of documents written by Ramzi Binalshibh, justifying the attacks on America: "Extracts: the Reality of the New Crusaders' War"]

[FBIS Transcribed Text]

**Defeater of the Crusaders / Saladin Eldin al-Ayubi** [nom de plume]

Please translate into English, publish and keep at the Library of the American Congress

Second publication, revised and corrected

**Preamble of 2nd publication**

The rush in producing the first publication of the book in 8 days had a negative effect on the quality of the book, as it contained some errors and deficiencies in the text.

I therefore thought it should be published again in a more precise and corrected version, bearing in mind that it would be a human effort which could still be incomplete in quality as only God Almighty is perfect.

Author / Saladin Eldin al-Ayubi (Defeater of Crusaders)

**Summary of the book**

**Extracts:**

Prior to reaching a conclusion on which to base the issue of killing women and children of the infidels in America, one important point needs to be clarified and that is: Is America a country of war or of peace?

The common answer is that America isn't a country of peace and has never been so.   If we were to argue this matter with anybody whose opinion is otherwise and agreed that it is a country of peace, then we would say that it turned into a country of war when it broke the peace and helped the Jewish people more than 50 years ago to occupy Palestine and shatter its nation.   It broke the peace the day it bombed Iraq and put it under blockage, the day it bombed and did the same to Sudan, and when it bombed and put Afghanistan under blockage and assaulted the Muslims there.

It is therefore agreed that it is a country of war and such a country may be harmed by the Muslims in every method, because Muslims have the right to harm people (the infidels) of such a country, just as the prophet Muhammad did.

As for the events of that glorious Tuesday in America, we want to say that it

UNCLASSIFIED

#13
2 618
R-4

## UNCLASSIFIED

hasn't been proved that the Muslims were responsible for it. If the Crusaders blame the Muslims, then we can say that the investigations are illegal and do not correspond to any rules. We will also say that the investigations are void because the opponent is also the judge. We therefore want to ask them not to jump to conclusion in judging people.

In case that the events which took place in America were the doing of Muslims, then it is legal because those operations were against an enemy state.

It is permitted for Muslims to kill the infidels under a principle of reciprocity, because if those infidels are targeting Muslim women, children and the elderly, then the Muslims can do the same (verse of the Koran).

Al-Shafi'i and al-Jassas, who are fanatic Muslims, believe that you can burn and destroy the enemy's country even if there were Muslims there, because to avoid destroying states for such reasons would only delay the progress of Jihad (a relative verse from the Koran).

Releasing and circulating the above verse indicates delay in the Jihad flame because large Muslim communities exist in every country of the world.

The infidels have based their accusations of Muslims on causes for corruption. They, the infidels, have said that these operations would result in the termination of the Jihad slogans internationally, and maybe in the Shishan and Palestine. We, in turn, want to comment on this declaration by the following: 1) that could not be possible because we know that according to the Koran, the Jihad will go on until the end of time; 2) the European Union decided eight months ago to suppress the Jihad movements financially and otherwise, and is still doing so.

As for charity work for the benefit of Muslim organizations, these have been under control. The Arab Ministers of Interior met in 1994 in Algeria and decided to put these charities under control, after which Presidents of Arab countries met in Tunisia and came out with the same decision. Therefore controlling and hitting these committees has been practised for some time now.

You are not well acquainted with the Islamic Emirate to enable you to judge whether these operations would have been for the benefit of Islam or otherwise. The Islamic Emirate exists within three choices, the best of which is bitter:

First choice: to co-operate with the international pressure and act according to the false idols rules.

Second choice: to insist on its stand and stick to its principles, thus to eventually die slowly after a number of years.

## UNCLASSIFIED

Exhibit B 37

#/3
3 of 18
P-4

UNCLASSIFIED

Third choice: to fight back and try to pull down its enemy to its land in order to be defeated, as it was defeated in the past.

America had drawn up a plan for the invasion of the land of Afghanistan and also for an attack on Afghanistan by several countries well before the events in America. Therefore if news of such a plan had reached the Islamic Emirate and it had reacted and executed those operations, then all we can say is "well done".

On the other hand, there have been advantages as a result of those operations which have not been observed or mentioned. One of the advantages is that even if America had taken immediate and destructive revenge against Afghanistan, it would be looking into the Muslims affairs with more reluctance especially in the Palestine case. Also, these operations have dropped America in the worst economical losses ever known in history. America's losses have reached a trillion, it lost nearly 2000 experts in economy, its stock exchange has fallen tremendously, the dollar has lost a lot of its value, airline companies have either gone bankrupt or released thousands of employees, as well as many other financial losses.

The Crusaders war appears quite clearly on the horizon. The Crusade has gathered its party, prepared its gear, and the American President, Bush, has announced that this war is a long Crusaders war which will require patience. He also declared that his campaign is targeting 60 targets, 27 of which were announced all over the Islamic world. Therefore, every Muslim has to be on the alert and feel responsible to stand against the campaign of the Crusaders with all his money, his soul, his sons and his time.

The above statements are some of what the book held within its pages. The reader of this summary should know that we have not covered the whole book, and it is therefore better to read the book in full.

May peace be with you.

**Introduction**

(Extracts):

Many questions, more than a hundred, have been asked about whether what happened in America is legitimate?

For any person who has been following events, it is easy to say that what happened in America was a punishment from God for all the injustice and oppression that America has done to nations all over the world and especially to Muslims. If one felt sorrow for the nearly 20,000 people killed and injured as a result of the events, then one should think about the people of Iraq who lost, as a result of sanctions, nearly 2m Muslim, the Palestinians lost half their people in

UNCLASSIFIED
Exhibit B 38



UNCLASSIFIED

the Israelis attacks on them, as well as the Afghani nation where 7000 Muslim were killed.   All this in addition to the Muslims in the Philippines, Indonesia, Kosovo, Somalia, Libya, Sudan and many other Islamic nations whose blood is on the American hands.

The result that America got out of these destructive operations is just part of the harvest that it planted all over the world.   If America was hit by a sad and mournful event once, the nations that we mentioned earlier have been suffering for years, and still are.   Therefore, America should taste some of the actions of other nations.

**The research and preservation of blood**

(Extracts):

The attacks that took place on America have not been proved to be the responsibility of Muslims.

The responsibility for the events that have taken place against America, namely destroying the two international trade centres, destroying the Ministry of Defence, attacking the White House, and the Congress, or even hijacking a plane with its passengers, cannot be imposed on Muslims.   Although, according to the Koran, it is legal to destroy any country that is aggressive towards the Muslim nations anywhere in the world, but nothing as such has been proved.

(The text here lists again the numbers of people who are dying all over the world because America has either imposed sanctions on their country, like Iraq, or is supporting another country in attacks, like what's happening in Palestine, or itself attacking a country like Afghanistan).

As examples of acting in mutual reciprocity on America:

-- Because of Saddam and his Party, America punished a whole nation which was bombed and put under sanctions where millions of Muslims died.

-- Because of Usama Bin Ladin, Afghanistan was bombed and tens of thousands of Muslims died.

-- Because of an unidentified factory in Sudan, the country was attacked and a medicine factory was bombed where Muslims died.

-- And so on -- and on -- and on.

We, in turn, want to say:

-- Due to the fact that the American Government punishes the world because



A 13
S 614
P-4

# UNCLASSIFIED

of individuals, we will apply the same rule and punish the American people because of its government.

What would anger America if we punished its people?   Is it not their own rule?   Doesn't America decide on who to attack with an excuse of being either a terrorist or supportive of terrorism? It does not kill the actual doer but the innocent.

The Islamic Emirate was aware that America was putting together a military plan to invade its land and hit it by air in order to remove the Emirate and form a government led by Zaher Shah who was in exile in Rome two months before the September events.   The Pakistani Islamic paper (Zarb Mu'min) published an article by Pakistan's ex Ministry of Foreign Affairs, Niaz Zink, that high-ranking officials in the American Government informed him around the middle of July 2001 that America would take military action against Afghanistan in the middle of October 2001.   The Pakistani Minister also said that the American officials informed him of the plan during a conference held under the patronage of the United Nations in Berlin.

He also said that the American officials stated that if Bin Ladin was not handed over immediately, then the United States would take military action in order to capture him, or even kill him, together with Mullah Omar, Head of the Taliban movement.

The Pakistani ex-official explained that America would be proceeding with its operations from bases in Tajikistan where there were a number of American consultants.

He also said that Uzbekistan would participate in the operations and that 17,000 Russian soldiers were put on standby as the operations were planned to start with the snow season in Afghanistan which is around the middle of October.

The Pakistani official was in doubt that America would go back on its plans even if the handing over of Bin Ladin took place.

The BBC transmitted this report explaining that the United States was planning these military operations against Usama Bin Ladin and the Taliban movement even before the attack.

If the above news had reached the Islamic Emirate then its attitude, if it was actually the Islamic Emirate, is a great military competition.   Based on the above information, it carried out the assassination of Ahmed Shah Masoud, thus confusing the plans and shattering the ideas.   If it was responsible for the attacks on America, then political and military attitude required it, as it would have been silly for the Emirate to watch and wait for the Americans to attack.   We can see that the attacks that took place in America have shattered

#13
6 of 10
P-4

UNCLASSIFIED

American allies against the Emirate.

The fall of 6333 casualties and double that figure injured, does not blow out the fire in the hearts of Muslims against America. We therefore need a thousand operations as these.

We are all hoping that those attacks will be the beginning of the end of America.

(The text goes on for many pages giving extracts from old and not so old "Fatwas" of different religious Muslim characters, with many verses from the Koran).

**An advice to the Muslims who reside in countries of the infidels**

(Extracts):

We should not forget to advise our Muslim brothers who live amongst the infidels not to forget that they are first in line to be loyal and not to be tempted by the lives they live in those countries.

---------

God has disclosed the beliefs of the crusaders and brought out to light what their hearts held towards the Muslims.   Their war is not against terrorism or anything that is just, this is a cover for their real intentions.

The American President Bush ran out of patience and could not keep the secret of his belief, so he stated, in a press conference on Sunday, 16.09.2001: "This Crusade, this war on terrorism, is going to take a long time".   He tried later to cover up the real meaning of that statement by visiting the Islamic Centre in America.

Some criticism was issued regarding Bush's statement, namely by one of America's most senior politicians remarking on the famous "Nightline" on ABC channel that: "It was a mistake that the President made by using that particular phrase, for several reasons, such as:

First: In reality, the Crusaders were actually defeated in those wars by Saladin Eldin al-Ayubi, and it is not the right time to recall a defeat when we are in need of victory".

Second: The actual phrase "Crusaders wars" would provoke our Muslim allies whom we need in our fight against terrorism soon.

President Bush also said during a press conference one day after the events,

#/3
7 of 10
R-4

UNCLASSIFIED

when he was asked for his intention against who was responsible: "I can only say that we will erase the country who held the terrorists from the world map", referring to the Islamic Emirate in Afghanistan before finding the proof against them.

Bush also said in a very aggressive manner: "We sill smoke them", meaning to smoke them in the American criminal manner similar to what they did in Vietnam when they gassed complete villages and cities.

Whoever says that handing over Usama Bin Ladin would have put out the trigger for war, is wrong.   The target was not Usama Bin Ladin; it was Islam in general and the Jihad in particular.

**Extracts from a statement made by Mullah Muhammad Omar:**

You have all been following news on the campaign of the Crusaders led by the United States of America and supported by Britain and other Christian countries, Russia and other ex-communist countries.   You should also know that the reasons for such a campaign are not what has been broadcast or announced.   They are after destroying the Islam nation.

(Mullah Muhammad Omar goes on urging Muslims to stand against the Americans, again giving examples from verses of the Koran).

I call upon the rich and well-to-do people and say: Your duty is to donate for the cause of serving God.

To all Muslim youths, I say: Head for Jihad and have your guns ready.

When God gives us victory, then America and its allies won't be able to face us.

America with all its power cannot face the power of God Almighty.

We are not afraid of American soldiers whatever their number is, because we are soldiers of God.

**Extracts from a letter of Mullah Muhammad Omar to the Afghani people:**

(He starts with a verse from the Koran).

This is the third empire that has attacked us.   You all know that the British attacked Afghanistan, but for what reason?   Was Usama there then?   The Russians attacked Afghanistan, was there an Usama?   And here is the third empire that's attacking us, but we all know that it has nothing to do with Usama; the issue is to do with Islam.

## UNCLASSIFIED

It is a reality that there were attacks on America by planes, but everybody knows that one single man, especially if he was an immigrant and alone, cannot be behind these great and well-organized attacks.

The people behind these attacks are known to America, but they are not accused.   Instead, the accusation goes towards Afghanistan and the Islamic Emirate because they know that in Afghanistan there is a real Islamic organization, which they consider is a threat and danger to them.

My advice to you is that the Koran said to be alert and not afraid.   Don't be tempted by the infidels' media to weaken your faith as God is on our side as long as we are good Muslims.

**Extracts from a letter by the Sheikh Usama Bin Ladin to the Pakistani people after the uprising of Friday, 21/9/2001, where the Pakistani forces killed some protesters:**

(Verses of the Koran).

I was very saddened to hear that some of our Muslim brothers have been killed in Karachi while protesting against the American attacks on the Islamic lands of Pakistan and Afghanistan.   May we ask God to accept them as martyrs.

It is not strange that the Muslim nation in Pakistan would strike in defence of their Islam, as they are considered the front lines of defence for Islam in that area, just as the Afghanis were when the Russians attacked more than twenty years ago.

I am glad to advise you, brothers, that we are still on the road of Jihad and backing the heroic Afghani nation under the leadership of the Mujahid Mullah Muhammad Omar.

Your brother in Islam / Usama Bin Muhammad Bin Ladin.


[Description of Source: London The Sunday Times (Internet Version-WWW) in English -- conservative newspaper covered for worldwide reports]

*THIS REPORT MAY CONTAIN COPYRIGHTED MATERIAL. COPYING AND DISSEMINATION IS PROHIBITED WITHOUT PERMISSION OF THE COPYRIGHT OWNERS.*

---

*Unclassified*

[Go To Last Hit][Go To Top of Document]

UNCLASSIFIED

Exhibit B 43

UNCLASSIFIED



Press arrows to move to previous and next documents; press *Hit List* button to return to hit list

#13
10 of 19
P-4

UNCLASSIFIED

# THE 9/11
# COMMISSION
# REPORT

$\overline{IS}N^{\#}$ 13

1 64

R - S

UNCLASSIFIED



## COMMISSION
### MEMBERS

Thomas H. Kean
CHAIR

Lee H. Hamilton
VICE CHAIR

Richard Ben-Veniste

Bob Kerrey

Fred F. Fielding

John F. Lehman

Jamie S. Gorelick

Timothy J. Roemer

Slade Gorton

James R. Thompson

UNCLASSIFIED

ISN #13
264
R-5

UNCLASSIFIED

# PREFACE

WE PRESENT THE NARRATIVE of this report and the recommendations that flow from it to the President of the United States, the United States Congress, and the American people for their consideration. Ten Commissioners—five Republicans and five Democrats chosen by elected leaders from our nation's capital at a time of great partisan division—have come together to present this report without dissent.

We have come together with a unity of purpose because our nation demands it. September 11, 2001, was a day of unprecedented shock and suffering in the history of the United States. The nation was unprepared. How did this happen, and how can we avoid such tragedy again?

To answer these questions, the Congress and the President created the National Commission on Terrorist Attacks Upon the United States (Public Law 107-306, November 27, 2002).

Our mandate was sweeping. The law directed us to investigate "facts and circumstances relating to the terrorist attacks of September 11, 2001," including those relating to intelligence agencies, law enforcement agencies, diplomacy, immigration issues and border control, the flow of assets to terrorist organizations, commercial aviation, the role of congressional oversight and resource allocation, and other areas determined relevant by the Commission.

In pursuing our mandate, we have reviewed more than 2.5 million pages of documents and interviewed more than 1,200 individuals in ten countries. This included nearly every senior official from the current and previous administrations who had responsibility for topics covered in our mandate.

We have sought to be independent, impartial, thorough, and nonpartisan. From the outset, we have been committed to share as much of our investigation as we can with the American people. To that end, we held 19 days of hearings and took public testimony from 160 witnesses.

xv

UNCLASSIFIED

ISN #13
3-64
R-5

UNCLASSIFIED

passports, which Binalshibh in turn would pass along to KSM, probably for subsequent use in al Qaeda propaganda.[152]

The most significant part of the mid-July conversation concerned Jarrah's troubled relationship with Atta. KSM and Binalshibh both acknowledge that Jarrah chafed under Atta's authority over him. Binalshibh believes the disagreement arose in part from Jarrah's family visits. Moreover, Jarrah had been on his own for most of his time in the United States because Binalshibh's visa difficulty had prevented the two of them from training together. Jarrah thus felt excluded from the decisionmaking. Binalshibh had to act as a broker between Jarrah and Atta.[153]

Concerned that Jarrah might withdraw from the operation at this late stage, KSM emphasized the importance of Atta and Jarrah's resolving their differences. Binalshibh claims that such concern was unwarranted, and in their mid-July discussion reassured KSM that Atta and Jarrah would reconcile and be ready to move forward in about a month, after Jarrah visited his family. Noting his concern and the potential for delay, KSM at one point instructed Binalshibh to send "the skirts" to "Sally"—a coded instruction to Binalshibh to send funds to Zacarias Moussaoui. While Binalshibh admits KSM did direct him to send Moussaoui money during the mid-July conversation, he denies knowing exactly why he received this instruction—though he thought the money was being provided "within the framework" of the 9/11 operation.[154]

KSM may have instructed Binalshibh to send money to Moussaoui in order to help prepare Moussaoui as a potential substitute pilot for Jarrah. On July 20, 2001, Aysel Senguen, Jarrah's girlfriend, purchased a one-way ticket for Jarrah from Miami to Dusseldorf. On Jarrah's previous four trips from the United States to see Senguen and his family in Lebanon, he had always traveled with a round-trip ticket. When Jarrah departed Miami on July 25, Atta appears to have driven him to the airport, another unique circumstance.[155]

Binalshibh picked up Jarrah at the airport in Dusseldorf on July 25. Jarrah wanted to see Senguen as soon as possible, so he and Binalshibh arranged to meet a few days later. When they did, they had an emotional conversation during which Binalshibh encouraged Jarrah to see the plan through.[156]

While Jarrah was in Germany, Binalshibh and Moussaoui were in contact to arrange for the transfer of funds. Binalshibh received two wire transfers from Hawsawi in the UAE totaling $15,000 and, within days, relayed almost all of this money to Moussaoui in two installments.[157]

Moussaoui had been taking flight lessons at the Airman Flight School in Norman, Oklahoma, since February but stopped in late May. Although at that point he had only about 50 hours of flight time and no solo flights to his credit, Moussaoui began making inquiries about flight materials and simulator training for Boeing 747s. On July 10, he put down a $1,500 deposit for flight simulator training at Pan Am International Flight Academy in Eagan, Minnesota, and by the end of the month, he had received a simulator schedule to train from

UNCLASSIFIED

ISN #13
464
R-5

# UNCLASSIFIED

**Department of Defense**
**Office for the Administrative Review of the Detention of Enemy**
**Combatants at U.S. Naval Base Guantanamo Bay, Cuba**

15 June 2007

TO:          Personal Representative

FROM:     OIC, CSRT (15 Jun 07)

SUBJECT:    SUMMARY OF EVIDENCE FOR COMBATANT STATUS REVIEW
            TRIBUNAL – AL-SHIB, RAMZI BIN

1. Under the provisions of the Deputy Secretary of Defense Memorandum, dated 14 July 2006, *Implementation of Combatant Status Review Tribunal Procedures for Enemy Combatants Detained at U.S. Naval Base Guantanamo Bay, Cuba*, a Tribunal has been appointed to determine if the detainee is an enemy combatant.

2. An enemy combatant has been defined as "an individual who was part of or supporting the Taliban or al Qaida forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who committed a belligerent act or has directly supported hostilities in aid of enemy armed forces."

3. The following facts support the determination that the detainee is an enemy combatant.

   a. On the morning of 11 September 2001, four airliners traveling over the United States were hijacked. The flights hijacked were: American Airlines Flight 11, United Airlines Flight 175, American Airlines Flight 77, and United Airlines Flight 93. At approximately 8:46 a.m., American Airlines Flight 11 crashed into the North Tower of the World Trade Center, resulting in the collapse of the tower at approximately 10:25 a.m. At approximately 9:03 a.m., United Airlines Flight 175 crashed into the South Tower of the World Trade Center, resulting in the collapse of the tower at approximately 9:55 a.m. At approximately 9:37 a.m., American Airlines Flight 77 crashed into the southwest side of the Pentagon in Arlington, Virginia. At approximately 10:03 a.m. United Airlines Flight 93 crashed in Stoney Creek Township, Pennsylvania. These crashes and subsequent damage to the World Trade Center and the Pentagon resulted in the deaths of 2972 persons in New York, Virginia, and Pennsylvania.

   b. According to court transcripts and evidence from United States v. Zacarias Moussaoui, the detainee was closely associated with three of the hijackers responsible for the "9/11" attacks, Mohammed Atta (Atta), Marwan Al-Shehhi (Al-Shehhi) and Ziad Jarrah while they lived in Hamburg, Germany during the late 1990's and early 2000. The detainee, Atta and Al-Shehhi are known to have lived at or frequented one particular address during the same time period, 54 Marienstrasse 21073, Hamburg, Germany.

R-18
Page 1 of 4

# UNCLASSIFIED

# UNCLASSIFIED

SUBJECT:    SUMMARY OF EVIDENCE FOR COMBATANT STATUS REVIEW
            TRIBUNAL – AL-SHIB, RAMZI BIN

    c. Airline and immigration records indicate that from November 1999 through February 2000, the detainee, Mohammed Atta, Marwan Al-Shehhi and Ziad Jarrah all traveled from Germany to Pakistan.

    d. Sayf al-Adl is a senior al Qaida military commander with a long-term relationship with Usama bin Laden. Sayf al-Adl's role in the organization has been as a trainer, military leader, and key member of Usama bin Laden's security detail.

    e. The diary of Sayf al-Adl was recovered during a raid in Saudi Arabia in 2004. The diary details the detainee's involvement in the 11 September 2001 terrorist plot and subsequent attack. The detainee is listed as a "highly professional jihadist" along with "9/11 hijackers", Mohammed Atta and Ziad Jarrah. The diary states that the three were briefed on an operation involving aircraft by Abu Hafs, a senior al Qaida planner. The detainee, Mohammed Atta, and Ziad Jarrah subsequently met with Usama bin Laden about the plan. Following the meeting, al Qaida began arrangements for the detainee, Mohammed Atta and Ziad Jarrah to receive pilot training. The detainee handled administrative details for the "9/11 hijackers" while they were in the United States and the detainee served as an al Qaida Europe based liaison.

    f. The detainee was identified in a video tape of potential suicide operatives.

    g. The detainee attempted to obtain a United States visa on four occasions from May 2000 to November 2000 for the purpose of attending flight school in the United States. Each application was rejected by United States Department of State.

    h. The detainee attempted to enroll in the Florida Flight Training School, where "9/11 hijacker" Ziad Jarrah was a student. The detainee put down a 2,350 United States dollars deposit for flight training.

    i. Ziad Jarrah repeatedly attempted to assist the detainee's travel to the United States and enrollment in the Florida flight training center.

    j. The detainee also attempted to enroll at the Florida-based aviation language school.

    k. The detainee, while in Germany, wired "9/11 hijacker" Marwan Al-Shehhi (who was in the United States) 2708.33 United States dollars on 13 June 2000 via moneygram.

    l. The detainee, while in Germany, wired "9/11 hijacker" Marwan Al-Shehhi (who was in the United States) 1803.19 United States dollars on 21 June 2000 via moneygram.

    m. The detainee, while in Germany, wired "9/11 hijacker" Marwan Al-Shehhi (who was in the United States) 1760.61 United States dollars on 26 July 2000 via Western Union.

    n. The detainee, while in Germany, wired "9/11 hijacker" Marwan Al-Shehhi (who was in the United States) 4,118.13 United States dollars on 25 September 2000 via Western Union.

# UNCLASSIFIED

Exhibit B 50

# UNCLASSIFIED

SUBJECT:    SUMMARY OF EVIDENCE FOR COMBATANT STATUS REVIEW
TRIBUNAL – AL-SHIB, RAMZI BIN

o. In June 2002, the detainee was personally interviewed by Yosri Fouda (Fouda), an investigative journalist for Al-Jazeera television. The interview took place over the course of 48 hours in Karachi, Pakistan. Also present at the meeting was Khalid Sheikh Mohammed (KSM), a senior al Qaida planner. Fouda conducted the interview in person with both the detainee and KSM. The detainee and KSM detailed how the "9/11 attacks" were planned and executed during the course of the interview. KSM identified the detainee as the coordinator of the "9/11 attacks." The detainee displayed items he claimed were "souvenirs" of the "9/11 attacks." The items included: an air navigation map of the American eastern seaboard, flight simulator CD-Roms and Boeing manuals and a flight instruction book the detainee claimed had "9/11 hijacker" Mohamed Atta's (Atta) handwritten notes. The detainee stated Mohamed Atta (Atta) left them in the Hamburg, Germany, apartment he shared with the detainee. The detainee stated that he later met with Atta in July, 2001 in Madrid, Spain, to finalize the operational details of the "9/11 plot." The detainee stated he received a phone call on 29 August 2001 from Atta that gave the date for the "9/11 attacks." After learning this, the detainee ordered active al Qaida cells in Europe and elsewhere to evacuate and then he fled to Pakistan.

p. An unsigned letter found at the detainee's point of capture, and addressed to the detainee, asks follow on questions related to the detainee's Al-Jazeera interview detailing the "9/11 attacks."

q. An article from the London Sunday Times published on 8 September 2002 listed excerpts from a 112 page document entitled "The Reality of the New Crusaders' War." The detainee passed the document to Al-Jazeera reporter Yosri Fouda with a request for the document to be translated into English and entered into the Library of Congress. According to the London Sunday Times the document is al Qaida's written attempt to justify the "9/11 attacks" through Islamic teaching.

r. The London Sunday Times article published on 8 September 2002 listed excerpts from "The Reality of the New Crusaders' War" which contained statements from Taliban leader Mullah Mohamed Omar and Usama bin Laden which encourages jihad in service of the ousted Taliban regime.

s. Documents captured in a raid of a separate al Qaida safe house were identical to documents captured along with the detainee. The documents included training manuals, security information and combat related subjects.

t. Letters and personal effects of a senior al Qaida operative were discovered in the safe house where the detainee was arrested.

u. Letters found at the detainee's point of capture detailed a plan to egress Pakistan with forged identification. This plan was in conjunction with a senior al Qaida operative.

Page 3 of 4



# UNCLASSIFIED

SUBJECT:    SUMMARY OF EVIDENCE FOR COMBATANT STATUS REVIEW
            TRIBUNAL – AL-SHIB, RAMZI BIN

     v.  A letter captured on an al Qaida courier detailed a senior al Qaida operative's instructions to the detainee to identify operatives to send to the United States or United Kingdom.

     w.  The detainee wired approximately 15,000 United States dollars to Zacharias Moussaoui while Moussaoui was enrolled in pilot training.

4.  The detainee has the opportunity to contest his designation as an enemy combatant.  The Tribunal will endeavor to arrange for the presence of any reasonably available witnesses or evidence that the detainee desires to call or introduce to prove that he is not an enemy combatant and that is deemed relevant to that issue.  The Tribunal President will determine the reasonable availability and relevance of evidence or witnesses.

# UNCLASSIFIED

Exhibit B 52

## DETAINEE ELECTION FORM

**Date:** 13 FEB 07

**Start Time:** N/A

**End Time:** N/A

**ISN#:** 13

**PR #** 4

**Translator Required?** N/A        **Language?** N/A

**CSRT Procedure Read to Detainee or Written Copy Read by Detainee?** N/A

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Detainee Election:**

☐   **Wants to Participate in Tribunal**

☐   **Wants Assistance of Personal Representative**

☒   **Affirmatively Declines to Participate in Tribunal**

☒   **Affirmatively Declines Assistance of Personal Representative**

☒   **Uncooperative or Unresponsive**

**Personal Representative Comments:**

DETAINEE IS UNCOOPERATIVE AND UNRESPONSIVE .

At the 1st scheduled meeting to present the CSRT notification to the Detainee on 9 Feb 07, the Detainee stated he would not participate in the Tribunal Process and would not meet again with PR#4 and the Arabic translator.

At the 2nd scheduled meeting to present the Unclassified Summary on 13 Feb 07, the Detainee chose to not leave his cell to meet with PR#4 and the Arabic translator.

At the 3rd scheduled meeting to present the Unclassified Summary on 16 Feb 07, the Detainee chose to not leave his cell to meet with PR#4 and the Arabic translator.

At the 4th scheduled meeting to present the Unclassified Exhibits on 5 March 07, the Detainee chose to not leave his cell to meet with PR#4 and the Arabic translator.

UNCLASSIFIED // ~~FOUO~~

## Personal Representative Review of the Record of Proceedings

I acknowledge that on _14_ March 2007 I was provided the opportunity to review the record of proceedings for the Combatant Status Review Tribunal involving ISN # 1 0013.

_____ I have no comments.

✓ My comments are attached.

Name: ████████████ MAJOR, USAF  Date: _14 MAR Ø 7_

Signature: ████████████████████

1. VERBATIM TRANSCRIPT OF CSRT — P. 3 OF 8
— PERSONAL REPRESENTATIVE STATEMENT — CHANGE CRST TO CSR
HIGHLIGHTED AND FLAGGED ON P. 3 OF 8