IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RAMZI BIN AL-SHIBH,                         :
                                            :
              Petitioner                    :
                                            :
       v.                                   :        Civil No. 06-1725 (EGS)
                                            :
GEORGE W. BUSH, *et al.*,                   :        **NOTICE OF MOTION**
                                            :
              Respondents.                  :

TO:    Terry Henry
       Andrew Warden
       U.S. Department of Justice
       Civil Division, Federal Programs Branch
       20 Massachusetts Ave., N.W.
       Washington, D.C.  20530

       PLEASE TAKE NOTICE that Petitioner Ramzi bin al-Shibh, through undersigned

counsel, will move before the Honorable Emmet G. Sullivan, United States District Judge for the

District of Columbia, at a time and on a date to be set, for the following relief:

       1.  An Order enjoining the Military Commission proceedings.

       Petitioner relies upon the Statement of Points and Authorities submitted with this notice

and incorporates that document as if it were set forth fully herein.


                                   Respectfully submitted,


                                   ___/s/Candace Hom_____
                                   Richard Coughlin
                                   Federal Public Defender
                                   Candace Hom
                                   Assistant Federal Public Defender
                                   Office of the Federal Public Defender
                                   972 Broad Street, Fourth Floor
                                   Newark, New Jersey  07102
                                   (973) 645-6347

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **RAMZI BIN AL-SHIBH**, | : | |
| | : | |
| *Petitioner*; | : | |
| | : | |
| v. | : | |
| | : | CIVIL NO. 06-CV-1725 (EGS) |
| **GEORGE W. BUSH**, *et al.*, | : | |
| | : | |
| *Respondents*. | : | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITIONER RAMZI BIN AL-SHIBH'S MOTION TO ENJOIN MILITARY COMMISSION PROCEEDINGS

Petitioner Ramzi bin al-Shibh, acting through his Next Friend and counsel, respectfully requests that the Court enjoin Respondents from prosecuting him by military commission created pursuant to the Military Commissions Act or any law or regulation other than a proceeding pursuant to the Uniform Code of Military Justice or Title 18 of the United States Code until such time as the Court rules on the merits of his petition for a Writ of Habeas Corpus. Without immediate action from this Court, Petitioner will face trial by an unlawful, illegally constituted military commission in violation of domestic and international law. Petitioner faces immediate, severe and irreparable harm. Accordingly, this Court should grant bin al-Shibh's motion to enjoin the military commission proceedings.

## PRELIMINARY STATEMENT

Petitioner bin al-Shibh is a citizen of Yemen who was taken into custody by the United States while in Pakistan. On information and belief, Petitioner was detained by the Central Intelligence Agency in secret prisons from 2002 to 2006, until he was transferred to Guantanamo Bay and the custody of the United States military.

Petitioner's brother filed a *pro se* request for habeas relief with this Court, which was docketed on October 5, 2006. The Court appointed undersigned counsel to represent Petitioner on May 4, 2007. On August 17, 2007, Petitioner's *habeas* petition was stayed.

On May 9, 2008, charges against Petitioner al-Shibh and four other alleged co-conspirators were referred for trial by military commission. Petitioner is charged with crimes of conspiracy, attacking civilians, attacking civilian objects, intentionally causing serious bodily injury, murder in violation of the law of war, destruction of property in violation of the law of war, hijacking or hazarding a vessel or aircraft, terrorism, and providing material support for terrorism under the Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat. 2600 (2006).

On June 5, 2008, Petitioner bin al-Shibh was arraigned. During the arraignment, Petitioner disclosed that he was under psychiatric care and receiving psychotropic medication. Petitioner bin al-Shibh is next scheduled to appear before a military commission on August 14, 2008. A trial date has not been set but is imminent. Following the release of *Boumediene v. Bush*, 553 U.S. ___ , 128 S. Ct. 2229 (2008), on July 5, 2008, Petitioner's counsel filed a notice of filing, alerting the Court that they had transmitted to the Court Security Officer a motion for leave to lift the stay previously imposed in Petitioner's *habeas* action, and a motion for leave to file an Amended Petition for Writ of Habeas Corpus. The Amended Petition sets forth the bases for Petitioner's claims for relief.

## **JURISDICTION**

This Court has jurisdiction under 28 U.S.C. §§ 1331, 1361, 1391, 1651, 2201, 2202, 2241-42; 5 U.S.C. § 702; and U.S. Const. Art. I, § 9, cl. 2. *See In re Yamashita*, 327 U.S. 1, 9 (1946) ("[T]he Executive branch of the government could not, unless there was suspension of

2

the writ, withdraw from the courts the duty and power to make such inquiry into the authority of

the commission as may be made by habeas corpus.").

## **ARGUMENT**

### I.  **The Court Has The Power To Enjoin Military Commission Proceedings**

#### a.  **District Courts Have Inherent Power To Protect Their Own Jurisdiction**

This Court has the power to enjoin the military commission proceedings against

Petitioner bin al-Shibh.  District courts have inherent power to issue stays.  *Landis v. North*

*American Co.*, 299 U.S. 248, 254 (1936); *see also Clinton v. Jones*, 520 U.S. 681, 706 (1997)

("The District Court has broad discretion to stay proceedings as an incident to its power to

control its own docket.").  This Court's authority to enjoin military commission proceedings

stems from the All Writs Act:  "The Supreme Court and all courts established by Act of

Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and

agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  *See also S.E.C. v. Vision*

*Commc'ns, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996) ("The All Writs Act, 28 U.S.C. § 1651(a),

empowers a district court to issue injunctions to protect its jurisdiction . . . .").  Where

appropriate, this Court and other courts in this district have enjoined military commission

proceedings in order to prevent irreparable harm to petitioners.  *See Al Sharbi v. Bush*, 430 F.

Supp. 2d 1 (D.D.C. 2006) (enjoining military commission proceedings against petitioner pending

issuance of final decision by Supreme Court in *Hamdan v. Rumsfeld*); *Hicks v. Bush*, 397 F.

Supp. 2d 36 (D.D.C. 2005) (same); *cf. Hamdan v. Rumsfeld*, 344 F. Supp. 2d 152 (D.D.C. 2004)

(ordering petitioner cannot be tried until military commission rules are amended consistent with

the Uniform Code of Military Justice), *aff'd in part* 548 U.S. 557 (2006).

Petitioner seeks a writ of *habeas corpus* from this Court declaring that he is being held

unlawfully and being subjected to unlawful criminal proceedings.  In order for the Court to

maintain jurisdiction over those claims, the proceedings must be enjoined; otherwise, Petitioner

may have already suffered the injury which the Court has the power to remedy.  As the district

court in *Hicks v. Bush* stated,

> [I]t is within the province of a district court to determine whether a
> military commission has jurisdiction over a particular individual
> prior to that individual's adjudication by a military commission.
> Thus, the Court has the authority to enjoin Respondents from
> going forward with military commission proceedings against
> Petitioner.  An injunction in this case is necessary in order for this
> Court to maintain its jurisdiction over Petitioner's claim that a
> military commission lacks jurisdiction to try him, a claim which
> Petitioner is entitled to have adjudicated by this Court prior to trial
> before a military commission.

*Hicks v. Bush*, 397 F. Supp. 2d 36, 41 (D.D.C. 2005) (citations omitted).  As in *Hicks*, Petitioner

bin al-Shibh is entitled to have his claims adjudicated by this Court prior to trial by military

commission.  With pre-trial proceedings already occurring, the Court must act immediately to

protect Petitioner's rights.

## II. An Injunction Is Necessary To Preserve The Status Quo And Prevent Imminent, Irreparable Harm To Petitioner

In determining whether an injunction in appropriate, courts apply a four-part test:

Petitioner must demonstrate "1) a substantial likelihood of success on the merits, 2) that it would

suffer irreparable injury if the injunction is not granted, 3) that an injunction would not

substantially injure other interested parties, and 4) that the public interest would be furthered by

the injunction."  *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir.

1995); *Washington Metro Area Transit Comm. v. Holiday Tours*, 559 F.2d 841, 843 (D.C. Cir.

1977).  All four factors weigh heavily in favor of an injunction in this case.

4

**a.  Petitioner Will Suffer Irreparable Injury If He Is Tried By An Illegal Military Commission**

There is no doubt that being tried by an illegal military commission will cause significant, irreparable injury to Petitioner.  As previously recognized by this Court, "the harm to the petitioner is undoubtedly irreparable" when petitioner faces imminent proceedings before a military commission that may ultimately be declared unlawful.  *Al Sharbi v. Bush*, 430 F. Supp. 2d 1, 3 (D.D.C. 2006).  This Circuit holds that an injury must be "both certain and great" to justify an injunction.  *See, e.g., Wisconsin Gas Co. v. FERC*, 758 U.S. F.2d 674 (D.C. Cir. 1985), Petitioner's threatened injury clearly meets that test.  The harm Petitioner faces from being tried by an unlawful military commission is irreparable and cannot be repaired by post-conviction review.  "Setting aside the judgment after trial and conviction insufficiently redresses [Petitioner's] right not to be tried by a tribunal that has no jurisdiction."  *Hamdan v. Rumsfeld*, 415 F.3d 33, 36 (D.C. Cir. 2005), *rev'd on other grounds,* 126 S. Ct. 2749, 2798 (2006); *Hicks v. Bush*, 397 F. Supp. 2d 36, 42 (D.D.C. 2005).  The Circuit Court has held that being forced to participate in a procedure that might later be found unlawful would cause petitioner "a significant and irreparable injury."  *Rafeedie v. INS*, 880 F.2d 506, 517-18 (D.C. Cir. 1989).  The Circuit Court found that Rafeedie established the "judicially cognizable injury" of being forced to present a defense to a tribunal that might later be declared unlawful.  His opponent would therefore know his defense in advance, which would prejudice him in a later proceedings once the first one was declared unlawful.  *Id*. at 517.  Accordingly, the Circuit Court affirmed the injunction issued by the lower court.  *Id*. at 519.  The harm faced by Petitioner in this case is no different, constituting significant and irreparable injury that establishes the first factor and weighs in favor of an injunction.

The Supreme Court explained the significant nature of the harm posed by being tried by a

5

military commission process prior to the determination of its constitutionality, declaring in

*Hamdan* that the defendant "and the Government both have a compelling interest in knowing in

advance whether Hamdan may be tried by a military commission that arguably is without any

basis and law and operates free from the procedural rules prescribed by Congress for courts-

martial -- rules intended to safeguard the accused and ensure the reliability of any conviction."

*Hamdan v. Rumsfeld*, 548 U.S. 557, 752 (2006).  In this case, as in *Hamdan*, any form of post-

conviction review will simply be unable to undo the harm that Petitioner bin al-Shibh would

suffer from being "tried by a military commission that is arguably without any basis and law . . .

."  *Id*.  The fact that Congress enacted the MCA has no bearing here, as the Supreme Court has

already held that a significant portion of the MCA (the only portion which was before it) is

unconstitutional.  *Boumediene v. Bush*, 128 S. Ct. at 2240 ("§ 7 of the Military Commissions Act

. . . operates as an unconstitutional suspension of the writ.").  Deference to Congress is not

appropriate in this case, despite "[t]he usual presumption [] that Members of Congress, in accord

with their oath of office, considered the constitutional issue and determined the amended statute

to be a lawful one . . . ."  *Id*. slip op. at 7 (2008).  Despite that presumption, the Supreme Court

invalidated Section 7 of the MCA.

This Court must have the opportunity to carefully review the claims in the Amended

Petition and determine by what procedures, if any, Petitioner may lawfully be tried *before* he is

forced to undergo an unlawful trial.  The Supreme Court recognized the importance of

permitting pre-trial *habeas* proceedings to challenge military commission proceedings.  In

*Hamdan*, the Court observed that "abstention is not appropriate in cases in which individuals

raise 'substantial arguments denying the right of the military to try them at all."  126 S. Ct. at

2770 n.16.  Given the unprecedented nature of the MCA scheme, and the particularly shocking

6

aspects of Petitioner's pre-trial detention and interrogation, Petitioner bin al-Shibh has a

"compelling interest in knowing in advance whether [he] may be tried by a military commission

that arguably is without any basis in law." *Id.* at 2772. If the district court reviewing Hamdan's

case had accepted the government's abstention claim, Hamdan would have been placed in

*Rafeedie*'s "catch 22" -- forced to decide whether to preview his defense in a trial lacking

jurisdiction over him or risk mounting no defense at all. That trial (and dozens of others) would

have been invalidated, and they all would have been forced to start over, with the government

handed a preview of their defenses. Petitioner bin al-Shibh deserves no less of an opportunity to

challenge the military commission's jurisdiction over him.

Moreover, forcing Petitioner to defend himself before an invalid military commission

would frustrate his constitutional *habeas* right to challenge the legality of his detention. One

purpose of *habeas* is to determine unlawful enemy combatancy. Petitioner bin al-Shibh is being

brought to trial on the finding of a combatant status review tribunal that lacks constitutionally

adequate procedural protections, including the right to counsel, the right to see and respond to

the evidence against him, and the right to confront and examine witnesses against him. With the

military commission's jurisdiction based on Petitioner's alleged status as an unlawful combatant,

one of the few possible defenses available to him will be to argue that he is entitled to POW

status and immune from prosecution. However, if Petitioner is forced to raise such a defense at

his commission, his ability to argue in his constitutional *habeas* hearing that he is not a

combatant at all, *i.e.*, that he was never directly engaged in hostilities against the United States,

may be severely prejudiced. Requiring Petitioner bin al-Shibh to participate in the commission

in advance of his *habeas* hearing would thus create a vicious catch-22, forcing him to either

abandon one of the few possible defenses in his trial, or to forfeit much of his *habeas* hearing

and thereby waive his right to challenge the CSRT's flawed determination of enemy combatancy.[1]  *Parhat v. Gates*, No. 06-1397 (D.C. Cir. June 20, 2008) (order) (finding that a CSRT failed to satisfy the Government's own standard of enemy combatancy).

The harm Petitioner will suffer if his trial is not enjoined is incapable of being repaired. While the MCA allows for a form of post-conviction review, it is an extremely limited form that is powerless to remedy the damage Petitioner will suffer.  First, after review by the newly-created Court of Military Commission Review, the MCA grants the United States Court of Appeals for the District of Columbia Circuit exclusive jurisdiction to review final judgments. The scope of that review is limited to:  "(1) whether the final decision was consistent with the standards and procedures specified in this chapter; and (2) to the extent applicable, the Constitution and the laws of the United States."  10 U.S.C. § 950g(c).  Thus, only a final judgment against Petitioner may be reviewed.  The claims Petitioner has raised in the Amended Petition -- that the military commission does not have personal or subject matter jurisdiction over him, as well as the constitutionally prohibited procedural defects – can never be reviewed post-conviction.  Second, those claims can never be reviewed pre-conviction.  *See Khadr v. United States*, No. 07-1405, 2008 WL 2468496 (D.C. Cir. June 20, 2008) (holding no jurisdiction to review pre-conviction challenge to personal jurisdiction).  Thus, it is simply impossible for the review mechanisms provided by the MCA to ever allow for review of Petitioner's claims.  Petitioner's claims cannot be adequately reviewed post-conviction.  An injunction in this case would be a carefully tailored, yet necessary act to preserve this Court's

---

[1] Moreover, a central tenet of *Boumediene* is that the delay in considering the Guantanamo detainees' habeas petitions challenging their detention has already been far too long, and that "[t]he detainees in these cases are entitled to a *prompt* habeas corpus hearing."  *Boumediene*, 128 S. Ct. at 2275 (emphasis added).  As the Court explained, "[i]n some of these cases six years have elapsed without the judicial oversight that habeas corpus or an adequate substitute demands" and "the costs of delay can no longer be borne by those who are held in custody."  *Id.*  The delay is even more grievous considering Petitioner's detention and deliberate and interrogation and the hands of the CIA in secret "black sites" designed to keep Petitioner from accessing the legal processes to which he is entitled.  *See* Amended Petition ¶¶ 28-30.

effective jurisdiction over Petitioner's clams.  Particularly in light of the absence of any

countervailing interest, the military commission proceedings should be enjoined.

> **i.    The MCA Procedures Related to Petitioner's Mental Competency
> Issue Fall Far Short of Rules for Courts-Martial and Prejudice
> Petitioner Significantly**

The unique circumstances of Petitioner's military commissions case demonstrate that

Petitioner faces significant and imminent injury if no injunction is issued.  As discussed further

below, Petitioner's mental health is at issue in his military commissions proceedings.  On the

evening before the June 5, 2008 arraignment, Petitioner's counsel was first informed that

Petitioner was receiving psychotropic medication.  Declaration of CDR Suzanne M. Lachelier,

dated 11 July, 2008, attached hereto as Exhibit A ("Lachelier Decl."), ¶ 22.  After an evaluation

is completed, a competency hearing is to be conducted on August 15, 2008.  *See United States v.*

*Mohammed et al.*, (C.M.C.R. July 1, 2008) (Order on Motions for Special Relief) ("C.M.C.R.

Order on Motions for Special Relief"), attached hereto as Exhibit B, ¶ 4.

Petitioner is severely prejudiced by the military commissions rules for evaluation of

mental competency.  Rule for Military Commissions (RMC) 706.  In contrast to the Rule for

Courts-Martial (RCM) 706, there are significant differences that deprive Petitioner of important

constitutional safeguards.  Since Petitioner is about to undergo this process, as related above, the

prejudice that Petitioner faces is immediate.

Certain procedures as spelled out in the military commissions rules provide little

protection to Petitioner regarding the evaluation of his mental health status, including his

statements to medical personnel.  While the prosecution receives a copy of a summary report of

the exam, which includes statements that Petitioner makes to medical personnel conducting the

exam, there is no provision in the military commissions rules, as there is in the courts-martial

rules, that specifically precludes disclosure to the prosecution of statements made by the accused to medical personnel, unless such disclosure is done by defense counsel, the accused, or the judge.  *Compare* RMC 706 *with* RCM 706.  With respect to the military commission process, this leaves open the possibility that JTF, which can receive a copy of the full report upon its request, can disclose the statements to the prosecution.  The military judge has indicated his position that JTF and the prosecution are "one government," Lachelier Decl. ¶ 28, and thus it is reasonable to anticipate that this disclosure of petitioner's statements to medical personnel will take place.

Another provision found in the rules for courts-martial but lacking in the military commission rules is that additional mental health evaluations may be accommodated at any stage of the proceedings, unlike the military commissions process, which has no such provision. *Compare* RCM 706 *with* RMC 706.  Finally, the rules for courts-martial allow for dismissal of the charge or administrative action, in lieu of criminal action, to be taken, based on the report of examination.  *See* RCM 706.  The correlating military commission rule makes no discussion of the possibility of dismissal of the charges, and thus allows for no such resolution of the charges based on the examination report.  *See* RMC 706.

The lack of the above protections fails to safeguard Petitioner bin al-Shibh's constitutional rights, including the right not to incriminate himself with his own statements, under the Fifth Amendment, and his right to a fair trial and to put on a defense under the Fifth and Sixth Amendments.  Overall, Petitioner bin al-Shibh faces significant and imminent injury given the proceedings that are currently taking place in the military commissions process.  This prejudice and injury faced by Petitioner weigh in favor of a preliminary injunction while this Court determines the constitutionality of the military commissions process.

### b.   Petitioner Is Likely To Succeed On The Merits Of His Petition For A Writ of Habeas Corpus

Petitioner's Amended Petition for Writ of Habeas Corpus ("Amended Petition")

demonstrates that Petitioner's ongoing detention by the United States is in violation of domestic

and international law.  Further, the Amended Petition alleges that Petitioner is being tried by an

unlawful tribunal constituted in violation of the Constitution and international law, without

personal or subject matter jurisdiction over him.  Petitioner incorporates by reference his claims

set forth in the Amended Petition in their entirety, and summarizes key elements of those claims

below.

### i. This Court Has Jurisdiction To Hear Petitioner's Claims And Grant Relief

### 1.   Habeas Corpus Is The Appropriate Vehicle for Petitioner's Claims

The Supreme Court has long recognized the authority and obligation of Article III courts

to entertain pretrial collateral challenges to the "jurisdiction" of military tribunals.  *See, e.g.*,

*United States* v. *Grimley*, 137 U.S. 147, 150 (1890); *In re Yamashita*, 327 U.S. 1, 8 (1946).  And

since the Civil War, the Court has recognized habeas corpus as the appropriate procedural

vehicle through which to vindicate such claims.  *E.g.*, *Ex parte Milligan*, 71 U.S. (4 Wall.) 2

(1866); *see also Ex parte Reed*, 100 U.S. 13 (1879).

Although the precise line of demarcation separating "jurisdictional" challenges from

other claims is, at best, unclear, a number of decisions illustrate that this Court may hear

Petitioner's pretrial *habeas* challenge.  For example, in *habeas* petitions, the Supreme Court has

reviewed the merits of claims that (1) the assertion of military jurisdiction is unconstitutional on

its face, *see, e.g.*, *Ex parte Quirin*, 317 U.S. 1 (1942); *Milligan*, 71 U.S. (4 Wall.) 2; (2) the

court-martial or military commission lacks personal jurisdiction over the defendant, *see, e.g.*,

11

*Kinsella* v. *United States ex rel. Singleton*, 361 U.S. 234 (1960); *Reid* v. *Covert*, 354 U.S. 1

(1957) (plurality); *United States ex rel. Toth* v. *Quarles*, 350 U.S. 11 (1955); *Madsen* v. *Kinsella*,

343 U.S. 341 (1952); *see also Ex parte Yerger*, 75 U.S. (8 Wall.) 85 (1869); or (3) the court-

martial or military commission lacks subject-matter jurisdiction over the charged offenses, *see,*

*e.g.*, *Hamdan*, 126 S. Ct. 2749; *Duncan* v. *Kahanamoku*, 327 U.S. 304 (1946).

Indeed, the Court has even considered a challenge to a court-martial on the ground that

the military failed to "fully and fairly" consider whether its proceedings had deprived the

defendants of their constitutional rights.  *See Burns* v. *Wilson*, 346 U.S. 137, 142–45 (1953)

(plurality); *id.* at 149-50 (Frankfurter, J., agreeing with plurality on federal jurisdiction).  Thus,

where, as here, a petitioner raises colorable claims that his trial by a military tribunal would not

just be voidable, but *void*, an unbroken line of precedent compels the conclusion that *habeas*

*corpus* is appropriate.

### 2.  Abstention Is Not Appropriate

None of the cases discussed above required that the *habeas* petition be held in abeyance

pending the conclusion of the military proceedings, and for good reason.  As the Supreme Court

noted in *Parisi v. Davidson*, "Under accepted principles of comity, the court should stay its hand

only if the relief the petitioner seeks . . . would also be available to him with reasonable

promptness and certainty through the machinery of the military judicial system . . . ."  405 U.S.

34, 41–42 (1972).  Where a petitioner raises claims for which relief is *not* necessarily available

in the military system, including claims challenging his amenability to military jurisdiction in the

first place, abstention is fundamentally inappropriate.[2]   The reasons why this claim has

---

[2] A petitioner who has "raised substantial arguments denying the right of the military to try [him] at all"
need not exhaust the remedies afforded him by the military before filing a habeas petition. *Schlesinger v.
Councilman*, 420 U.S. 738, 763 (1975) (citing *Noyd v. Bond*, 395 U.S. 683, 696 n.8 (1969)); *accord United
States ex rel. Toth v. Quarles*, 350 U.S. 11 (1955); *Parisi v. Davidson*, 405 U.S. 34, 41-42 (1972) (rejecting
abstention from a habeas claim because "the relief the petitioner seeks" was not "available to him with

particular salience in Petitioner's case are detailed in Section 3, *infra*.

Nor does *Schlesinger v. Councilman*, 420 U.S. 738 (1975), counsel to the contrary.  First, the Supreme Court held previously that abstention was inappropriate in a Hamdan's case. As Justice Stevens explained,

> [N]either of the comity considerations identified in *Councilman* weighs in favor of abstention in this case.  First, Hamdan is not a member of our Nation's Armed Forces, so concerns about military discipline do not apply.  Second, the tribunal convened to try Hamdan is not part of the integrated system of military courts, complete with independent review panels, that Congress has established.  Unlike the officer in *Councilman* Hamdan has no right to appeal any conviction to the civilian judges of the [U.S. Court of Appeals for the Armed Forces].  Instead, . . . any conviction would be reviewed by a panel consisting of three military officers designated by the Secretary of Defense.

*Hamdan*, 126 S. Ct. at 2771 (citations omitted).  It is true that the MCA, enacted after the Court's decision, provides for an appeal as of right from the military appellate panel (now called the "Court of Military Commission Review") to the D.C. Circuit.[3]  But such an appeal was *already* available under the Detainee Treatment Act of 2005 at the time of the Supreme Court's decision.  *See* DTA § 1005(e)(3)(B)(I), 119 Stat. 2680, 2743. Thus, the Court's analysis in *Hamdan* is applicable to Petitioner's case.

Second, *Councilman* itself rightly concluded that it would be "'especially unfair to require exhaustion . . . when the complainants raise[] substantial arguments denying the right of the military to try them at all.'"  420 U.S. at 759 (quoting *Noyd v. Bond*, 395 U.S. 683, 696 n.8 (1969)); *see also Hamdan*, 126 S. Ct. at 2770 n.16.  Petitioner bin al-Shibh raises such "substantial arguments" and it is entirely dubious whether "the relief the petitioner seeks . . . would also be available to him with reasonable promptness and certainty through the

---

reasonable promptness and certainty through the machinery of the military judicial system"); *cf. Duro v. Reina*, 495 U.S. 676 (1990) (granting pretrial habeas petition by Native American prosecuted by another tribe). *Quirin*, 317 U.S. at 19, on habeas heard the challenge before the trial was complete.

[3] Nevertheless, there are reasons to doubt the adequacy of the D.C. Circuit's appellate jurisdiction under the MCA.  *See infra* Section 3.

machinery of the military judicial system." *Parisi*, 405 U.S. at 41-42. As such, abstention

would, in Justice Kennedy's words, "impose a *de facto* suspension" of the Writ, *Boumediene*,

128 S. Ct. at 2262, something this court cannot -- and must not -- do. *See id.* at 2275 ("In some

of these cases six years have elapsed without the judicial oversight that habeas corpus or an

adequate substitute demands. And there has been no showing that the Executive faces such

onerous burdens that it cannot respond to habeas corpus actions. . . . While some delay in

fashioning new procedures is unavoidable, the costs of delay can no longer be borne by those

who are held in custody."). As explained above and in the Amended Petition, the circumstances

of Petitioner's detention -- warrantless arrest, deliberate "disappearance" followed by a lengthy

period of improper treatment, which, on information and belief, included torture -- demonstrate

even more strongly that Petitioner should have a *habeas* hearing as soon as practicable to prevent

the additional harm of being subjected to an unlawful tribunal.

### 3. The MCA Does Not Divest This Court Of Jurisdiction

Notwithstanding the traditional availability of *habeas corpus* to attack military tribunals

collaterally, and the inappropriateness of abstention from claims such as Petitioner's, the MCA

contains a provision that the government might argue precludes jurisdiction:

> Except as otherwise provided in this chapter and notwithstanding any other
> provision of law (including section 2241 of title 28 or any other habeas corpus
> provision), no court, justice, or judge shall have jurisdiction to hear or consider
> any claim or cause of action whatsoever, including any action pending on or filed
> after the date of the enactment of the Military Commissions Act of 2006, relating
> to the prosecution, trial, or judgment of a military commission under this chapter,
> including challenges to the lawfulness of procedures of military commissions
> under this chapter.

MCA § 3(a)(1), 120 Stat. at 2623 (codified at 10 U.S.C. § 950j(b)).

One reading of this provision is that it merely codifies, in the context of the MCA, the

prudential rule that civilian courts lack supervisory jurisdiction over military tribunals. Such a

14

reading is bolstered by the provision's plain text, which focuses on claims "relating to the prosecution, trial, or judgment of a military commission under this chapter, *including* challenges to the lawfulness of procedures of military commissions under this chapter" (emphasis added). In focusing on "prosecution, trial, or judgment," the provision does not seem to contemplate challenges to the *jurisdiction* of the military commission over either the defendant or the charges on which he is indicted, or, for that matter, challenges to the facial constitutionality of such proceedings.

Moreover, any doubt as to whether the MCA should be so interpreted is resolved by constitutional avoidance. *See Ashwander* v. *Tenn. Valley Auth.*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring); *TRW, Inc.* v. *Andrews*, 534 U.S. 19, 31 (2001). Because 10 U.S.C. § 950j(b) would be unconstitutional if construed to preclude jurisdiction over Petitioner bin al-Shibh's *habeas* petition, *see infra*, and because an alternative construction of the provision *is* "fairly possible," that construction must be adopted.

If 10 U.S.C. § 950j(b) could only be interpreted as divesting jurisdiction over Petitioner's claims, it would violate the Suspension Clause by precluding access to the Great Writ without providing an adequate, alternative remedy. Although *Boumediene* concerned access to the Writ for the purpose of challenging executive detention, it follows that the right identified in *Boumediene* extends to jurisdictional challenges to military commissions. Again, the Supreme Court's case law is instructive. As noted above, in a series of cases during the 1950s, the Court repeatedly reached the merits of *habeas* petitions brought by U.S. citizens held overseas who challenged whether they could properly be subjected to courts-martial or military commissions. At that time, though, the federal *habeas* statute had been interpreted as authorizing jurisdiction only in the district in which the petitioner was detained. *See Ahrens* v. *Clark*, 335 U.S. 188

15

(1948).

Ahrens thus should have precluded jurisdiction over petitions filed by individuals held outside the territorial jurisdiction of any district court, unless the Constitution required such access. *See, e.g.*, *Rasul* v. *Bush*, 542 U.S. 466, 476-79 (2004); *see also id.* at 497 (Scalia, J., dissenting) ("The constitutional doubt that the Court of Appeals in *Eisentrager* had erroneously attributed to the lack of habeas for an alien abroad might indeed exist with regard to a *citizen* abroad—justifying a strained construction of the habeas statute, or (more honestly) a determination of constitutional right to habeas."). Thus, the negative inference to be drawn from the fact that the Court reached the merits in cases such as *Burns*, *Toth*, *Reid*, and *McElroy*, is that the right to *habeas corpus* protected by the Suspension Clause includes the right to contest military jurisdiction.[4]

As such, if 10 U.S.C. § 950j(b) applies to Petitioner bin al-Shibh's petition, its preclusion of this court's jurisdiction would only be constitutional if the MCA provides an adequate, alternative remedy. *Boumediene* rejected the government's argument that the MCA provides an adequate, alternative remedy, *see* 128 S. Ct. at 2266-74, and the claim of inadequacy is far stronger when it comes to Petitioner's challenge.

First, the crux of Petitioner's claims goes to his right not to be tried, a right that simply cannot be vindicated once the trial has taken place. Unless the MCA provides Petitioner bin al-Shibh with a meaningful opportunity to contest his right not to be tried before the trial takes place, it is an inadequate substitute for the Great Writ. The MCA does not allow defendants to

---

[4] Even if the reach of the Suspension Clause were unclear, that lack of clarity would itself be a reason to interpret 10 U.S.C. § 950j(b) as not precluding jurisdiction. *See INS* v. *St. Cyr*, 533 U.S. 289, 301 n.13 (2001) ("The fact that this Court would be required to answer the difficult question of what the Suspension Clause protects is in and of itself a reason to avoid answering the constitutional questions that would be raised by concluding that review was barred entirely.")

take interlocutory appeals to the Court of Military Commission Review, let alone to the D.C.

Circuit.  The D.C. Circuit confirmed this reading just a few weeks ago, holding that it lacks

jurisdiction to review a defendant's interlocutory challenge to the military commission's

personal jurisdiction, even where the defendant prevailed on that issue before the trial court, only

to have that decision reversed on the *government's* appeal to the Court of Military Commission

Review.[5]  *See Khadr* v. *United States*, No. 07-1405, 2008 WL 2468496 (D.C. Cir. June 20,

2008).[6]  Thus, the MCA provides no opportunity to a military commission defendant to

meaningfully vindicate his right not to be tried before anyone other than the trial judge.

Second, if it applies to Petitioner bin al-Shibh's claims, 10 U.S.C. § 950j(b) would not

preclude just a *pre*-trial challenge to a military commission; it would preclude post-trial

challenges, as well.  For example, 10 U.S.C. § 950g(c) provides as follows:

> The jurisdiction of the Court of Appeals on an appeal [of a final judgment
> rendered by a commission] shall be limited to the consideration of —
> (1)      whether the final decision was consistent with the standards and
>            procedures specified in this chapter; and
> (2)      to the extent applicable, the Constitution and the laws of the United States.

This section, in turn, is modeled after section 1005(e)(3)(D) of the DTA, which limited the scope

of the D.C. Circuit's review to:

---

[5] In contrast, the statute *does* authorize a range of interlocutory appeals by the government both to the Court of Military Commission Review, 10 U.S.C. § 950d(a), and D.C. Circuit, 10 U.S.C. § 950d(d).

[6] Khadr's claim did not arise through a habeas petition, but instead concerned whether the MCA or the collateral order doctrine gave the D.C. Circuit appellate jurisdiction to review a specific interim decision of the Court of Military Commission Review.  In contrast to Khadr, Petitioner argues, through his constitutional right to the Great Writ, that the entire commission slated to try him is unlawful.  The relevant precedent for his claim is thus the Supreme Court's holding requiring pretrial habeas.  *Hamdan*, 126 S. Ct. at 2772.  Indeed, one reason why the court in *Khadr* may have declined to allow interlocutory review is the availability of the writ of habeas corpus to challenge the entire foundations of the commission.

Here, Petitioner contests the entire legality of the system to try him, which makes this case unlike a typical criminal one.  The difference is even starker because the legal foundations of Petitioner's trial apparatus have been discredited by *Boumediene*.  It is as if Canadian law were suddenly made applicable in Vermont—every Vermont trial would have to be examined from the ground up.

17

> (i)     whether the final decision was consistent with the standards and
>          procedures specified in [Military Commission Order No. 1]; and
> (ii)    to the extent the Constitution and laws of the United States are
>          applicable, whether the use of such standards and procedures to
>          reach the final decision is consistent with the Constitution and laws
>          of the United States.

DTA § 1005(e)(3)(D), 119 Stat. at 2743.  Thus, § 950g(c) appears intended to limit the scope of

the D.C. Circuit's review to whether the "final decision" is consistent with the MCA,

Constitution, and laws.  However, as the Supreme Court held with respect to that DTA language

in *Boumediene*, "If Congress had envisioned DTA review as coextensive with traditional habeas

corpus, it would not have drafted the statute in this manner."  128 S. Ct. at 2265.  Indeed,

missing from the scope of D.C. Circuit review are claims that the commission lacks jurisdiction

over the defendant, over the subject-matter, and over challenges to collateral trial orders not

necessarily included in the "final decision."

Finally, the appellate review provided for by the MCA is only triggered once the

"convening authority" approves the "final decision" of the commission, *see* 10 U.S.C. § 950c(a),

even though the statute nowhere specifies a timeframe within which such action must be taken.

*See, e.g.*, 10 U.S.C. § 950c(a).  Although the language is mandatory, the timing is left entirely to

the discretion of the convening authority.

The upshot of the above analysis is simple: habeas remains the appropriate vehicle for

challenging, on a pre-trial basis, a military commission; abstention remains inappropriate in this

case given that Petitioner claims  -- first and foremost -- the right not to be tried; because of

*Boumediene*, 10 U.S.C. § 950j(b) would be unconstitutional if read to preclude this Court's

jurisdiction; therefore, 10 U.S.C. § 950j(b) should not be so read, and this Court should proceed

to the merits of Petitioner's claims forthwith.

### ii.    The Constitution Applies At Guantanamo And Protects Petitioner From A Facially Unconstitutional Trial

The Supreme Court's opinion in *Boumediene* establishes that the Constitution applies at Guantanamo Bay.  It rejected the government's contention that because the United States lacks "*de jure* sovereignty," the Constitution does not apply there.  *See* 128 S. Ct. at 2253-59.  Instead, taking "notice of the obvious and uncontested fact that the United States, by virtue of its complete jurisdiction and control over the base, maintains *de facto* sovereignty over this territory," *id.* at 2253, the Court made clear that "questions of extraterritoriality turn on objective factors and practical concerns, not formalism."  *Id.* at 2258.  In particular, when deciding whether the Constitution applies in a particular context extraterritorially, the Court considers "whether judicial enforcement of the provision would be 'impracticable and anomalous.'"  *Id.* at 2255 (citations omitted).

The Court analyzed several "objective factors and practical concerns" in *Boumediene* to reach its holding that enforcing the Suspension Clause would be neither impracticable nor anomalous.  The factors and concerns the *Boumediene* Court considered apply to Petitioner bin al-Shibh's challenge in the same way in which they applied to the *Boumediene* petitioners' challenges to the legality of the *habeas* suspension.

First, the Supreme Court noted that there was no security problem with applying the Constitution at Guantanamo Bay.[7]  Second, the Court pointed out that "[t]here is no indication, furthermore, that adjudicating a habeas corpus petition would cause friction with the host government."  *Boumediene*, 128 S. Ct. at 2261.  Third, the Court noted that the U.S. has complete control over Guantanamo Bay and no other sovereign has a stake in developments on

---

[7] "[O]ther than the detainees themselves, the only long-term residents are American military personnel, their families, and a small number of workers.  The detainees have been deemed enemies of the United States.  At present, dangerous as they may be if released, they are contained in a secure prison facility located on an isolated and heavily fortified military base."  *Boumediene*, 128 S. Ct. at 2261.  The U.S. has

19

the base: "While obligated to abide by the terms of the lease, the United States is, for all practicable purposes, answerable to no other sovereign for its acts on the base." *Id*. Fourth, the Court observed that Guantanamo Bay is not "located in an active theater of war" and so enforcing the Constitution could not endanger ongoing military operations. *Id*. at 2262. In light of these factors, the Court held that "there are few practical barriers to" enforcing the Suspension Clause at Guantanamo Bay. *Id*.

The Supreme Court's doctrine is clear that structural constraints on the powers of the U.S. Government are in effect at Guantanamo Bay. For, wherever it acts, "[t]he United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution." *Reid*, 354 U.S. at 5-6 (plurality) (footnote omitted); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 277 (1990) (Kennedy, J., concurring in the judgment) ("I take it to be correct, as the plurality opinion in *Reid v. Covert* sets forth, that the Government may act only as the Constitution authorizes, whether the actions in question are foreign or domestic.").

Finally, *Boumediene* makes clear that individuals at Guantanamo Bay are entitled to fundamental constitutional rights. More than 75 years ago, "the Court took for granted that even in unincorporated Territories the Government of the United States was bound to provide to noncitizen inhabitants 'guaranties of certain fundamental personal rights declared in the Constitution.'" *Boumediene*, 128 S. Ct.. at 2255 (quoting *Balzac v. Porto Rico*, 258 U.S. 298, 312 (1922)). Even then, the notion that noncitizens living outside the formally sovereign United States were guaranteed fundamental constitutional rights was not new. *See Late Corp. of Church of Jesus Christ of Latter-day Saints v. United States*, 136 U.S. 1, 44 (1890). Among the most fundamental of these rights is due process. *Cf. Verdugo-Urquidez*, 494 U.S. at 278 (Kennedy, J.,

20

concurring in the judgment) (stating that with respect to a trial in the United States, "[a]ll would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant").

### iii.    The Military Commission Lacks Personal Jurisdiction Over Petitioner

The military commission at Guantanamo Bay lacks personal jurisdiction to try Petitioner bin al-Shibh. Both the MCA and the Constitution limit trial by military commission to individuals who have been properly determined to be unlawful enemy combatants. Petitioner is not an enemy combatant, let alone an unlawful one. *Boumediene* teaches that Petitioner is entitled to a *habeas* hearing before this Court to determine whether the Executive has properly designated him as an unlawful enemy combatant. In light of *Boumediene*, permitting Petitioner bin al-Shibh's trial before resolving the claims made within his *habeas* petition would violate both the MCA and the Constitution.

The MCA creates jurisdiction for the military commissions to try only "alien unlawful enemy combatant[s]." MCA § 948d(a). The military commissions lack jurisdiction to try "[l]awful enemy combatants who violate the law of war." MCA § 948d(b). Any trial of a lawful enemy combatant must be before a court-martial. *Id. Boumediene*, moreover, holds that a CSRT or military commission (which is not a "court of record," *see* 128 S. Ct. at 2268-69) cannot be an adequate substitute for a federal *habeas* proceeding in determining a detainee's status. For "the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law." *Id.* at 2266 (internal quotation marks and citation omitted).

Like the MCA, the Constitution forbids subjecting an individual who is not an enemy combatant to trial by military commission. As far back as *Ex parte Milligan*, the Supreme Court

addressed the proper scope of the personal jurisdiction of military trials.  *See* 71 U.S. (4 Wall.) at 118 ("The controlling question in the case is this:  Upon the *facts* stated in Milligan's petition, and the exhibits filed, had the military commission mentioned in it *jurisdiction*, legally, to try and sentence him?").  As the Court subsequently explained in *Ex parte Quirin*:

> By universal agreement and practice, the law of war draws a distinction between the armed forces and the peaceful populations of belligerent nations and also between those who are lawful and unlawful combatants. Lawful combatants are subject to capture and detention as prisoners of war by opposing military forces. *Unlawful combatants* are likewise subject to capture and detention, *but in addition they are subject to trial and punishment by military tribunals for acts which render their belligerency unlawful.*

317 U.S. at 30-31 (1942) (emphasis added); *see also Yamashita*, 327 U.S. at 11.[8]

Petitioner bin al-Shibh is not an unlawful enemy combatant, and so cannot be tried by military commission.  Unlike General Yamashita or the German soldiers in *Quirin*, he is not a member of the armed forces of any nation at war with the United States.  *Cf. Quirin*, 317 U.S. at 37-38 ("Citizens who associate themselves with the *military arm of the enemy government*, and with its aid, guidance and direction enter this country bent on hostile acts are enemy belligerents within the meaning of . . . the law of war.") (emphasis added).  Petitioner bin al-Shibh is a citizen of Yemen, a country at peace with the United States.  Affiliation with or membership in a terrorist organization does not create enemy combatant status.  *See Milligan*, 71 U.S. (4 Wall.) at 130; *Al-Marri v. Wright*, 487 F.3d 160, 186-87 (4th Cir. 2007) ("Neither *Quirin* nor any other precedent even suggests, as the Government seems to believe, that individuals with constitutional rights, unaffiliated with the military arm of any enemy government, can be

---

[8] Individuals who are not enemy combatants may not be tried by a military tribunal.  This boundary between civilians and combatants must be policed carefully, for "[t]here is no indication that the Founders contemplated setting up a rival system of military courts to compete with civilian courts for jurisdiction over civilians who might have some contact or relationship with the armed forces."  *Reid*, 354 U.S. at 30 (plurality); *see also id.* at 31 ("In *Duncan* v. *Kahanamoku*, 327 U.S. 304, the Court reasserted the principles enunciated in *Ex parte Milligan* and reaffirmed the tradition of military subordination to civil authorities and institutions. It refused to sanction the military trial of civilians in Hawaii during wartime despite government claims that the needs of defense made martial law imperative.").

subjected to military jurisdiction and deprived of those rights solely on the basis of their conduct on behalf of an enemy organization."), *reh'g en banc granted*, No. 06-7427 (4th Cir. 2007); *see also Parhat v. Gates*, slip op. at 24 (holding that the Government's "bare assertions cannot sustain the [CSRT's] determination that Parhat is an enemy combatant."*)*. Finally, Petitioner bin al-Shibh has never participated directly or actively in any hostilities with the United States.[9]

In sum, both the MCA and the Constitution limit personal jurisdiction to persons properly determined to be unlawful enemy combatants by a correct application of relevant law. Petitioner bin al-Shibh is not an enemy combatant, and to the extent this Court or some other appropriately convened *habeas* court ultimately determines that he is, he is certainly not an unlawful combatant. As such, Petitioner's commission lacks personal jurisdiction.

### iv.    The MCA Violates the Ex Post Facto Clause

Some offenses for which Petitioner is slated to be tried violate the Constitution's Ex Post Facto Clause. As a result, the commission lacks subject matter jurisdiction to prosecute Petitioner for these charges. Ex post facto laws are criminal statutes that retroactively: (1) punish previously innocent conduct; (2) aggravate the criminal nature of an act; (3) increase the punishment for a crime; or (4) change the rules of evidence to lower the government's burden of proof or reduce the quantum of evidence necessary to convict the defendant. *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798). The *Calder* definition remains authoritative. *See Stogner v. California*, 539 U.S. 607, 611 (2003) (*Calder* provides the "authoritative account of

---

[9] Even if this Court were ultimately—following a proper habeas hearing—to determine that Petitioner bin al-Shibh were an enemy combatant, he is still not an *unlawful* enemy combatant, and so not subject to trial by a military commission. To the extent Petitioner is found to have participated in armed conflict, his participation qualifies him as a POW and so makes him ineligible for military trial. The Third Geneva Convention provides that "militias or volunteer corps forming part" of the armed forces of a Party to a conflict are lawful combatants entitled to POW status. Third Geneva Convention, Art. 4(A)(1),(2). So too are "[p]ersons who accompany the armed forces without actually being members thereof[,]" *id.* Art 4(A)(4), (5), as are "[i]nhabitants of a non-occupied territory, who on the approach of the enemy spontaneously take up arms to resist the invading forces . . . ." *Id.* Art 4(A)(6). Any or all of these provisions of the Geneva Conventions would suffice to grant Petitioner—were he ultimately determined to have been involved in hostilities—the status of a POW, and so remove a military commission's jurisdiction over him.

23

the scope of the *Ex Post Facto* Clause"). While a criminal statute fitting any one *Calder* category states an ex post facto violation, in this case, Petitioner's prosecution unfortunately falls into each of them. The MCA was signed into law in October of 2006. By that time, Petitioner had been in U.S. custody for almost over four years, most of it in secret, CIA "black sites." Thus, any conduct with which Petitioner is charged must have been an offense at the time it was committed -- well before the enactment of the MCA. Unfortunately, Congress overreached and included in the MCA certain "crimes" which simply were not violations of the law of war or domestic law such that they would be applicable to Petitioner bin al-Shibh. These include the offences of "Conspiracy" as defined in 10 U.S.C. § 950v(b)(28) and "Providing Material Support for Terrorism," defined at 10 U.S.C. § 950v(b)(25). These statutes purport to specify offenses under the international law of war, not offenses under the U.S. criminal code. However, the alleged conduct giving rise to these charges predates Petitioner's capture, and thus necessarily predates the definition of the offenses in the MCA. On its face, then, the prosecution of the Conspiracy and Material Support charges represents the retroactive application of a criminal statute in a manner prohibited by the Ex Post Facto Clause. *See Beazell v. Ohio*, 269 U.S. 167, 170 (1925) (laws "which purport to make innocent acts criminal after the event" violate the Ex Post Facto Clause).

Although the drafters of the MCA believed that the Guantanamo detainees had no constitutional rights, they nonetheless inserted § 950p into the statute in the hope of avoiding an Ex Post Facto violation. Section 950p provides:

> (a)     PURPOSE.—The provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.(b)     EFFECT.—Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter.

Implicit in this provision is the recognition that Congress cannot, and did not intend to, apply the MCA in a manner that would offend the Ex Post Facto Clause. The recital in the MCA that the offenses are those "that have traditionally been triable by military commissions" limits the jurisdiction of the Commission—at least with respect to individuals in custody prior to the enactment of the MCA, such as Petitioner -- to traditional law-of-war offenses. Because, however, neither Conspiracy nor Material Support is within the category of "offenses that have traditionally been triable by military commissions," this bootstrapping provision cannot cure the Ex Post Facto Clause violation.

As an initial matter, the mere fact that Congress asserts that certain "crimes" are offenses triable by commissions does not make it so. "Whether the offense as defined is an offense against the law of nations depends on the thing done, not on any declaration to that effect by Congress." *United States v. Arjona*, 120 U.S. 479, 488 (1887). As discussed in the following Section, the Supreme Court has long rejected arguments that Congress could, pursuant to its "Define and Punish" power, criminalize an offense that was not, in the Court's view, a recognized violation of the law of nations. The Supreme Court has already held that Conspiracy is not an offense against the law of war that is triable by commission. Justice Stevens, writing for the plurality, explained that Conspiracy did not state a law-of-war offense:

> At a minimum, the Government must make a substantial showing that the crime for which it seeks to try a defendant by military commission is acknowledged to be an offense against the law of war. That burden is far from satisfied here. The crime of "conspiracy" has rarely if ever been tried as such in this country by any law-of-war military commission not exercising some other form of jurisdiction[10] and does not appear in either the Geneva Conventions or

_____

[10] Elsewhere the Court explained that the military commission initially convened to try Hamdan was a law-of-war commission: "Since Guantanamo Bay is neither enemy-occupied territory nor under martial law, the law-of-war commission is the only model available." *Hamdan*, 126 S. Ct. at 2777. The commissions authorized by the MCA are likewise law-of-war commissions, as they only exercise jurisdiction over a subset of combatants and over offenses "made punishable by this chapter or the law of war," 10 U.S.C. § 948d(a), and each substantive offense punishable under the MCA has as an element the requirement that

the Hague Conventions—the major treaties on the law of war. Winthrop explains that under the common law governing military commissions, it is not enough to intend to violate the law of war and commit overt acts in furtherance of that intention unless the overt acts either are themselves offenses against the law of war or constitute steps sufficiently substantial to qualify as an attempt.

126 S. Ct. at 2780-81 (citing Winthrop, *Military Law and Precedents* 841 (2d ed. 1920)).

Like Conspiracy, Material Support for Terrorism is not recognized as a violation of the law of war. "Actionable violations of international law must be of a norm that is specific, universal, and obligatory." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 732 (2004) (citations and quotation marks omitted). There never has been, and is not now, universal agreement and practice among nations concerning such an offense. It has never been tried by commission. *See* David Glazier, *Precedents Lost: The Neglected History of the Military Commission*, 46 Va. J. Int'l L. 5 (2005); Michael O. Lacey, *Military Commissions: A Historical Survey*, 2002 Army Law. 41 (2002). It is not identified as a war crime in the War Crimes Act, 18 U.S.C. § 2441, or in the *Law of War Handbook*, the principal statement published by the military on the law of war. Int'l & Operational Law Dep't, Judge Advocate General's Legal Ctr. & Sch., U.S. Army, *Law of War Handbook* 206-15 (Keith E. Puls ed., 2005).[11] A recent Congressional Research Service report prepared for members of Congress concluded that "defining as a war crime the 'material support for terrorism' does not appear to be supported by historical precedent."[12]

In short, there is no basis whatever for any contention that Conspiracy or Material Support are offenses condemned by universal agreement and practice throughout the international community.[13] Because they are newly enacted offenses that have not "traditionally

---

it "took place in the context of and was associated with armed conflict," Manual for Military Commissions, pt. IV, Crimes and Elements.

[11] *Available at* http://www.loc.gov/rr/frd/Military_Law/pdf/law-war-handbook-2005.pdf.

[12] Jennifer K. Elsea, *The Military Commissions Act of 2006: Analysis of Procedural Rules and Comparison with Previous DOD Rules and the Uniform Code of Military Justice* 12 (CRS, updated Sept. 27, 2007), *available at* http://www.fas.org/sgp/crs/natsec/RL33688.pdf.

[13] Recognition of Material Support for Terrorism as a war crime would require, in the first instance, universal agreement concerning the definition of "terrorism." There is a bewildering array of inconsistent definitions of terrorism under U.S. law alone, *see* Nicholas J. Perry, *The Numerous Federal Legal Definitions of Terrorism: The Problem of Too Many Grails*, 30 J. Legis. 249, 254-55 (2004), and absolutely no consensus internationally on the meaning of the term, *see United States v. Yousef*, 327 F.3d 56, 97, 108 n.42 (2d Cir. 2003) (noting "the failure of States to achieve anything like consensus on the definition of terrorism" and, moreover, that "United States legislation has adopted several approaches to

been triable by military commissions," 10 U.S.C. § 950p, they violate the Ex Post Facto Clause, and so the Commission lacks jurisdiction over these charges.

> **v.    The MCA Exceeds Congress' Powers Under The Define And Punish Clause**

The Constitution places strict structural limits on Congress' power to define the subject-matter jurisdiction of any federal court, including military commissions. Congress has no general police power. Instead, "[t]he Constitution creates a Federal Government of enumerated powers. *See* Art. I, § 8." *United States v. Lopez*, 514 U.S. 549, 552 (1995). Article I, Section 8, Clause 10 grants Congress the power "To define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." This Clause does not create a general police power allowing Congress to define and punish whatever criminal offenses it wishes any more than does the Commerce Clause. Rather, as the constitutional text makes clear, Congress is only empowered to define and punish "offenses against the law of nations." Just as the Commerce Clause limits Congress's power to define criminal offenses,[14] so too does the Define and Punish Clause. Unless a particular offense is "against the law of nations," Congress must rely on another source of authority. Otherwise, Congress could use the Define and Punish Clause to criminalize any offense it wished by merely characterizing certain activity as an offense against the law of nations.

---

defining terrorism, demonstrating that, even within nations, no single definition of 'terrorism' or 'terrorist act' prevails"); *Tel-Oren v. Libyan Arab Republic*, 726 F. 2d 774, 806-07 (D.C. Cir. 1984) (Bork, J., concurring) (the claim that a defendant "violated customary principles of international law against terrorism[] concerns an area of international law in which there is little or no consensus . . . . [N]o consensus has developed on how to properly define 'terrorism' generally.").

[14] The Supreme Court has held that Congress is not free to unilaterally determine what constitutes a substantial effect on interstate commerce when exercising its Commerce Clause power. *See United States v. Morrison*, 529 U.S. 598, 607 (2000) ("'The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.'") (quoting *Marbury*, 5 U.S. (1 Cranch) at 176 (Marshall, C.J.)). In *Morrison*, the Court held that "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. . . . Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Id.* at 614 (internal quotation marks and citations omitted).

27

As the *Reid* plurality explained, "the jurisdiction of military tribunals is a very limited and extraordinary jurisdiction derived from the cryptic language in Art. I, § 8, and, at most, was intended to be only a narrow exception to the normal and preferred method of trial in courts of law." 354 U.S. at 21.  Because "[u]nder the grand design of the Constitution civilian courts are the normal repositories of power to try persons charged with crimes," it follows that "[e]very extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of the right to jury trial and of other treasured constitutional protections." *Id.*  The Supreme Court has long guarded the limitations placed on Congress by the Define and Punish Clause, and rejected arguments that Congress could criminalize an offense under this Clause that was not, in the Court's view, a recognized violation of the law of nations.  *See United States v. Furlong*, 18 U.S. (5 Wheat.) 184, 198 (1820) (rejecting the claim that Congress had criminalized murder on the high seas by labeling it "piracy" -- an offense against the law of nations -- and suggesting that if Congress could do so, its power under the Define and Punish Clause would be limitless).[15]

In *Quirin*, the Supreme Court looked to the laws of war to identify the limits of Congress' power under the Define and Punish Clause:  "We are concerned only with the question whether it is within the constitutional power of the National Government to place

---

[15] This was recognized at the Constitutional Convention, where James Wilson noted that "[t]o pretend to *define* the law of nations which depended on the authority of all the Civilized Nations of the World, would have a look of arrogance [] that would make us ridiculous."  2 The Records of the Federal Convention of 1787, at 615 (Max Farrand, ed., rev. ed. 1966).  "[Gouverneur] Morris replied [to Wilson] by suggesting that 'define' was intended to suggest the need to provide detail, not to create offenses where none had previously existed." Beth Stephens, *Federalism and Foreign Affairs: Congress's Power to "Define and Punish . . . Offenses against the Law of Nations"*, 42 Wm. & Mary L. Rev. 447, 473 (2000).  "The debates at the Constitutional Convention made clear that Congress would have the power to punish only actual violations of the law of nations, not to create new offenses." *Id.* at 474.  *See also* A.J. Colangelo, *Constitutional Limits on Extraterritorial Jurisdiction: Terrorism and the Intersection of National and International Law*, 48 Harv. Int'l L.J. 121, 141 (2007).  Attorney General Speed later agreed: "To *define* is to give the limits or precise meaning of a word or thing in being; to make is to call into being.  Congress has power to *define*, not to make, the laws of nations." 11 Op. Atty. Gen. 297, 299 (1865) (James Speed).

petitioners upon trial before a military commission for the offenses with which they are charged.

We must therefore first inquire whether any of the acts charged is an offense against the law of

war cognizable before a military tribunal, and if so whether the Constitution prohibits the trial."

317 U.S. at 29.[16]

In this case, there is little difficulty in resolving subject-matter jurisdiction, for as

explained in detail in the previous Section, Conspiracy and Providing Material Support for

Terrorism are not and never have been violations of the law of war. For these reasons, some of

Petitioner's military commission charges exceed the limits of the Define and Punish Clause, and

so the commission lacks subject-matter jurisdiction over them.

### vi.    The MCA Is An Unconstitutional Bill Of Attainder

The commission slated to try Petitioner bin al-Shibh violates the prohibition on Bills of

Attainder and therefore lacks subject matter jurisdiction. U.S. Const. Art. I, § 9, cl. 3 ("No Bill

of Attainder . . . shall be passed."). Laws violate the Attainder Clause when they inflict

"legislative punishment, of any form or severity, of specifically designated persons or groups."

*United States v. Brown*, 381 U.S. 437, 447 (1965); *Foretich v. United States*, 351 F.3d 1198,

1217 (D.C. Cir. 2003).[17]

---

[16] In *Quirin*, the charges levied were those which "according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals." *Id.* As a result, the Court granted that "Congress . . . has thus exercised its authority to define and punish offenses against the law of nations . . . *within constitutional limitations.*" *Id.* (emphasis added); *see also Yamashita*, 327 U.S. at 13 (explaining that a Japanese general could only be tried by military tribunal if "the charge preferred against him is of a violation of the law of war."). While reaffirming the constitutional limitation on the subject matter jurisdiction of military commissions, *Quirin* and *Yamashita* place an outer limit on what Congress can punish as an offense against the law of nations. Even so, there may be instances in which an act is regarded by some as an offense against the law of war, but still is not within the subject matter jurisdiction of a military court. *Quirin*, 317 U.S. at 29 ("We may assume that there are acts regarded in other countries, or by some writers on international law, as offenses against the law of war which would not be triable by military tribunal here, either because they are not recognized by our courts as violations of the law of war or because they are of that class of offenses constitutionally triable only by a jury.").

[17] The Framers recognized that such concerns would be particularly salient during times of national crisis. "Bills of this sort have been most usually passed in England in times of rebellion, or gross subserviency to the crown, or of violent political excitements; periods, in which all nations are most liable (as well the free as the enslaved) to forget their duties, and to trample upon the rights and liberties of others." Story,

29

The MCA violates the constitutional prohibition on attainders because it (1) singles out non-citizens whom the Government may unilaterally and extra-judicially label "unlawful enemy combatants," and then (2) punishes them by subjecting them to trial before unfair military commissions based solely on that label. The MCA fits within the first prong because it targets a single, identifiable class, *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977) -- individuals it labels "unlawful enemy combatants" (and labels without proper proceedings to determine whether the labels fit). *See, e.g.*, 151 CONG. REC. S10374 (Sept. 28, 2006) (remarks of Sen. Domenici) ("We cannot give terrorists the right to bring a habeas corpus petition that seeks release from prison on the grounds of unlawful imprisonment, as the Specter amendment would."). The statute does not survive simply because it fails to mention a particular person. The specificity requirement is met "whether the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Selective Serv. Sys. v. Minnesota PIRG*, 468 U.S. 841, 847 (1984); *see also Brown*, 381 U.S. at 461 ("It was not uncommon for English acts of attainder to inflict their deprivations upon relatively large groups of people, sometimes by description rather than [name].").

The second prong of the Attainder Clause analysis requires the Court to examine whether the law in question imposes punishment on the identified group. Because of the creativity with which Congress may devise punishment, more than criminal sanctions qualify as attainders. Courts look to a three-part inquiry to evaluate whether the law imposes punishment and so is unconstitutional:

> (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of the burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a

---

Commentaries, § 1344 (quoted in *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323 (1866)).

congressional intent to punish."

*Selective Service*, 468 U.S. at 852 (citing *Nixon*, 433 U.S. at 473, 475-76, 478).  Here, the

MCA's creation of an alternative and unfair trial scheme satisfies all three criteria.[18]  First, there

can be little doubt that the commission trial system "falls within the historical meaning of

legislative punishment."  *Id.*  Most obviously, the death penalty, as well as life imprisonment, are

available punishments.  Second, the sole purpose of the MCA's trial is to inflict punishment.

Unlike the AUMF or the DTA, the MCA does not even purport to authorize or regulate

preventive detention.  There simply is no "nonpunitive legislative purpose," *Selective Service*,

---

[18] Moreover, reading the MCA to remove this Court's jurisdiction to consider Mr. bin al-Shibh's habeas petition for pre-trial relief would further violate the Attainder Clause.  First, the purported deprivation of pretrial habeas imposes a severe punishment on Mr. bin al-Shibh and similarly situated petitioners.  As the Supreme Court held, Mr. bin al-Shibh has a right to avoid trial by an otherwise unlawful or improper court. *Hamdan*, 126 S. Ct. at 2768.  By purporting to strip this Court of jurisdiction to hear Mr. bin al-Shibh's detention claim or a pre-trial challenge to the constitution of any commission that might try him, the MCA imposes a burden that is at the heart of the Attainder Clause's protections.  For at least the past 140 years the Supreme Court has recognized that the deprivation of full and complete access to the courts qualifies as "punishment."  In *Pierce v. Carskadon*, 83 U.S. 234, 238-39 (1873), the Supreme Court held that it was an unlawful attainder for the West Virginia legislature to limit access to the courts by refusing to allow petitioners to reopen a judgment attaching property in that State's courts solely because the petitioners refused to swear an oath disavowing allegiance to the Confederacy.  *Id.* at 237-38.  In *Pierce*, non-residents of West Virginia were required to swear the loyalty oath, but no such restriction applied to residents or to those who swore the oath.  *Id.* at 236.  The petitioners were denied review of a judgment attaching their property, based solely on their non-resident status and inability to take the loyalty oath.  *Id*.  Relying on *Cummings* and *Garland*, the Court summarily declared this lack of access to the courts an unlawful attainder.  *Id.* at 239.  Since that time, the Supreme Court has continued to read *Pierce* for the proposition that denying complete access to the courts qualifies as an attainder.  *See Brown*, 381 U.S. at 449 n.21 ("[In *Pierce*] the Court voided as a bill of attainder a West Virginia statute *conditioning access to the courts* upon the taking of an oath similar to those involved in *Cummings* and *Garland*.") (emphasis added); *Flemming v. Nestor*, 363 U.S. 603, 615 n.8 (1960) (same); *cf. Bellsouth Corp. v. FCC*, 162 F.3d 678, 683 (D.C. Cir. 1998) (citing *Pierce* as an example of the Court striking down an attainder).  Concerns about access are particularly salient here because, as previously explained, forcing Mr. bin al-Shibh to endure a commission trial will compromise his ability to put on a defense in a future proceeding—be it a habeas corpus detention action or a subsequent criminal trial.

Second, the severe burden imposed on Mr. bin al-Shibh by the jurisdiction-stripping provisions of the MCA far outweighs any possible non-punitive legislative purpose.  Although it might be argued that removing jurisdiction aimed to improve governmental or judicial efficiency, this cannot be the case.  For as Congress was well aware, its attempt to remove habeas jurisdiction would lead to both pre-trial challenges to the MCA in federal court as well as the post-trial review established by the MCA.

Third, Congress intended to remove pretrial habeas jurisdiction out of punitive intentions.  *See, e.g.,* 152 Cong. Rec. S10238-01(Sept. 27, 2006) (statement of Sen. Lott) ("Now we have this huge discussion about habeas corpus.  Bring on the lawyers.  What a wonderful thing we can do to come up with words like this. Our forefathers were thinking about citizens, Americans.  They were not conceiving of these terrorists who are killing these innocent men, women, and children.").

468 U.S. at 852, to a military trial.  The contention that trial by commission can prevent detainees from engaging in future acts of terrorism cannot cure it of its punitive nature.[19]  Third, the legislative history of the MCA makes clear that Congress set up commissions based on a desire to punish individuals that Congress viewed as terrorists.[20]  For these reasons, prosecution by the military commission is an unconstitutional bill of attainder, and the commission lacks subject matter jurisdiction to try Petitioner bin al-Shibh.

### vii.    The Military Commission Violates Petitioner's Right To Equal Protection

The MCA sets up a different, and inferior, trial system only for noncitizens, in violation of the Equal Protection guarantee.  By drawing categorical distinctions between citizens and aliens even when each acts in the very same way, the MCA violates the Equal Protection component of the Due Process Clause of the Fifth Amendment.  *See Graham v. Richardson*, 403 U.S. 365, 371 (1971) ("[C]lassifications based on alienage [are] inherently suspect and subject to close judicial scrutiny."); Katyal, *Equal Protection in the War on Terror*, 59 Stanford L. Rev. 1365, 1370-78 (2007).[21]  Citizenship is no bar to belligerency, *see Quirin*, 317 U.S. at 37, and the Authorization for the Use of Military Force, 115 Stat. 224 (2001), draws no such distinction.

---

[19] *See Nixon*, 433 U.S. at 476 n.40 ("*United States v. Brown* established that punishment is not restricted purely to retribution for past events, but may include inflicting deprivations on some blameworthy or tainted individuals in order to prevent his future misconduct.").

[20] *E.g.*, 152 Cong. Rec. S10238-01 at S10239 (Sept. 27, 2006) (statement of Sen. Lott), *supra* n.32; 152 Cong. Rec. H7522-03, at H7538 (Sept. 27, 2006) (statement of Rep. McHugh) ("Why should an accused terrorist enjoy protections that exceed what the Constitution provides to every one of us as United States citizens?"); *Hearing Before the Senate Judiciary Committee* (Sept. 25, 2006) (statement of Sen. Cornyn) ("It is important to remember, and sometimes I think some forget, these are enemies of the United States, captured on the battlefield.  These are not individuals who have been arrested for committing crimes and then who are entitled to all of the process an American citizen would in an Article III court.").

[21] International law also recognizes a similar parity principle.  *See* Art. 102, Geneva Convention Relative to the Treatment of Prisoners of War Aug. 12, 1949, 6 U.S.T. 3316; *id.* Art. 3(1)(d) (requiring trial before a "regularly constituted court"); International Committee of the Red Cross, Commentary: Convention (III) Relative to the Treatment of Prisoners of War Art. 129, Aug. 12, 1949, *available at* http://www.icrc.org/ihl.nsf/COM/375-590155.  The International Covenant on Civil and Political Rights (ICCPR), which the U.S. government has ratified, sets out in article 14(1) that all persons "shall be equal before the courts and tribunals."  International Covenant on Civil and Political Rights, *opened for signature* Dec. 16, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (entered into force Mar. 23, 1976).

The Equal Protection Clause of the Fourteenth Amendment applies to all "persons" regardless of citizenship.  As the Supreme Court in *Plyler v. Doe*, 457 U.S. 202, 210 (1982), declared, "[A]n alien is surely a 'person' in any ordinary sense of that term," and is entitled to equal protection of the laws.  *See also Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. . . .  [Its] provisions are universal in their application to all persons within the territorial jurisdiction . . ."). The Supreme Court has recognized that the Fifth Amendment's Due Process Clause embraces the "concept of equal justice under law."  *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976). Accordingly, the Fourteenth Amendment's Equal Protection Clause and the Fifth Amendment's Due Process Clause "require the same type of analysis."  *Id.*; *see Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995) ("the equal protection obligations imposed by the Fifth and the Fourteenth Amendments [are] indistinguishable"); *Buckley v. Valeo*, 424 U.S. 1, 93 (1976).

Aliens are "a prime example of a 'discrete and insular' minority" because they cannot vote. *Graham*, 403 U.S. at 372.  The Court, therefore, has applied careful scrutiny to state laws that disfavor aliens.[22]  *E.g., Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977); *In re Griffiths*, 413 U.S. 717, 721-22 (1973); *Sugarman v. Dougall*, 413 U.S. 634 (1973).[23]

---

[22] While the Supreme Court has been more accepting of alienage distinctions in the distribution of Medicare, social security, and other public entitlements, *see Mathews v. Diaz*, 426 U.S. 67, 77 (1976), the matter of who faces a trial with their life on the line is not a matter of government largesse.  *See Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (asserting that the writ of habeas corpus "has remained a critical check on the Executive, ensuring that it does not detain individuals except in accordance with law."); *INS v. St. Cyr*, 533 U.S. 289, 301 (2001).  Unlike the simple preferential treatment of American citizens for government employment or political leadership, *see Sugarman v. Dougall*, 413 U.S. 634 (1973); *Foley v. Connelie*, 435 U.S. 291 (1978), the MCA offends the very essence of equal justice under law.

[23] Were this Court to read the MCA to remove this Court's pretrial jurisdiction over Mr. bin al-Shibh's case, the statute would violate the Fifth Amendment because it discriminates in the allocation of fundamental rights, and, in particular, the fundamental rights of habeas corpus and access to courts.  *See, e.g., Plyler v. Doe*, 457 U.S. 202, 217 (1982).  As the text of the MCA makes clear, it is not only those——like Mr. bin al-Shibh ——whom the Government has held under its control for the past six years in Guantanamo that have their habeas rights removed.  The MCA deprives *all* aliens of those rights, even lawful resident aliens living within the United States, and violates equal protection for this reason as well.

Moreover, the Supreme Court has applied heightened review to government efforts to discriminate

The MCA violates equal protection by shunting only aliens into an inferior trial

procedure even when the alien is accused of the same crime as a citizen.  Targeted at a

population who cannot vote, it seeks to ensure that alien detainees are subjected to inferior

tribunals while their citizen counterparts are brought to civilian court -- even if the citizen may

have committed a far more egregious offense (such as the detonation of a weapon of mass

destruction).  The MCA unconstitutionally singles out a class of people who, though they may be

housed within our territory, are not similarly sheltered by our political process.  While the United

States has had military commissions before, it has never, to undersigned counsel's knowledge,

exempted American citizens from the process -- be it the trials in World War II at issue in

*Quirin*, or those in the Mexican-American war.  *See Quirin*, 317 U.S. at 37; David Glazier, Note,

*Kangaroo Court or Competent Tribunal?: Judging the 21st Century Military Commission*, 89

VA. L. REV. 2005, 2030 (2003).

Even if Congress can set up military commissions, it cannot set them up only for

foreigners.  Creating an inferior trial system that discriminates between aliens and citizens serves

no legitimate government interest.  There is no reason why the government must subject aliens

who are alleged to have participated in acts of terrorism to military commissions, but need not do

so for citizens suspected of the same crimes.  Accordingly, the commission slated to try

---

in access to courts, even based on non-suspect classifications.  *See, e.g., Tennessee v. Lane*, 541 U.S. 509,
522-23 (2004) (stating that "the right of access to the courts" is subject to "more searching judicial review"
under equal protection). Thus, the Court has struck down state statutes depriving the poor of appellate
counsel, *see Douglas v. California*, 372 U.S. 353 (1963), trial transcripts, *see Griffin v. Illinois*, 351 U.S. 12
(1956), and appeal rights, *see M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), even though poverty is not a suspect
classification, *see Harris v. McRae*, 448 U.S. 297 (1980). The unequal access to the Great Writ, leaving
American citizens with pretrial habeas challenges but not green-card holders or foreigners, violates equal
protection. *See Coolidge v. New Hampshire*, 403 U.S. 443, 454 n.4 (1971) (listing the right to the writ of
habeas corpus among rights that are "to be regarded as of the very essence of constitutional liberty")
(citation omitted); *Carafas v. LaVallee*, 391 U.S. 234, 238 (1968) (declaring that the right to habeas corpus
is "shaped to guarantee the most fundamental of all rights").

    The MCA's attempt to remove habeas jurisdiction fails under this standard.  The fight against
terrorism neither necessitates nor justifies stripping aliens detained in U.S. territory of their most
fundamental rights.  The government has no more interest in revoking court access of alien detainees than
they do citizen detainees; both classes must be treated evenly.

34

Petitioner bin al-Shibh violates the Constitution's guarantee of equal protection.

### viii. The MCA Violates The Geneva Conventions And Petitioner's Right to Due Process of Law

Common Article 3 of the Geneva Conventions further prohibits trying Petitioner on the referred charges because it incorporates the ex post facto principle, the right to equal protection, and other legal norms as among those judicial guarantees that are indispensable. The Supreme Court has already ruled that Common Article 3 applies and protects detainees in any proceeding before a commission. *Hamdan*, 126 S. Ct. at 2796 ("Common Article 3, then, is applicable here and . . . requires that [petitioner] be tried by a 'regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.'") (quoting 6 U.S.T. 3316, 3320, art. 3, ¶ 1(d)). The MCA contemplates that Common Article 3 must be respected. *See* 10 U.S.C. § 948b(f). In *Hamdan*, a plurality of the Supreme Court pointed out that Common Article 3 "must be understood to incorporate at least the barest of those trial protections that have been recognized by customary international law. Many of these are described in Article 75 of Protocol I to the Geneva Conventions of 1949, adopted in 1977 . . . ." 126 S. Ct. at 2797. Article 75, ¶ 4(c) of Protocol I explicitly prohibits ex post facto trials. Protocol Additional to the Geneva Conventions of 12 August 1949, art. 75, ¶ 4(c), *opened for signature* 8 June 1977, 1125 U.N.T.S. 3.[24]  Because charges levied against Petitioner did not

---

[24] The *Law of War Handbook* recognizes that international law prohibits ex post facto prosecutions. *Law of War Handbook* at 206. In addition, the International Committee of the Red Cross identifies the ex post facto principle as a fundamental tenet of customary international law. *See* 1 Int'l Comm. of the Red Cross, *Customary International Humanitarian Law* 371-72 (Jean-Marie Henckaerts & Louise Doswald-Beck eds., 2005) (mirroring the text of the provision in Article 75 of Protocol I). The prohibition on ex post facto prosecution has also been codified in the statute governing the ICC. Rome Statute of the International Criminal Court, arts. 22, 24, July 17, 1998, 2187 U.N.T.S. 90. Likewise, the International Covenant on Civil and Political Rights states that observation of the ex post facto principle (listed as a guarantee to all persons standing trial in Article 15) is non-derogable. International Covenant on Civil and Political Rights, art. 4, ¶ 2, *opened for signature* Dec. 16, 1966, 999 U.N.T.S. 171. Both the American Convention on Human Rights and the European Convention on Human Rights echo these provisions regarding ex post facto prosecutions. *See* American Convention on Human Rights, arts. 9, 27, *opened for signature* Nov. 21, 1969, 1144 U.N.T.S. 123; European Convention on Human Rights, arts. 7, 15, Nov. 4, 1950, 213 U.N.T.S. 221. Further, the ICTY has stated that although its statute gives it the power to try persons for certain crimes, it will only permit prosecution for conduct proscribed by customary international law at the time of commission. *Prosecutor v. Blaskic*, Case No. IT-95-14-A, Judgment, ¶ 78 (July 29, 2004).

exist as a criminal offense under international law at the time of his alleged conduct, the commission violates Common Article 3 and lacks jurisdiction.[25]

Numerous other procedures in Petitioner bin al-Shibh's case further violate Common Article 3, and so divest the commission of jurisdiction. *See Hamdan*, 126 S. Ct. at 2803 (Kennedy, J. concurring) (noting that "the *Eisentrager* Court itself considered on the merits claims that 'procedural irregularities' under the 1929 Convention 'deprive[d] the Military Commission of jurisdiction'") (citation omitted).  All of the following violations of Common Article 3 also state violations of the Constitution's Due Process Clause.  For brevity's sake, Petitioner bin al-Shibh has not repeated the facts and legal claims in a separate section.  The MCA offends Common Article 3 by discriminating on the basis of national origin, affording an inferior procedure to aliens who fall within the jurisdiction of commissions.  The distinction between citizens and foreigners discussed above offends the principle of equality (a fundamental judicial guarantee in matters of criminal procedure), and it undermines any claim that military commissions are "regularly constituted courts."  The principle of parity and non-discrimination in criminal procedure is clearly set forth in paragraph 1 of Article 75 of Additional Protocol I.

The MCA provides disparate and inferior treatment in other areas.  For example, as explained more fully in the Amended Petition, the MCA shifts the burden with respect to the use of hearsay evidence, placing on the party opposing admission of the evidence the burden of showing its unreliability.  *See* 10 U.S.C. § 949a.  It also permits the use of evidence obtained through coercion, *see* 10 U.S.C. § 948r, a very serious violation of fundamental rights in this case where Petitioner was subjected to secret detention and interrogation practices.  *See* Amended Petition ¶¶ 36-46.  Among other things, Common Article 3 also prohibits "violence to life and person," ¶ 1(a), and "outrages upon personal dignity, in particular humiliating and

---

[25] Any contention that Common Article 3 provides no protection to Petitioner based upon MCA § 948b(g) ("No alien unlawful enemy combatant subject to trial by military commission under this chapter may invoke the Geneva Conventions as a source of rights") must be rejected for the plain reason that no one has determined that Petitioner is an alien *unlawful* enemy combatant.  To date, a CSRT has found Petitioner bin al-Shibh to be an "enemy combatant" only.  *See* Lachelier Decl. ¶ 27.

degrading treatment," ¶ 1(c).  Article 75 of Protocol I also bans "threats to commit any of the foregoing acts."

Finally, the MCA purports to strip from defendants the ability to assert defenses or invoke rights based on the Geneva Conventions.  *See* 10 U.S.C. § 948b(g).  One of the indispensable guarantees protected by Common Article 3 is the right to invoke law -- including Common Article 3 -- in one's defense in a judicial proceeding.  Similarly situated defendants in other American courts are not deprived of potential defenses or substantive rights based on the Geneva Conventions, which have the status of domestic law under the Supremacy Clause.  In addition, these rights may be separately enforced under a 1946 Treaty between the United States and Yemen.[26]

Because Petitioner bin al-Shibh has a strong likelihood of showing that the irregular procedures already implemented in commission proceedings violate Common Article 3 and due process of law, and so divest the commission of jurisdiction, this Court should issue a preliminary injunction.

### ix.    The MCA And The Military Commission Violate Petitioner's Sixth Amendment Right To Counsel

The MCA creates an unlawful system of legal "representation" that violates the Sixth Amendment right to counsel.  Petitioner bin al-Shibh has already been denied meaningful access to counsel, first in the unlawful CSRT process and now in the unlawful military commission process.  Although Petitioner bin al-Shibh has been held in the custody of the United States for several years, he was not provided with counsel until April 7, 2008, when military counsel was assigned to defend him.  *See* Lachelier Decl. ¶ 2.  By virtue of his detention in Guantanamo Bay,

---

[26] The treaty guarantees Petitioner the right to be "treated in accordance with the requirements and practices of generally recognized international law" and also guarantees "the fullest protection of the laws and authorities of the country" and that nationals "not be treated in any manner less favorable than the nationals of any third country."  Treaty No. 43, Art. 3, at  http://untreaty.un.org/unts/1_60000/1/2/00000096.pdf.  It explicitly extends to "all territory under the sovereignty *or* authority of either of the parties, except the Panama Canal Zone," thereby including Guantanamo Bay.  *See id*. Art. 6.

Petitioner's military counsel can only visit him after making a request fourteen (14) days in advance and arranging travel by military aircraft. Lachelier Decl. ¶ 11. Due to heightened security requirements based on Petitioner's status as a "high value" detainee, Petitioner may not communicate with his military counsel by mail or telephone. Lachelier Decl. ¶¶ 13, 14. Petitioner bin al-Shibh has attempted to communicate with his military counsel by mail but the letters were held at Guantanamo until they arrived to visit him three weeks later. Lachelier Decl. ¶ 16.

Additionally, neither of Petitioner's military counsel is qualified to try death-penalty cases under either the military system or any state. Lachelier Decl. ¶ 5. Under the MCA, Petitioner is entitled only to the counsel provided to him by the government, and any civilian counsel he is able to retain at no cost to the government. MCA § 949c(b). As Petitioner's government-provided counsel are not qualified to represent him, Petitioner is denied his Sixth Amendment right to qualified counsel.

While Petitioner bin al-Shibh has been afforded counsel, his counsel have been prevented from adequately representing him. Although Petitioner was first assigned military counsel on April 7, 2008, it was approximately two months later, on the evening before the June 5, 2008 arraignment, when Petitioner's counsel was first informed that Petitioner was receiving psychotropic medication, Lachelier Decl. ¶ 22, thereby rendering the preparations for his arraignment potentially inadequate and inappropriate. At the arraignment, Petitioner's counsel requested a continuance in light of the newly-discovered information regarding Petitioner's mental status, and asked the commission not to engage in any inquiry with Petitioner at that time, to give the defense an opportunity to get more information regarding Petitioner's mental health. Lachelier Decl. ¶ 24. The Military Judge initially denied that request, Lachelier Decl. ¶

24, but upon engaging in an inquiry with Petitioner, the judge ultimately determined that the defense should be given more time to gain information regarding Petitioner's medical status and make any appropriate motions, Lachelier Decl. ¶ 25.  Petitioner's commissions counsel then filed a continuance request, the details of which are largely classified.  *See* C.M.C.R. Order on Motions for Special Relief, Exhibit B, ¶ 4.  The request identified commissions counsels' observations of Petitioner's behavior and knowledge of his experiences in U.S. custody.  The request for continuance was granted, and the judge, *sua sponte*, ordered that a competency evaluation be conducted.  *See* C.M.C.R. Order on Motions for Special Relief, Exhibit B, ¶ 15.  Under commission rules, that competency evaluation will be conducted by medical personnel selected by the government, and will address very limited questions.  *See United States v. Mohammed et al.*, (C.M.C.R. July 1, 2008) (Order on Inquiry into the Medical Capacity or Mental Responsibility of the Accused), attached hereto as Exhibit C.

Concurrently, commissions counsel have made a request to the Convening Authority (the body responsible for funding expert requests and other administrative matters having to do with the commissions) for the funding of an independent expert.  That request is still pending with the Convening Authority; should it be denied, commissions counsel would then have to file a motion challenging that denial before the Military Judge.  Petitioner's commissions counsel have sought his medical records; the government has yet to produce those records.  Meanwhile, the Military Judge scheduled a competency hearing for August 15, 2008.  *See* C.M.C.R. Order on Motions for Special Relief, Exhibit B, ¶ 15.  However, Petitioner's counsel believe he is being medicated involuntarily.  Lachelier Decl. ¶ 23.

In sum, the extremely limited nature of Petitioner's military counsel's access to information regarding Petitioner's case, as well as the inflexibility of the commissions process in

accommodating the opportunity to have an independent medical examiner evaluate the competency of Petitioner, demonstrates even more forcefully the inadequacy of the procedures afforded to Petitioner and the military commission's unconstitutionality.

### a.  An Injunction Will Cause No Harm To Respondents

Simply put, enjoining military commission proceedings against Petitioner until such time as the Court has the opportunity to rule on the Amended Petitioner will cause no harm to Respondents.  First, an injunction is appropriate to preserve the status quo.  *United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969).  At this time, although he has appeared in a preliminary hearing, Petitioner has not been tried by the unlawful military commissions.  Enjoining further proceedings now will preserve the relative positions of the parties and ensure that neither party is prejudiced by any conduct prior to the Court's resolution of the Amended Petition.  Petitioner has been held by the United States for six years.  Respondents initially held Petitioner unlawfully, far from the United States, and tortured him.  After approximately three years of unlawful, secret detention, Petitioners was transferred to different unlawful detention at Guantanamo Bay.  The only possible harm an injunction could cause Respondents would be the missed opportunity to try Petitioner in an unlawful military commission.  That sort of harm should not be countenanced by the Court, particularly where the risk of irreparable harm to Petitioner is so great.

### b.  The Public Interest Will Be Served By An Injunction

The public interest will be served by a short delay of the military commission proceedings while this Court determines the constitutionality of the commission process.  The public has no interest in seeing Petitioner tried by an unconstitutional system.  To the contrary,

40

an injunction will serve the public interest in several ways.  First, a stay will increase judicial economy and military efficiency by avoiding the need for a second set of trials if this Court ultimately rules the commissions unlawful.  Second, a failure to resolve the legality of Petitioner's trial before it begins will create inefficiencies during trial, as neither the parties nor the judge will be able to resolve motions with any certainty.

Third, trying Petitioner before an unconstitutional commission at the same time that his *habeas* petition challenging his detention is under consideration before this Court would cause considerable confusion, judicial inefficiency, and uncertainty for all parties involved. Most seriously, the two proceedings could reach conflicting results.  Using unfair and untested procedures and standards, the military commission might convict Petitioner and sentence him to lengthy continued detention or even death.  At the same time, the federal *habeas* court might conclude that Petitioner is not an enemy combatant and therefore cannot be detained in Guantanamo, or that Petitioner is a lawful combatant entitled to the full panoply of protections afforded to prisoners of war, including the right not to be tried.

Even if the ultimate outcomes of the two proceedings are not in conflict, interim procedural decisions and rulings -- on, for example, the admissibility of evidence, access to witnesses, ability to review classified evidence, and attorney-client relations -- might well conflict with each other.  For example, the commission could deny Petitioner the ability to call certain witnesses whereas this Court, in a *habeas* proceeding to determine the legality of Petitioner's detention, could grant such access.  The likelihood of such confusion between different tribunals and branches is not in the public interest.

Finally, trying Petitioner bin al-Shibh under a dubious regime whose very legality has been called into question by the Supreme Court would reduce the legitimacy of the proceedings

41

in this country and in the eyes of the world.  The rule of law requires that a criminal defendant

know, in advance, the charges for which he may be tried and the procedures that will be used to

try him.  The issues at stake in Petitioner's case are foundational to our Constitution as well as

the laws of war.  Petitioner is alleged to have committed very serious crimes which haunt the

American public years after they were committed.  It is in the public interest that if anyone is to

be tried for those crimes, he be tried in accordance with our laws and the laws of the

international community.  Anything less would disparage the memories of the victims, many of

whom dedicated their lives to upholding the rule of law.

As explained above, Petitioner will be irreparably harmed by being forced to undergo an

unconstitutional trial -- a harm that cannot be remedied by post-conviction review.  It is the duty

of the courts to say "what the law is."  *Boumediene*, 128 S. Ct. at 2259 (quoting *Marbury v.

Madison*, 1 Cranch 137, 177 (1803)).  It is in the public interest for this Court to do so in

advance of Petitioner's trial by procedures which violate the supreme law of the land.

## CONCLUSION

For these and any other reasons the Court may find just and proper, the Court should

enjoin Respondents from prosecuting Petitioner by military commission created pursuant to the

Military Commissions Act or any law or regulation other than a proceeding pursuant to the

Uniform Code of Military Justice or Title 18 of the United States Code.


Dated:     July 11, 2008
           Newark, New Jersey

                                        Respectfully submitted,


                                        ____/s/Candace Hom_____
                                        Richard Coughlin
                                        Federal Public Defender

Chester M. Keller
First Assistant Federal Public Defender
Candace Hom
Assistant Federal Public Defender

Office of the Federal Public Defender
972 Broad Street, Fourth Floor
Newark, New Jersey  07102
(973) 645-6347

*Counsel for Petitioner*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **RAMZI BIN AL-SHIBH**, | : | |
| | : | |
| *Petitioner*; | : | CIVIL NO. 06-CV-1725 (EGS) |
| | : | |
| v. | : | |
| | : | |
| **GEORGE W. BUSH**, *et al.*, | : | |
| | : | |
| *Respondents*. | : | |

## DECLARATION

I, Suzanne M. Lachelier, CDR, JAGC, USN, affirm that the following facts are true to the best of my knowledge and belief:

1.      I am over the age of eighteen.  I am an attorney licensed to practice in the States of California and Virginia.  I am admitted to practice before the Southern and Central Districts of California, the Ninth Circuit Court of Appeals, the U.S. Supreme Court.  I am a Commander in the United States Navy Judge Advocate General's Corps, and in that capacity I am admitted to practice before all military courts.

2.      On April 7, 2008, I was detailed to represent Mr. Ramzi bin al Shibh before the military commissions convened at Guantanamo Bay, Cuba.

3.      On April 10, 2008, my co-counsel, LT Richard E.N. Federico, was detailed as co-counsel to represent Mr. bin al Shibh.

4.      LT Federico and I are assigned to the Office of the Chief Defense Counsel of the Military Commissions, and we are stationed in Washington, DC.

5.      Neither LT Federico or I have represented any defendant in a death penalty case before a military court, or any state or federal court.

6.      On information and belief, Mr. bin al Shibh was seized in Pakistan, by the Pakistani Inter-Services Intelligence (ISI), on September 11, 2002.

7.      At some point, the United States gained custody of Mr. bin al Shibh and held him in custody at various locations that the United States government deems classified.

8.      Since September 2006, Mr. bin al Shibh has been held in custody at the Joint Task Force Guantanamo (JTF-GTMO) detention facility, located aboard U.S. Naval Station, Guantanamo Bay.

9.      A Combatant Status Review Tribunal (CSRT) was convened at Naval Station Guantanamo Bay on February 22, 2007, to determine whether Mr. bin al Shibh is an enemy combatant.  On March 9, 2007,  the CSRT identified Mr. bin al Shibh as an enemy combatant.

10.     The report issued by the National Commission on Terrorist Attacks Upon the United States Report (also known as the 9/11 Commission Report) indicates that, during the years he has been in custody, Mr. bin al Shibh was interrogated repeatedly by agents of the United States.  Mr. bin al Shibh was not assigned counsel during this period.

11.     In order to visit Mr. bin al Shibh, I must contact JTF-GTMO's Staff Judge Advocate office 14 days in advance of any meeting, to request an appointment with him.

12.     While the 14-day requirement is sometimes waived, if any such waiver is sought, it must be separately justified, in writing.

13.     Mr. bin al Shibh has been designated a 'high value' detainee ("HVD").  As such, all communications from him are classified TOP SECRET // SCI (TS // SCI).

14.     Because of this classification, Mr. bin al Shibh, my co-counsel and I cannot communicate by telephone or U.S. mail.  In order to speak with Mr. bin al Shibh, therefore, we must travel to JTF-GTMO.  This travel most often takes one full day in each direction.

15.     JTF-GTMO permits only two HVDs to meet with their attorneys in the morning, and two in the afternoon.  There are, therefore, a total of only four appointment times per day for all HVDs in the custody of JTF-GTMO.  There are currently seven HVDs facing charges before the military commissions.  Military counsel representing HVD clients in military commissions cases, even those representing clients in capital cases such as Mr. bin al Shibh's, do not get priority over habeas counsel in reserving these limited appointment times.

16      Mr. bin al Shibh has written letters to me, but due to the restrictions on mailing correspondence from HVDs, I was not able to read the letters until I returned to Guantanamo, two and three weeks after he originally sent each of the letters.  Mr. bin al Shibh has not, since then, attempted to correspond in writing with me or my co-counsel.

17.     The classification of communications from Mr. bin al Shibh includes notes I and co-counsel take when meeting with Mr. bin al Shibh.

18.     Notes taken during any meeting must be scanned on a classified scanner, onto a classified computer network, located in a specially designated facility where TS // SCI materials may be handled.  Once on the network, documents may then be retrieved in our Washington, DC area office.  They may only be retained and read in a specially designated facility there as well.

19.    This classified network for transferring notes was not put in place until late June 2008, after Mr. bin al Shibh's arraignment. Until then, our notes following any meeting with Mr. bin al Shibh remained in a safe in Guantanamo, and we were unable to refer to them, except when in Guantanamo.

20.    On April 16, 2008, charges against Mr. bin al Shibh were referred to the military commissions. He is charged, under the 2006 Military Commissions Act, with Conspiracy; Attacking Civilians; Attacking Civilian Objects; Intentionally Causing Serious Bodily Injury; Murder in Violation of the Law of War; Destruction of Property in Violation of the Law of War; Hijacking or Hazarding a Vessel or Aircraft; Terrorism; and Providing Material Support for Terrorism. The maximum penalty is death.

21.    On or about May 21, 2008, the Military Judge scheduled an arraignment for June 5, 2008. I sought a continuance of this arraignment, in order to permit more time to meet with Mr. bin al Shibh to discuss his case, options regarding counsel, and to ensure that all the classified systems necessary in this system were in place. This motion for a continuance was denied.

22.    On the evening of June 4, 2008, I was informed by the prosecution and court security personnel that Mr. bin al Shibh would be chained at his feet during the arraignment. I was told that a military psychiatrist had indicated this precaution was necessary because Mr. bin al Shibh was being administered psychotropic medication. The identity of the medication was not then provided to me.

23.    It is my belief that Mr. bin al Shibh is not voluntarily taking the medication.

24.    On June 5, 2008, at the arraignment, I moved for a continuance of the arraignment, asking MJ not to engage in a colloquy with Mr. bin al Shibh regarding counsel rights. I asked that I be given time to inquire into the medication that was being administered to him. This oral motion for a continuance also was denied.

25.    After attempt to engage in a colloquy with Mr. bin al Shibh, the military judge ultimately interrupted his own colloquy, and authorized the defense some time to obtain more information regarding his medical status, and make any appropriate motions.

26.    Approximately three weeks after the arraignment, the government provided me with a list of five medications that were being prescribed to Mr. bin al Shibh on the date of his arraignment. My research and discussions with a mental health expert reveal that one of these medications is used to treat schizophrenia. Another is used to regulate thyroid functioning.

27.    On behalf of Mr. bin al Shibh, I have filed two motions to dismiss for lack of personal jurisdiction. One motion seeks dismissal of his commission case based on the fact that he has not been designated an unlawful enemy combatant. The other motion seeks dismissal of the case, arguing that the government's outrageous conduct in seizing

Mr. bin al Shibh deprives the court of jurisdiction.  The facts underlying the latter motion are classified TS // SCI.  Resolution of these motions is pending with the commission.

28.     On June 10 , 2008, at an in camera conference, when I requested that JTF-GTMO notify the military judge if Mr. bin al Shibh should refuse to attend a court session, the military judge declined to order that notification; he expressed his belief that JTF-GTMO and the prosecution are "one government."


Date: 11 July, 2008             _____/s/_____
                                SUZANNE M. LACHELIER
                                CDR, JAGC, USN
                                Detailed Defense Counsel for Mr. Ramzi bin al Shibh

UNITED STATES                    )
                                 )          ORDER
       V.                        )
                                 )   MOTIONS FOR SPECIAL RELIEF
KHALID SHEIKH MOHAMMED;          )        D-010 AND D-011
WALID MUHAMMAD SALIH             )
       MUBARAK BIN 'ATTASH;      )
RAMZI BIN AL SHIBH;              )
ALI ABDUL AZIZ ALI;              )          1 JULY 2008
MUSTAFA AHMED AL HAWSAWI )


1. The Commission has considered the motion for special relief submitted by the Detailed Counsel for Mr. Bin al Shibh (D-010), the Government response thereto and the Defense reply.

2. The Commission has also considered the joint motion for special relief (D-011) submitted at the request of Mr. Sheikh Mohammed and Mr. Bin Attash, and Detailed Defense Counsel for Mr. Bin al Shibh and Mr. al Hawsawi, and the Government response thereto.

3. Standby Defense Counsel for Mr. Ali also seeks to join in the motion in D-011 on behalf of Mr. Ali. The Commission notes that in the motion and a separate email, dated 23 June 2008, Standby Defense Counsel for Mr. Ali indicates that Mr. Ali has indicated his desire to withdraw his *pro se* representation request and proceed with representation by the Detailed Military Defense Counsel. Standby Defense Counsel also indicates, however, that "The Defense fully expects that Mr. al Baluchi (Mr. Ali) may seek to proceed *pro se* while in the courtroom and in the presence of three of the defendants. The Defense further expects that Mr. al Baluchi (Mr. Ali) will move between proceeding *pro se* and with representation throughout the trial." (Name of accused as reflected on the charge sheet added)

       a. Although Mr. Ali would clearly be permitted to withdraw from his *pro se* status, this matter will need to be clarified in court, and with the understanding that he will not be permitted to change back and forth between represented and *pro se* status. Until such time that Mr. Ali clearly withdraws from his *pro se* status, Detailed Military Defense Counsel will continue to operate only the status of Standby Defense Counsel.

       b. Accordingly, since Standby Defense Counsel makes no representation that his joining in the motion in D-011 is with the consent of Mr. Ali, Mr. Ali will not be viewed as being a part of the joint motion.

c. While there may be little or no practical consequence to this distinction, the Commission finds the distinction worthy of note so that all parties remain clear on status of counsel.

4. On 13 June 2008, in D-010, Mr. Bin al Shibh sought an enlargement of time as to the 13 June 2008 ordered deadline to file pleadings with regard to the issue raised by Detailed Defense Counsel concerning Mr. Bin al Shibh's competence to make a *pro se* representation election. In that same motion Mr. Bin al Shibh also requested a continuance of the hearing scheduled for this matter on 10 July 2008. (The motion also requests modification of all other ordered litigation milestones in this case.) In its response to D-010 the Government did not oppose "a reasonable extension of time for the Defense to file a motion on the issue of the accused's competency" but did oppose a modification that would delay the 10 July 2008 hearing date with regard to this matter.

5. In D-010 the Defense proffers several different bases for the requested relief. Only one requires discussion with regard to the resolution of this issue. In support of its motion the Defense claims that "the government has not provided discovery to the defense that is germane to this issue." In its response, the Government essentially concedes the crux of the Defense claim with regard to the status of the discovery issue. As of the date of the Government response (23 June 2008), the Government states that "The Prosecution will soon provide the medical records of the accused" to the Defense. The Government goes on to describe various efforts that are underway with regard to the discovery process and further identifies a number of areas of potential dispute between the Government and the Defense with regard to discovery. The Commission notes that an order was issued on 25 June 2008 directing the Commander, Joint Task Force–Guantanamo Bay, Cuba, to provide "any and all medical records...related to" Mr. Bin al Shibh to the Prosecution for release to Detailed Defense Counsel. Resolution of the discovery issues is beyond the scope of the Commission's consideration of this motion. It is clear however, that the discovery process in this case has not matured to the point where Defense may reasonably be expected to competently litigate the issue in question with regard to Mr. Bin al Shibh.

6. While the Commission will grant a continuance of the trial schedule concerning the mental capacity motion raised by Detailed Defense Counsel for Mr. Bin al Shibh, additional action is also required to move that issue toward resolution. RMC 909 governs the issue of capacity of an accused to stand trial by Military Commission. After referral of charges, the military judge may conduct a hearing to determine the mental capacity of an accused, either *sua sponte* or upon request of either party. RMC 909 contemplates that the results of an inquiry pursuant to RMC 706 is reasonably a part of the hearing conducted by the Military Judge. Accordingly, based on the matters addressed in D-010, the Commission has determined that an order directing an inquiry into the mental capacity of Mr. Bin al Shibh in accordance with RMC 706 is appropriate. An order to that effect will be issued concurrent with this ruling. The due date and hearing date of the Defense motion in this regard will be established in anticipation of the completion of that process.

7. With regard to the discovery matters noted by the Defense, it appears that while the Government is seeking to comply with portions of the Defense discovery request, the Government is also taking the position that the Defense request is too both too broad, as it pertains to this issue, and premature, because if the accused is granted *pro se* status Mr. Bin al Shibh might "take an entirely different approach to pre-trial discovery" and thereby presumably not request similar discovery on his own behalf. While the Commission reserves judgment on the viability of the Government suggestion, it is clear that, absent resolution of the discovery aspect of this matter between the parties, an additional hearing will be required following a proper and specific discovery motion by the Defense and a full response by the Government. Neither the Defense discovery request nor the references to discovery concerns in this motion constitute a discovery motion that places the matter properly before the Commission for resolution.

8. In D-011 the Defense requests a continuance in the form of modification of the entire litigation schedule. This request is premised on a number of bases, to include: the incomplete status of the discovery process; the volume of discovery provided thus far; the limited ability of counsel to meet with the represented accused and similarly limited ability of standby counsel and RMC 506(d) personnel (non counsel advisors) to meet with the *pro se* accused; the logistic challenges associated with the handling of classified material; the complexity of the case; the capital nature of the case; and the *pro se* status of several accused. In its response, the Government agrees that some adjustment of the established litigation schedule might be appropriate, but urges a shorter delay than requested by the Defense.

9. If operated properly, the Military Commission process should provide a workable trial system that can deal with the complex dynamics of a world wide theater of military operations. While this process might differ in some regards from trial procedures in other courts, its design does not contemplate a truncated process of justice. In this regard, some aspects of the litigation process might reasonably take longer than would be expected in other trial systems. In the Commission's view, the investment of a reasonable amount of additional time at this stage of the proceedings is a prudent course of action that will contribute greatly toward achievement of a just result, and not simply a conclusion of the process one way or the other.

10. While the Commission generally concurs in the appropriateness of granting the Defense requests for enlargement of time and continuance, the Government has also correctly identified a number of matters that can and should be addressed during the currently scheduled session. Accordingly, a number of modifications will be made to the previously ordered litigation schedule.

11. At the sessions, now scheduled to begin on 9 July 2008, the Commission intends to address the issue of what role, if any, perceived or actual intimidation between the several accused played or is playing in the *pro se* elections requested by the several accused. Concerns about this matter were expressly raised by the comments made by Major Jackson during the last session of the Commission and impliedly by the email sent by LCDR Mizer (via LN1 Lindee) concerning "Notification of Acceptance of Counsel"

dated Monday 6/23/2008 1:50 PM. The Commission intends to discuss this matter with each of the accused on the record and in five separate sessions where each of the accused will appear outside the presence of the other accused.

12. In order to facilitate this process, the following schedule is provided:

      1330 9 July 2008:   Hearing with Mr. Al Hawasawi
      1630 9 July 2008:   Hearing with Mr. Ali
      0830 10 July 2008: Hearing with Mr. Bin Al Shibh
      1330 10 July 2008: Hearing with Mr. Bin Attash
      1600 10 July 2008: Hearing with Mr. Sheikh Mohammed
      0830 11 July 2008: Hearing with all accused if necessary

13. As part of the inquiry as described in paragraph 11, the Commission also intends to discuss the provisions of RMC 906(b)(7) concerning severance of charges in the event it appears that an accused or the Government is prejudiced by a joint or common trial.

14. With regard to the matter of severance, the Government is directed to prepare a brief addressing the Government's position on severance of the proceedings for one or more or all of the accused. This brief will be due to the Commission and opposing counsel and the *pro se* parties not later than 18 July 2008. If any accused wishes to provide a response to the Government brief, it shall be submitted not later than 25 July 2008. If any accused wishes to file a separate brief on the issue of severance which is not a response to the directed Government brief, it may do so. Such brief, if filed, will be due not late than 25 July 2008.

15. The following revised trial schedule is ordered in response to the continuance requests by the Defense. Pursuant to RMC 707, the Commission finds that these delays serve the interest of justice, and outweigh the interest of the public and the parties in abiding by the originally ordered litigation schedule. The Commission further finds that all delay associated with this modification is the responsibility of the Defense for the purposes of RMC 707 accountability.

    a.   18 July 2008: Brief regarding the severance issue due from the Government.

    b.   25 July 2008: Due date if any accused wishes to file a separate motion on the issue of severance which is not a response to the directed Government brief.

    c.   30 July 2008: Production completion date for all required and agreed upon requested discovery.

    d.   01 August 2008: Initial RMC 706 report due from the board to the Military Commissions Trial Judiciary Staff, trial counsel and the defense counsel for Mr. Bin al Shibh.

e.    08 August 2008: Full RMC 706 report due to the defense counsel for Mr. Bin al Shibh.

f.    14 August 2008: Severance Motion hearing in GTMO if necessary.

g.    15 August 2008: RMC 909 competency hearing with regard to Mr. Bin al Shibh.

h.    29 August 2008: Law Motions due to the military judge and opposing counsel and other *pro se* parties. In general, law motions are those which require no evidentiary hearing to determine. If any counsel/*pro se* party intends to submit more than ten (10) law motions, that counsel/*pro se* party will tell the military judge and opposing counsel/other *pro se* parties the total number of law motions which counsel intend to present NLT 1200 hours, 27 August. The military judge will advise counsel/other *pro se* parties of a revised schedule to present the motions.

*Note 1: Motions will have as their underlying legal premise no more than one legal basis. If there is more than one legal basis, then there should be more than one motion. Law motions include motions relative to sentencing.*

*Note 2: Motions, response, and reply due dates are a No Later Than date. Counsel for both sides are advised that any motion, response, or reply which is ready for submission prior to the due date should be submitted when completed. The efficient and proper process of motion practice will NOT be enhanced by delivering multiple motions, responses, or replies to the Commission or opposing party at the last possible moment.*

i.    10 September 2008: Discovery Motions Due

j.    24 September 2008 : Hearing on Law and Discovery Motions in GTMO

k.    TBD: Evidentiary Motions. Evidentiary motions due to the military judge and opposing counsel/other *pro se* parties. In general, evidentiary motions are those which deal with the admission or exclusion of specific or general items or classes of evidence.

*Note 1: See Notes 1 and 2 above.*

*Note 2: Defense witness requests associated with any motions should be submitted to the trial counsel in accordance with R.M.C. 703 simultaneously with the filing of the motion (or Defense response in the case of a Government motion) in question. The Government response to any witness request will be due within five days of the submission of the request. Any Defense motion for production of witnesses in conjunction with a motion will be due to the court and opposing counsel within five days of receipt of a denied witness request.*

5

l.    TBD:  Hearing in GTMO re Evidentiary Motions.

m.    TBD:  Submission of requested group voir dire questions for the Military Commission Members.

> *Note: The military judge intends to conduct all group voir dire questioning of the members per R.M.C. 912. The military judge's group voir dire will take counsel's requested questions into account as appropriate. The military judge will also conduct the initial follow-up individual voir dire based on responses to the group questions. Counsel will be permitted to conduct additional follow-up voir dire.*

n.    TBD:  Defense Requests for Government Assistance in Obtaining Witnesses for use on the merits. See R.M.C. 703.

> *Note: The Government response to any witness request will be due within five days of the submission of the request. Any Defense motion for production of witnesses in conjunction with a motion will be due to the court and opposing counsel within five days of receipt of a denied witness request.*

o.    TBD:  Hearing re Witness Production Motions and any unresolved matters.

p.    TBD:  Assembly and Voir Dire for Panel Members.

q.    TBD:  Beginning of trial on the merits.

r.    Counsel should direct their attention to the Rules of Court, RC 3, Motions Practice, and specifically Form 3-1, 3-2, and 3-3, for the procedures the Commission has established for this trial. All motions, responses and replies shall comport with the terms of RC 3.6 in terms of timeliness. Any request for extension of any response or reply deadline associated with this hearing will be submitted before the deadline for the reply or response.

s.    Requests for deviations from the timelines for hearings or for submission of motions established by this order must be submitted not later than 20 days prior to the date established, except for law motions for which requests for deviations from the due date must be submitted within 7 days prior to the date established.

Ordered this 1st day of July 2008:

Ralph H. Kohlmann
Colonel, United States Marine Corps
Military Judge

| | | |
|---|---|---|
| UNITED STATES | ) | |
| | ) | ORDER |
| V. | ) | |
| | ) | INQUIRY INTO THE MENTAL |
| KHALID SHEIKH MOHAMMED; | ) | CAPACITY OR MENTAL |
| WALID MUHAMMAD SALIH | ) | RESPONSIBILITY OF THE ACCUSED |
| MUBARAK BIN 'ATTASH; | ) | |
| RAMZI BIN AL SHIBH; | ) | |
| ALI ABDUL AZIZ ALI; | ) | 1 JULY 2008 |
| MUSTAFA AHMED AL HAWSAWI | ) | |

1. The Military Judge orders that an inquiry into the mental capacity of Ramzi Bin Al Shibh be conducted in accordance with Rule for Military Commission 706.

2. The Board shall consist of two or more persons who are physicians or clinical psychologists. At least one member of the Board shall be either a psychiatrist or a clinical psychologist. If an Arabic speaking physician or clinical psychologist is reasonably available so that the schedule set forth in paragraph 5 below may be met, he or she will be appointed to the board. Unless an Arabic speaking physician or clinical psychologist is appointed, an Arabic speaking interpreter will be designated by the government to assist the board in its inquiry. Unless ordered by this Commission, this interpreter may not disclose anything learned during the inquiry, except to defense counsel (CDR Suzanne Lachelier, JAGC, USNR and/or LT. Richard Federico, JAGC, USN). The defense may choose to have its assigned interpreter present when the accused is examined.

3. The Board in its evaluation shall make separate and distinct findings as to each of the following questions:

   (A) Is the accused presently suffering from a mental disease or defect? If so, what is the clinical psychiatric diagnosis?

   (B) Does the accused have the present ability to consult with his lawyers with a reasonable degree of cognitive understanding and does he have a rational as well as a factual understanding of the proceedings against him. If so, does the accused have sufficient mental capacity to understand the nature of the proceedings against him (trial by commission) and to conduct or cooperate intelligently in the defense?

4. The basis for ordering this inquiry is a representation by the Detailed Defense Counsel that the accused is under the influence of and/or has been damaged by the forced use of psychotropic medication. Examinations and tests shall be conducted, if appropriate and required, to answer the questions set forth in paragraph 3 above. A thorough review of available medical records of the accused shall also be conducted.

5. Compliance with this order shall be as expeditiously as possible consistent with a medically competent and thorough examination to answer the specified questions.

   a. Not later than 1 August 2008, the Board shall prepare a summarized report consisting of only the Board's ultimate conclusions as to all questions specified in paragraph 3. This report will be prepared in three copies. The Military Commissions Trial

Trial Judiciary Staff, trial counsel and the defense counsel will be telephonically notified when this report is ready for pick-up. At the option of the officer responsible for the summarized report, it may be faxed or e-mailed to the Military Commissions Trial Judiciary Staff, trial counsel and the defense counsel.

b. Not later than 8 August 2008, the Board shall prepare its full report. This report shall be placed into a sealed envelope and provided to CDR Suzanne Lachelier, JAGC, USNR and/or LT Richard Federico, JAGC, USN only. The full report will NOT be faxed or e-mailed unless specifically requested by CDR Suzanne Lachelier, JAGC, USNR and/or LT Richard Federico, JAGC, USN.

6. Under no circumstances will the full report, matters considered by the Board during it's inquiry, or any statements made by the accused to the board (or evidence derived there from) be disclosed to anyone other than Cdr. Suzanne Lachelier, JAGC, USNR and/or Lt. Richard Federico, JAGC, USN, without express, written authorization from the military judge or the defense counsel.

7. Telephone numbers: Military Commissions Trial Judiciary Staff: 703.607.0621. Mr. Robert Swann, Trial Counsel: 703.602.4185, ext 178; and CDR. Suzanne Lachelier, JAGC, USNR or LT. Richard Federico, JAGC, USN, Defense Counsel: 703.588.0439.

Ordered this 1st day of July 2008:

Ralph Kohlmann
Colonel, United States Marine Corps
Military Judge

Encl:
Charge Sheet

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **RAMZI BIN AL-SHIBH**, | : | |
| | : | |
| *Petitioner*; | : | CIVIL NO. 06-CV-1725 (EGS) |
| | : | |
| v. | : | |
| | : | [PROPOSED] ORDER |
| **GEORGE W. BUSH**, *et al.*, | : | |
| | : | |
| *Respondents.* | : | |

THIS MATTER having come before the Court upon Petitioner's Motion to Enjoin Military Commission Proceedings; and the Court having considered the accompanying Memorandum of Points and Authorities in Support of Petitioner's Motion to Enjoin Military Commissions Proceedings, and Respondents' submissions; and for good cause shown,

IT IS on this _____ day of _____, 2008, hereby

ORDERED that Respondents, their agents, servants, employees, confederates, and any persons acting in concert or participation with them, or having knowledge of this Order by personal service or otherwise, are ENJOINED from prosecuting Petitioner, in any manner, including but not limited to holding any formal proceeding, by military commission created pursuant to the Military Commissions Act of 2006, 10 U.S.C. § 948a et seq. or any law, regulation or pronouncement other than proceedings under the Uniform Code of Military Justice or Title 18 of the United States Code.

_____
HONORABLE EMMET G. SULLIVAN
UNITED STATES DISTRICT JUDGE

# CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2008, I filed and served the foregoing Petitioner Ramzi bin al-Shibh's **Motion to Enjoin Military Commission Proceedings** by causing the original and six copies to be delivered to the Court Security Officer via Federal Express, with the original and four copies to be forwarded to the Court, and one copy to be conformed and returned to our office.

I further certify that upon receiving clearance from the Court Security Officer, one copy will be forwarded to the following counsel of record via U.S. mail:

Terry Henry
Andrew Warden
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, D.C.  20530


        /s/Candace Hom
        Candace Hom